UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA,

                                 **MEMORANDUM AND ORDER**

    -against-                        13-CR-149 (KAM)


PAUL RIVERA,
MICHAEL GARRETT,

                           Defendants.   X
-----------------------------------
**MATSUMOTO, United States District Judge:**

        In a third Superseding Indictment, defendants Michael
Garrett ("Mr. Garrett") and Paul Rivera ("Mr. Rivera")
(collectively, "defendants") are charged with racketeering
(Count I), racketeering conspiracy (Count II), interstate
prostitution (Count III), conspiracy to engage in sex
trafficking and sex trafficking of children (Count IV), sex
trafficking and sex trafficking of children (Count V),
conspiracy to distribute and possess with intent to distribute
heroin, cocaine base, cocaine and marijuana (Count VI),
possession with intent to distribute heroin and cocaine (Count
VII), conspiracy to commit murder in-aid-of racketeering (Count
IX), murder in-aid-of racketeering (Count X), murder while
engaged in a narcotics trafficking offense (Count XI), using,
carrying and possessing a firearm (Count XIV), and causing death
through use of a firearm (Count XV). (Superseding Indictment (S-
3) ("Indictment"), ECF No. 94.) Mr. Garrett also is charged with

money laundering (Count VIII), and Mr. Rivera is charged with witness tampering (Count XII) and attempted obstruction of justice (Count XIII). (*Id.*)

These charges arise from the defendants' alleged involvement in a group known as "Together Forever" or "TF Mafia" that operated in the neighborhood of Brownsville in Brooklyn, New York as well as in Scranton, Pennsylvania. (*Id.* at 2.) The indictment alleges that defendants were both leaders of TF Mafia. (*Id.*)

After Mr. Rivera was stopped on January 18, 2012 by the Pennsylvania State Police ("PSP") and a police search of the vehicle yielded quantities of cocaine and heroin (*see* Gov.'s Memo. of Law in Resp. to Defs. Paul Rivera and Michael Garrett's Mots. to Suppress and Garrett's Initial Pre-Trial Mots. ("Opp.") filed 7/8/14, ECF No. 117, at 3-4; Compl. filed 2/5/13, ECF No. 1), Mr. Rivera was charged with several felony violations of Pennsylvania law and was incarcerated in Pennsylvania pending trial. (Opp. at 4.) The defendants thereafter came to the attention of the Federal Bureau of Investigation ("FBI"). (Opp. at 3.) On February 5, 2013, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge for the Eastern District of New York, issued an arrest warrant for Mr. Rivera based on a complaint charging him with conspiracy to distribute one or more controlled substances in violation of 21 U.S.C. § 846. (Compl.)

Mr. Rivera was subsequently removed to federal custody. On March 11, 2013, a federal grand jury returned an indictment charging Mr. Rivera with conspiring to distribute one or more controlled substances in violation of 21 U.S.C. § 846. (Indictment as to Paul Rivera filed 3/11/2013, ECF No. 11.)

On June 24, 2013, defendants were charged together in a superseding indictment alleging a conspiracy to distribute one or more controlled substances and possession of cocaine and heroin with the intent to distribute. (Superseding Indictment filed 6/24/13, ECF No. 31.) On October 7, 2013, the grand jury returned a second superseding indictment that brought numerous charges against defendants, including racketeering conspiracy and racketeering, with specified predicate acts of narcotics trafficking, sex trafficking, money laundering, witness tampering, and murder. (Superseding Indictment (S-2) filed 10/7/13, ECF No. 62.) On April 28, 2014, the grand jury returned the current third superseding indictment (S-3).

Presently before the court are the following pre-trial motions filed by defendants.

**Mr. Garrett's Motions**

Mr. Garrett moves to (a) suppress physical evidence recovered from a September 1, 2010 car stop, (b) suppress Mr. Garrett's post-arrest statements after his arrest in this case on June 12, 2013, (c) direct the to government disclose all

3

evidence favorable to Mr. Garrett pursuant to *Brady v. Maryland*
373 U.S. 83 (1963), (d) direct the government to disclose any
prior bad acts or criminal convictions that the government
intends to use at trial pursuant to Federal Rule of Criminal
Procedure 404(b), (e) grant Mr. Garrett's request for a bill of
particulars, (f) permit Mr. Garrett to bring further motions
upon the basis of any newly discovered information, and (g)
permit Mr. Garrett to join in the motions of his co-defendant as
appropriate. (Memo. of Law in Support of Def.'s Pretrial Mots.
("Garrett Mots.") filed 6/9/14, ECF No. 110.)

**Mr. Rivera's Motions**

Mr. Rivera moves to (a) suppress physical evidence
recovered pursuant to a search of a vehicle search on January
18, 2012, and (b) suppress Mr. Rivera's statements made to the
government during a proffer session dated August 30, 2012.
(Rivera Mots. filed 6/10/14, ECF No. 113.)

## DISCUSSION

**I. Mr. Garrett's Motions**

### A. Motion to Suppress Physical Evidence from Mr. Garrett's September 1, 2010 Car Stop and Arrest

Mr. Garrett moves to suppress evidence seized from his
car when he was stopped on September 1, 2010 by a New Jersey
State Police ("NJSP") trooper for alleged traffic violations on
the grounds that the stop was without probable cause, and the

search that yielded the contraband was unlawful, because it was
conducted without Mr. Garrett's consent and without probable
cause. (*See* Garrett Mots. at 1-2.) The government argues that
the stop of Mr. Garrett's vehicle was based on probable cause,
because Mr. Garrett violated New Jersey traffic laws, the
subsequent search of a package found in the trunk of the Garrett
Vehicle was lawful, because Mr. Garrett lacked standing to
challenge it, the search was supported by probable cause, and
the contraband inevitably would have been discovered. (*See* Opp.
at 46-51.)

On September 8, 2014, September 9, 2014, and October
29, 2014, the court held an evidentiary hearing addressing Mr.
Garrett's and Mr. Rivera's motions to suppress evidence.
Regarding Mr. Garrett's September 1, 2010 car stop, the
government presented Todd Unangst[1] ("Mr. Unangst"), the tow
truck operator who towed Garrett's car, NJSP Trooper Rivas
("Trooper Rivas"), who initiated the September 1, 2010 car stop,
NJSP Detective Shotwell ("Detective Shotwell"), who assisted
with the investigation, and NJSP Detective Torre ("Detective
Torre"), who conducted an inventory search of Mr. Garrett's car.

---

[1] The government refers to Mr. Unangst by his initials, T.U., in its brief,
because he is a civilian witness. The government has not moved for the court
to redact his name. Given that Mr. Unangst has testified in open court at the
evidentiary hearing, the transcript of which has been or will be made
publicly available, and the government has not provided additional evidence
to support a request for redaction, the court will refer to Mr. Unangst by
his full name.

Mr. Garrett did not present any witnesses and relied upon affirmations submitted in connection with his motion papers. (*See* Garrett Affirm. filed with Garrett Mots., ECF No. 110, at 3; Garrett Affirm. filed with Garrett Reply, ECF No. 123-1.) Mr. Garrett and the government filed post-hearing submissions with the court. (*See* Garrett's Post-Hr'g Memo. in Supp. of Garrett's Mot. to Suppress ("Garrett Post-Hr'g Memo."), ECF No. 147; Gov.'s Proposed Finding of Facts and Conclusions of Law following the Suppression Hr'g ("Gov. Post-Hr'g Memo."), ECF No. 148.)

## 1. Factual Findings

During the evidentiary hearing, the witnesses for the government presented a credible and largely consistent account of Mr. Garrett's car stop on September 1, 2010.

### a. Testimony from the Government Witnesses

According to Trooper Rivas[2], whose testimony the court found credible, on September 1, 2010, he was on duty and assigned to the night shift at the NJSP station in Hope, New Jersey ("Hope Police Station"), which is located off of Exit 12

---

[2] Trooper Rivas has been a trooper with the NJSP for more than seven years. (T1 at 142.) His responsibilities include general policing duties, criminal investigation, and traffic enforcement on the highway. (*Id.*) He has completed training in connection with his position as a trooper, including attending and completing the state police academy, an additional three months of training during which he was mentored by a senior trooper, and initial training and updated training on New Jersey law as related to traffic stops. (*Id.* at 143-44.)

on Interstate 80 ("I-80"). (T1[3] at 144-45). At approximately
10:30 p.m.[4], Trooper Rivas was patrolling I-80 when he observed a
black Mercedes with New York license plate EML 4151 (the
"Garrett Vehicle") traveling westbound in the left lane on I-80.
(*Id.* at 145-48.) Trooper Rivas observed that the Garrett Vehicle
was having difficulty maintaining its position driving in the
left lane. (*Id.* at 146.) He then saw the Garrett Vehicle change
from the left lane to the center lane without signaling. (*Id.*)

Trooper Rivas testified that failing to maintain a
lane and changing lanes without using a directional signal are
violations of New Jersey state law and that, based on his
observations of the traffic violations, he determined that he
would stop the Garrett Vehicle. (*Id.* at 148, 155.) Trooper Rivas
testified that he then turned on the lights on his police car
and pulled the Garrett Vehicle over to the side of the road.

---

[3] T1 refers to the transcript and exhibits of the September 8, 2014 hearing;
T2 refers to the transcript and exhibits of the September 9, 2014 hearing;
and T3 refers to the transcript and exhibits of the October 29, 2014 hearing.

[4] The court notes that Trooper Rivas testified that he observed Mr. Garrett's
alleged traffic infraction around 10:30 p.m. (T1 at 145), but that the
Computer-Aided Dispatch ("CAD") Report marks the beginning of the dispatch at
10:46 p.m. (Ex. SH-3500-AR25.) The timestamp on Trooper Rivas's mobile vision
recorder ("MVR") in his troop car showed that the MVR was initiated at 10:30
p.m. (T1 at 221; Gov. Ex. DD.)  Trooper Rivas testified that the CAD Report
is generated by a dispatcher at the communications center who updates the CAD
Report based on incoming calls from troopers. (T1 at 154-55.) He also
testified that dispatchers may not necessarily log the trooper's call at the
exact moment the call is received. (*Id.*) The court finds Trooper Rivas's
explanation for this sixteen minute discrepancy between the CAD Report and
his testimony, corroborated by the MVR recording to be credible.

(*Id.* at 221-22; *see also* Gov. Ex. DD[5] at 22:30:22-22:30:51.)

Trooper Rivas proceeded to have a conversation with Mr. Garrett, the driver and sole occupant of the Garrett Vehicle. (T1 at 157-58). Trooper Rivas testified that he asked Mr. Garrett where he was going, to which Mr. Garrett responded that he was going to the Mohegan Sun casino to attend an event. (*Id.*) Trooper Rivas told Mr. Garrett that he was stopped because Mr. Garrett was having trouble maintaining his lane and switched lanes without using his directional signal. (*Id.; see also* Gov. Ex. DD at 22:31:30-22:34:15.) Trooper Rivas testified that Mr. Garrett was "very apologetic" and stated that there were problems with the air pressure in his tires which caused his vehicle to swerve. The MVR footage corroborates Trooper Rivas's testimony regarding Mr. Garrett's admission to swerving. (T1 at 159; *see also* Gov. Ex. DD at 22:31:30-22:34:15.)

Trooper Rivas testified that he then advised Mr. Garrett that he was going to check his license and registration for traffic violations and asked if Mr. Garrett had any recent traffic violations. (T1 at 159-60; *see also* Gov. Ex. DD at 22:34:30-22:35:15.) Mr. Garrett responded that he had been

---

[5] Government Exhibit DD refers to the inboard video and audio recording from Trooper Rivas's MVR, which was activated during the September 1, 2010 stop. Portions of this recording were played at the evidentiary hearing on September 8, 2014, and corroborated Trooper Rivas's testimony. (T1 at 157-58.)

stopped a few times in the past and had received a few traffic
tickets, but that he should be in good standing. (*Id.*)

Trooper Rivas testified that after returning to his
police vehicle and running Mr. Garrett's license and
registration, he learned that Mr. Garrett's license had been
suspended and that Mr. Garrett was not permitted to drive. (T1
at 160-61.) Trooper Rivas also learned that there was a traffic
warrant for Mr. Garrett's arrest in Knowlton Township, New
Jersey. (*Id.*) Trooper Rivas testified that because Mr. Garrett
was a suspended driver, Mr. Garrett was not permitted to operate
a motor vehicle. (*Id.*) Trooper Rivas testified that in light of
the fact that Mr. Garrett was a suspended driver and had a
warrant for his arrest, he decided to place Mr. Garrett under
arrest and to impound the vehicle. (*Id.*) In light of Mr.
Garrett's arrest, Trooper Rivas decided to have the Garrett
Vehicle towed by a tow operator under contract with the NJSP to
the operator's private tow yard and impounded. (*Id.* at 161-62.)

While Trooper Rivas was gathering additional
information from Mr. Garrett, NJSP Trooper Rachel Trent
("Trooper Trent") arrived on the scene. (T1 at 164; Gov. Ex. DD
at 22:42:50.) Trooper Rivas testified that he placed Mr. Garrett
under arrest and transported him back to the NJSP Hope Station
while Trooper Trent waited with the Garrett Vehicle until the
tow truck operator arrived. (T1 at 164.) While Trooper Rivas was

driving to the station with Mr. Garrett from the scene of the stop, Mr. Garrett advised that he needed his three cell phones from the center console of his vehicle. (*Id.* at 171-72.) Trooper Rivas placed a radio call to Trooper Trent requesting Mr. Garrett's phones, and she retrieved the three phones accordingly. (*Id.*)

At the station, Trooper Rivas required Mr. Garrett to remove his shoes and belt pursuant to NJSP operating procedures, before placing Mr. Garrett into a holding cell. (T1 164-65.) Trooper Rivas testified that he observed a partially smoked marijuana blunt in Mr. Garrett's left shoe. (*Id.*) After discovering the blunt, Trooper Rivas testified that he read Mr. Garrett his *Miranda* rights.[6] (*Id.* at 236.) Trooper Rivas also testified that Mr. Garrett stated he understood the *Miranda* warnings, but that Mr. Garrett refused to sign a card indicating that he had been read his warnings. (*Id.* at 215-16.) Trooper Rivas testified that, after being advised of his rights, Mr. Garrett did not affirmatively invoke his right to remain silent or his right to an attorney. (*Id.* at 217, 228.)

Meanwhile, at the scene of the car stop, a tow operator, Mr. Unangst, reported to the scene. (T1 at 116-17.)

---

[6] The court notes that Trooper Rivas initially testified that he read Mr. Garrett his *Miranda* rights after he was shown a package recovered from the Garrett Vehicle(T1 167-68), but corrected his testimony after his recollection was refreshed over the course of the questioning. (*Id.* at 236.) The court finds Trooper Rivas's correction of his testimony to be credible.

Mr. Unangst testified at the evidentiary hearing that he responded to a request by the NJSP to tow the Garrett Vehicle back to Mr. Unangst's impound lot. (*Id.*) Mr. Unangst testified that when he arrived on the scene, the Garrett Vehicle was on the side of the road with a police vehicle parked behind it. (*Id.* at 117-18.) Mr. Unangst also testified that a female police officer[7] was present in her police vehicle when he arrived. (*Id.* at 118.) Mr. Unangst testified that he positioned the tow truck in front of the Garrett Vehicle in order to prepare to pull the Garrett Vehicle onto the deck of the tow truck. (*Id.* at 119-20.)

Mr. Unangst testified that with "higher-end" cars like the Mr. Garrett's Mercedes, equipment called a "tow loop" is used to tow the vehicle without damaging the suspension or the frame of the vehicle. (T1 at 120.) The tow loop screws into the front bumper, and the tow hook from the tow truck attaches to the tow loop instead of the front bumper itself. (*Id.*) Mr. Unangst testified that in the course of his work as a tow truck operator, Mr. Unangst routinely used tow loops to tow high-end vehicles, which he understands to be the common practice among tow truck companies generally. (*Id.* at 128.)

---

[7] Although Mr. Unangst was not able to recall Trooper Trent's name, the parties do not dispute that the female officer who was present at the scene with Mr. Unangst was Trooper Trent. Therefore, the court also finds that Trooper Trent was the officer referred to by Mr. Unangst as being at the scene on September 1, 2010.

As was his common practice, Mr. Unangst used a key to
open the trunk and retrieve the tow loop from the Garrett
Vehicle. (T1 at 129-30.) Mr. Unangst testified that he did not
recall exactly how he obtained the keys for the Garrett Vehicle,
but he believed that either Trooper Trent handed him the keys
for the Garrett Vehicle or the keys were left for him in or near
the Garrett Vehicle. (*Id.* at 129, 140.) Mr. Unangst testified
that the NJSP did not direct him to open the trunk of the
Garrett Vehicle. (*Id.* at 120, 128.)

Mr. Unangst testified that when he opened the trunk of
the Garrett Vehicle, he noticed that it smelled like marijuana.
(T1 121-22.) Mr. Unangst then lifted the floor mat of the trunk
to search for the tow loop in the spare tire and tools chamber.
(*Id.* at 122.) After lifting up the floor mat, Mr. Unangst saw a
bag that was approximately ten to twelve inches in length. (*Id.*)
Mr. Unangst testified that he thought the package contained
marijuana. (*Id.* at 123.) Mr. Unangst then motioned to Trooper
Trent to approach the trunk. (*Id.*) Mr. Unangst testified that
when Trooper Trent saw the package, she advised Mr. Unangst that
he would have to tow the Garrett Vehicle back to the state
police barracks rather than to his impound lot as originally
planned. (*Id.*) According to the CAD Report, Trooper Trent then
notified the NJSP control center and the Hope Police Station
that she was in custody of "CDS" (a term for "controlled

dangerous substance") and would be returning to the station. (Gov. Ex. SH-3500-AR-25.) Accordingly, Mr. Unangst then towed the Garrett Vehicle back to the NJSP barracks. (T1 at 123.)

Trooper Rivas testified that Trooper Trent informed him about the discovery of the bag and brought a "clear vacuum sealed bag with a black bag inside of it" to Trooper Rivas at the station. (T1 at 165.) Trooper Rivas then showed Mr. Garrett the package that had been recovered from the Garrett vehicle. (*Id.* at 168.) Trooper Rivas testified that Mr. Garrett appeared "taken aback" and "in shock, wide eyed" upon being shown the package. (*Id.*) Trooper Rivas testified that when he asked Mr. Garrett about the package, Mr. Garrett denied that the package belonged to him. (*Id.*) Trooper Rivas credibly testified that he then asked Mr. Garrett for his consent to search the package, and Mr. Garrett denied consent. (*Id.*)

Trooper Rivas testified that he then conducted additional investigation of Mr. Garrett's criminal history which revealed "a significant criminal history" that included narcotics and violence. (T1 at 169.) Trooper Rivas credibly testified that based on the totality of the circumstances, he reached a belief that the package found in the Garrett Vehicle contained "a CDS, Controlled Dangerous Substance, some kind of drug." (*Id.* at 169.)

Detective Shotwell[8] testified that he received a call on September 1, 2010 from the Hope Police Station that provided an overview of the events of the evening involving Mr. Garrett and was instructed to go to the Hope Police Station to assist with the investigation. (T1 at 242-43.) When Detective Shotwell arrived at the Hope Police Station, he spoke to Trooper Rivas about the case and reviewed Mr. Garrett's criminal history report, which included narcotics trafficking. (*Id.* at 243.) Detective Shotwell also testified that he noticed that Mr. Garrett possessed multiple prepaid cell phones, which he found to be indicative of criminal activity based on his training and experience. (*Id.* at 243-44.)

Detective Shotwell testified that he examined the vacuum-sealed package that had been recovered from the trunk of the Garrett Vehicle. (T1 at 244.) He noted that the clear vacuum-sealed package contained another dark-colored plastic bag within. (*Id.* at 244-45.) Detective Shotwell testified that he found the package to be suspicious, because vacuum-sealing sucks air out of a package and is used to mask the smell of the contents of the package. (*Id.* at 245.) Detective Shotwell also

---

[8] Detective Shotwell has been employed by the NJSP for more than 18 years. (T1 at 240.) He was promoted to the position of Detective in 2003 and was promoted to the position of Detective Sergeant in approximately 2013. (*Id.*) Detective Shotwell has received training as a member of the NJSP, including attending and completing the state police academy, an additional two months of training during which he was mentored by a senior trooper, and various trainings regarding traffic and investigation, including criminal investigation school and at a Drug Enforcement Administration school. (T1 at 240-41.)

noted that the package did not appear to have been from the car manufacturer. (*Id.*)

Detective Shotwell testified that when he picked up the package, he could feel that the package contained several small-sized "bundles" within the dark plastic bag. (T1 at 245-46.) Detective Shotwell believed, based on his experience and the totality of the circumstances and the way the package and bundles looked and felt, that the smaller bundles inside the package contained narcotics. Detective Shotwell testified that, in the course of his career as a law enforcement officer, he had previously seen narcotics similarly packaged in a number of smaller bags, although not in the specific manner presented. (*Id.* at 246.)

Thereafter, Detective Shotwell testified that he discussed whether he should open the bag with his supervisor, Sergeant Walsh. (T1 at 246-47). They both agreed that the package should be opened for further investigation. (*Id.*)

Detective Shotwell opened the bag and testified that his first impression was an overwhelming vinegar odor. (T1 at 247.) Detective Shotwell observed five smaller clear bags that each contained a number of multi-colored balloons. (T1 at 247-48; Gov. Ex. R-3.[9]) In each clear plastic bag was a yellow piece

---

[9] The government admitted into evidence photographs taken of the package and its contents, found in the trunk of the Garrett Vehicle as Government Exhibits R-1 through R-6. (T1 at 166-67.)

of paper with the number "10" written on it. (T1 at 248; Gov. Ex. R-5.) Detective Shotwell testified that he opened up one of the balloons and found a dark-colored powder inside that he believed to be heroin. (T1 at 248; Gov. Ex. R-6.) Trooper Rivas testified that a field test conducted on the powder found in the balloon tested positive for heroin. (T1 at 171.)

Trooper Rivas also testified that the morning after he opened the package, he called a K-9 unit to perform an exterior sniff of the vehicle, and the canine alerted to the trunk of the vehicle. (T1 at 177-78.) Trooper Rivas testified that he then applied for a search warrant for the Garrett Vehicle, which was approved by Warren County Superior Court Judge John J. Coyle. (*Id.* at 178-79; Gov. Ex. C.[10]) Trooper Rivas testified that when he opened the trunk of the Garrett Vehicle for the search pursuant to the warrant, he noticed an odor of marijuana. (T1 at 182-83.) The search yielded a clear plastic bag containing marijuana found in a black duffel bag in the trunk of the car and a digital camera, among other items. (*Id.* at 179-84.)

Mr. Garrett was ultimately issued three citations as a result of the September 1, 2010 car stop which included: driving with a suspended license; careless driving; and operating a motor vehicle while in possession of CDS. (T1 at 163-64; 172-73.) On October 31, 2011, Mr. Garrett pleaded guilty to the

---

[10] The government admitted into evidence the approved search warrant for the search of the Garrett Vehicle as Government Exhibit C. (T1 at 179.)

tickets for careless driving and driving with a suspended license, as well as to a charge of possession of marijuana. (Gov. Ex. S.[11]) When Mr. Garrett's attorney in the Pennsylvania proceeding asked Mr. Garrett during his allocution, whether he was "changing lanes haphazardly without signaling," Mr. Garrett responded, under oath, that he was. (Gov. Ex. S at 10:42-43.)

### b. Testimony from Mr. Garrett's Affirmations

In his affirmations filed on June 9, 2014 and July 29, 2014, Mr. Garrett stated that (1) prior to his September 1, 2010 stop, he did not make an illegal lane change and did not fail to signal; (2) he did not consent to any search of his vehicle and its contents; and (3) he "did not deny knowledge of the package in the trunk." (Garrett Affirm. filed with Garrett Mots. at 3; Garrett Affirm. filed with Garrett Reply, ECF No. 123-1.)

### 2. Application and Conclusions

Mr. Garrett seeks to suppress the physical evidence recovered from the Garrett Vehicle on the grounds that Trooper Rivas did not have probable cause to stop the Garrett Vehicle and that the bag found in the trunk of the Garrett Vehicle was illegally seized and searched. For the reasons set forth below, the court denies Mr. Garrett's motion, finding that the NJSP officers had probable cause for each of the actions they took

---

[11] Government Exhibit S, a video recording of Mr. Garrett's guilty plea in Warren County Superior Court, was admitted into evidence for the evidentiary hearing. (T1 at 237.)

over the course of the investigation which yielded the contraband in the trunk of the Garrett Vehicle.

### a. Trooper Rivas's Testimony Was Credible

As an initial matter, Mr. Garrett's affirmations challenge two factual claims made by Trooper Rivas: (1) that Trooper Rivas observed Mr. Garrett changing lanes without signaling and failing to maintain the lane and (2) that Mr. Garrett told Trooper Rivas that the package found in the trunk of the Garrett Vehicle did not belong to him. In both cases, the court finds Trooper Rivas's testimony to be credible.

The court finds that Trooper Rivas was a truthful and reliable witness. The only inconsistency that Mr. Garrett has identified was the 16-minute discrepancy as to when the car stop began. Not only did Trooper Rivas provide a credible explanation for the discrepancy, but this inconsistency is, at best, minor, and does not cast doubt on Trooper Rivas's testimony or candor.

In contrast, the court declines to give significant weight to Mr. Garrett's affirmations. Because Mr. Garrett exercised his right not to testify, his testimony by affirmation was not subject to cross-examination. *See, e.g.*, *United States v. Walia*, No. 14-cr-213 (MKB), 2014 WL 3563426, at *13 n.8 (E.D.N.Y. July 18, 2014) ("As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-

examination." (quoting *United States v. Medina*, No. S3 13-cr-272, 2014 WL 1918633, at *12 n.13 (S.D.N.Y. May 8, 2014)(collecting cases))); *DiMattina v. United States*, No. 13-cv-1273 (JBW), 2013 WL 2632570 , at *22 (E.D.N.Y. June 13, 2013) ("Without the threat of cross-examination, [the defendant's] affidavits are viewed as self-serving and given little weight.")

With respect to Mr. Garrett's claim that he "did not make an illegal lane change, nor did [he] neglect to signal as the law requires," the court also considers that the MVR footage showed Mr. Garrett acknowledging and apologizing for his difficulty with maintaining his lane, and offering problems with the air pressure in his tires as an explanation. (Gov. Ex. DD.) Moreover, Mr. Garrett pleaded guilty under oath to committing careless driving by making a lane change without using his turn signal before his vehicle was stopped. (Gov. Ex. S.) The court also notes that Mr. Garrett failed to claim in his initial pre-trial motion that he did not make an illegal lane change, and only presented this assertion by affirmation in his reply, which further casts doubt on Mr. Garrett's denial that he did not make an illegal lane change. Thus, the court finds Officer Rivas's testimony that he observed Mr. Garrett making an illegal lane change and failing to maintain his lane to be entirely credible

and finds Mr. Garrett's statements to be inconsistent and unbelievable.[12]

The court also finds credible Trooper Rivas's testimony that Mr. Garrett advised Trooper Rivas that the package did not belong to Mr. Garrett. In Mr. Garrett's affirmation filed with his reply, Mr. Garrett avers that he never denied "knowledge of that package in the trunk." (Garrett Affirm. filed with Garrett Reply, ECF No. 123-1.) The court does not find Mr. Garrett's testimony by affirmation and Trooper Rivas's testimony at the evidentiary hearing to be inconsistent. The court makes the factual finding that Mr. Garrett had knowledge of the vacuum-sealed package in the trunk, but also denied that the package belonged to him. In his reply, Mr. Garrett "disputes the prosecution's representation that he made a statement denying the bag was his." (Garrett Reply, ECF No. 123, at 1.) To the extent that Mr. Garrett disputes Trooper Rivas's claim that Mr. Garrett denied ownership of the package, the court declines to credit Mr. Garrett's claim. Mr. Garrett has failed to present any evidence, in his affirmations or

---

[12] In a letter dated August 26, 2014, Mr. Garrett states that "[i]t is common knowledge that the New Jersey State Police are notorious for profiling minority drivers and frequently stopping and searching vehicles utilizing pre-textual traffic infractions as a justification." (Letter dated 8/26/14, ECF No. 130, at 2.) However, Mr. Garrett has presented no evidence that Trooper Rivas had the opportunity to observe Mr. Garrett's race prior to stopping Garrett's vehicle shortly after 10:30 p.m. On the MVR, Trooper Rivas is shown to have responded "unknown" over his radio communication when he was asked the gender and race of the vehicle occupants. (T1 at 157.) The court, therefore, respectfully rejects Mr. Garrett's argument that he was unlawfully stopped due to racial profiling.

otherwise, that he ever disclaimed ownership of the vacuum-sealed package.

### b. Trooper Rivas Had Probable Cause to Stop the Garrett Vehicle

The Fourth Amendment protects the "right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to vehicle stops. *Whren v. United States,* 517 U.S. 806, 809–10 (1996). "[T]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Harrison,* 606 F.3d 42, 45 (2d Cir. 2010) (citation and internal quotation marks omitted). As set forth above, the court finds that Trooper Rivas's observation of the Garrett Vehicle engaging in an illegal lane change and failing to maintain his lane established that Trooper Rivas had probable cause to believe that Mr. Garrett committed violations of New Jersey traffic laws. Thus, the stop of the Garrett Vehicle on September 1, 2010 was reasonable, based on probable cause, and proper under the United States Constitution.

### c. The Package Was Found in Plain View and Its Seizure Was Lawful

A warrantless search and seizure is "*per se* unreasonable under the Fourth Amendment—subject only to a few

specifically established and well-delineated exceptions." *United States v. Kiyuyung,* 171 F.3d 78, 83 (2d Cir. 1999) (quoting *Mincey v. Arizona,* 437 U.S. 385, 390 (1978)) (internal citations and quotation marks omitted). The "plain view" exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize an object "if its incriminating character is immediately apparent, and if the officer[] ha[s] a lawful right of access to the object." *Kiyuyung*, 171 F.3d at 83 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

The first issue is whether Trooper Trent and Mr. Unangst had a lawful right to observe the package in plain view as the Garrett Vehicle was being prepared by Mr. Unangst to be towed. The court finds that the NJSP decision to tow the Garrett Vehicle and remove it from the highway was reasonable to safeguard Mr. Garrett's property and to ensure the safety of the public, given that Mr. Garrett's license was suspended and he could not drive legally, and that there was an outstanding warrant for his arrest. Thereafter, in an effort to protect Mr. Garrett's property, a high-end Mercedes vehicle, Mr. Unangst, the private tow truck operator, acted according to industry practice by opening the trunk in order to locate the tow hooks, and then discovered the package in question and brought it to the attention of Trooper Trent. The evidence establishes that the NJSP and Mr. Unangst acted lawfully and reasonably to

protect the public and Mr. Garrett's property, and had every
right to view the seized package. *See Cady v. Dombrowski*, 413
U.S. 433, 443 (1973) (affirming warrantless search of vehicle,
which, "for elemental reasons of safety," was towed after an
accident); *Harris v. United States*, 390 U.S. 234, 236 (1968)
(upholding search where "discovery of the card was not the
result of a search of the car, but of a measure taken to protect
the car while it was in police custody").

The second issue is whether the "incriminating
character" of the package found in the Garrett Vehicle was
"immediately apparent." The Supreme Court has articulated this
standard as whether the police have "probable cause to believe
that an object in plain view is contraband without conducting
some further search of the object." *Minnesota v. Dickerson*, 508
U.S. 366, 375 (1993). Mr. Garrett argues that because the drugs
were not visible in the bag "by sight or shape," the
incriminating character of "the bag's *contents*" was not
immediately apparent. (Garrett Post-Hr'g Mot. at 3.)(emphasis
added). The court disagrees. The law does not require that
narcotics be plainly observable in order to justify the seizure
of a package under the plain view doctrine. *See Texas v. Brown*,
460 U.S. 730, 739 (1983) (holding that the police properly
seized green balloon from defendant's automobile, because
officer was aware that balloons tied in the manner of the one

possessed by the defendant were frequently used to carry narcotics, noting that "the opaque fabric of the balloon is all but irrelevant"); *United States v. Lopez-Salcedo*, No. 11 Cr. 482 (LMM), 2011 WL 5838283 (S.D.N.Y. Nov. 18, 2011) (upholding officer's seizure based on officer's immediate recognition that package contained drugs). In *United States v. Barrios-Moriera*, the Second Circuit held that a law enforcement agent had probable cause to seize a package that he believed contained cocaine, because "the rectangular package, measuring a certain size, wrapped in duct tape, spoke volumes as to its contents, particularly to an experienced DEA agent." 872 F.2d 12, 17 (2d Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990), and *cert. denied*, 493 U.S. 953 (1989)) (internal quotations omitted).

Here, the court finds that the incriminating character of the vacuum-sealed package found in the trunk of the Garrett Vehicle was immediately apparent based on its shape and the manner in which it was packaged. The uncontroverted evidence establishes that Mr. Unangst opened the trunk of the Garrett Vehicle to search for tow hooks, smelled marijuana, and discovered the vacuum-sealed package in the spare tire compartment, which he suspected contained marijuana and prompted him to alert Trooper Trent. Consequently, Trooper Trent notified

the radio dispatcher that she was in custody of suspected CDS and took the vacuum-sealed package to Hope Police Station.

"The Supreme Court has, in fact, stressed that analysis of fourth amendment issues involves 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not on the officer's actual state of mind at the time the challenged action was taken." *United States v. Scopo*, 19 F.3d 777, 783 (2d Cir. 1994) (citing *Maryland v. Macon,* 472 U.S. 463, 470–71 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, (1978)). In light of the fact that at the time of the seizure, Trooper Trent had, at Mr. Garrett's request, retrieved his three mobile phones from the center console of the Garrett Vehicle; Mr. Unangst had alerted her to the vacuum-sealed package in the trunk of the Garrett Vehicle; the trunk of the Garrett Vehicle smelled like marijuana[13]; and Trooper Trent observed the rectangular, vacuum-sealed bag in the spare tire compartment of the Garrett Vehicle,

---

[13] The court acknowledges that the government has not produced evidence establishing that Trooper Trent recognized the odor of marijuana emanating from the trunk of the Garrett Vehicle. However, the court makes the factual finding that the scent of marijuana was emanating from the trunk of the Garrett Vehicle based on Mr. Unangst's credible testimony that he opened the trunk and smelled marijuana. Probable cause determinations are made on the basis of what information the police had at the time of the seizure, *see United States v. Scopo*, F.3d 777, 783 (2d Cir. 1994); however, the fact that Trooper Rivas also credibly testified that he noticed the odor of marijuana when the trunk of the Garrett Vehicle was searched pursuant to a warrant, and that marijuana was found in the trunk of the Garrett Vehicle lends credibility to Mr. Unangst's testimony that the trunk of the Garrett Vehicle had the odor of marijuana.

the court finds that Trooper Trent's seizure of the package

based on probable cause to believe that it contained CDS was

reasonable.

d. **The Subsequent Search of the Package at the Police Station was Supported by Probable Cause**

Mr. Garrett also argues that the subsequent

warrantless search of the package found in the trunk of the

Garrett Vehicle by Detective Shotwell was unlawful because (1)

the initial seizure of the package was unlawful, and (2) the

"plain feel" doctrine does not apply. As the court previously

has determined that the warrantless seizure of the package was

lawful, the court addresses the "plain feel" exception.

The "plain feel" doctrine is a variation of the "plain

view" doctrine that provides that law enforcement "may lawfully

seize evidence they touch and can plainly feel is contraband or

contains contraband." *See United States v. Colon*, No. 10 Cr. 498

(RPP), 2011 WL 569874, at *13 (S.D.N.Y. Feb. 8, 2011) (citing

*Minnesota v. Dickerson*, 508 U.S. 366 (1993)). The Second Circuit

has also held that law enforcement's search of a container that

plainly feels like it contains contraband is lawful. *See United

States v. Ocampo*, 650 F.2d 421, 429 (2d Cir. 1981) (holding that

search of brown bag where law enforcement agents could plainly

feel that the bag contained currency was lawful). However, where

the nature of the object is not immediately apparent by touch,

law enforcement is prohibited from "physical manipulation" such as "feel[ing] the bag in an exploratory manner." *Bond v. United States*, 529 U.S. 334, 338-39 (2000). In *Minnesota v. Dickerson*, the Supreme Court found a search to be unconstitutional where an officer "determined that the lump was contraband only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket — a pocket which the officer already knew contained no weapon." 508 U.S. at 378. Based on the evidence in the record, the court finds that Detective Shotwell determined that there were smaller packages within the vacuum-sealed bag that he suspected contained narcotics, from a "plain feel" of the bag.[14]

Irrespective of whether Detective Shotwell's decision to open the package was justified by the "plain feel" doctrine, the court finds that the warrantless search of the package found in the trunk of Mr. Garrett's car was permitted under the automobile exception. In *California v. Acevedo*, 500 U.S. 565 (1991), the Supreme Court held:

> Until today, this Court has drawn a curious line between the search of an automobile that coincidentally turns up a container and the search of a container that

---

[14] "Q. When you picked up the bag, what did you feel?
A. Within the garbage bag there were several smaller bundles you could feel.
Q. What was the significance of how the bag felt?
A. There was -- like I said, the air was sealed in it. I mean, it was still -- it wasn't like a balloon, it was still pliable, but you could feel smaller bundles, and I thought those bundles were just broken down to smaller packaging of narcotics." (T1 at 246.)

> coincidentally turns up in an automobile. The protections of the Fourth Amendment must not turn on such coincidences. . . . The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.

500 U.S. at 580. Prior to *Acevedo*, separate doctrines permitted the warrantless search of an automobile to include a search of closed containers found inside the car when there is probable cause to search the vehicle, *United States v. Ross*, 456 U.S. 798 (1982), but prohibited the warrantless search of a closed container located in a vehicle when there is probable cause to search only the container, *Arkansas v. Sanders*, 442 U.S. 753 (1979). In *Acevedo*, the Court resolved this distinction, finding that the police may engage in a warrantless search of a container found within a vehicle when they have probable cause to believe the container itself holds contraband or evidence. 500 U.S. at 580. The Supreme Court reasoned that "prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests." *Id*. at 574 (quoting *United States v. Ross*, 456 U.S. 798, 821 n.28 (1982).

At the time of the seizure of the package, the NJSP had probable cause to search the rectangular, vacuum-sealed container pursuant to *Acevedo*. As previously discussed, Mr.

Unangst had alerted Trooper Trent to the vacuum-sealed package in the trunk of the Garrett Vehicle, because he believed it contained marijuana; Trooper Trent observed the rectangular, vacuum-sealed bag in the spare tire compartment of the Garrett Vehicle which she reasonably believed contained CDS; the trunk of the Garrett Vehicle smelled like marijuana; and Trooper Trent had retrieved three of Mr. Garrett's cell phones from the center console of the Garrett Vehicle. That the search of the vacuum-sealed package was delayed until Trooper Trent brought the package to Hope Police Station does not render the search unconstitutional. *See United States v. Johns*, 469 U.S. 478, 487 (1985) (upholding warrantless search of containers three days after they were removed from the trucks).

When Detective Shotwell made the determination to open the package at Hope Police Station, he had knowledge of the following additional facts: he could feel smaller packaged items within the vacuum-sealed bag which he suspected contained contraband; a marijuana cigarette had been recovered from Mr. Garrett's shoe during the processing of his arrest; Mr. Garrett's criminal history involved multiple narcotics trafficking and weapons possession encounters with the criminal justice system; two of the mobile phones recovered from the Garrett Vehicle were pre-paid phones, the use of which Detective Shotwell associated with criminal activity; he noticed that the

bag was vacuum-sealed, suggesting that scent was being intentionally suppressed; and the bag did not appear to be an item placed in the trunk by the manufacturer of the vehicle. As in *Acevedo*, Detective Shotwell had probable cause to believe that the vacuum-sealed package recovered from the trunk of the Garrett Vehicle contained contraband, thus allowing a warrantless search of the package. *See Acevedo*, 500 U.S. at 580 ("In the case before us, the police had probable cause to believe that the paper bag in the automobile's trunk contained marijuana. That probable cause now allows a warrantless search of the paper bag."); *see also United States v. Carter*, 173 F. App'x 79, 81 (2d Cir. 2006) (citing automobile exception and finding that law enforcement's identification of a marijuana cigarette in the open ashtray "gave rise to a fair probability that contraband or evidence of a crime would be found"); *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) (articulating the automobile exception and stating that "courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman may not.").

> **e. The Package of Contraband Recovered from the Garrett Vehicle Is Also Admissible Under the Doctrine of Inevitable Discovery**

Even assuming the seizure and search of the vacuum-sealed bag was unlawful, the court also analyzes the NJSP

actions under the doctrine of inevitable discovery. The court concludes that the contraband recovered from the trunk of the Garrett Vehicle inevitably would have been obtained by the NJSP and is also admissible on this ground.[15] It is well settled that "evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006). The court is required to rely on "demonstrated historical facts capable of ready verification or impeachment" when determining, "at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (internal quotations omitted). The Second Circuit requires that a court find, "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would have resolved in

---

[15] Whether a person voluntarily abandons property turns on the question of the intent of the person who is purported to have abandoned the property. *See U.S. v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990). As previously discussed, the court finds that Trooper Rivas's testimony that Mr. Garrett disclaimed ownership of the package to be credible. The court also notes, however, that Mr. Garrett refused to give his consent to search the package immediately thereafter, suggesting that Mr. Garrett intended to assert a possessory interest in the vacuum-sealed package. The court does not reach the question of whether Mr. Garrett abandoned the vacuum-sealed package found in the trunk of the Garrett Vehicle as the government has asserted, because the court finds that the seizure and search of the vacuum-sealed package was supported by probable cause and that the doctrine of inevitable discovery applies.

the government's favor." *Id.* at 60 (quoting *United States v. Lavan*, 10 F. Supp. 2d 377, 389 (S.D.N.Y. 1998)).

Even if the court were to find Fourth Amendment error, which it does not, in Trooper Trent's seizure of the vacuum-sealed package from the trunk of the Garrett Vehicle and the subsequent search of the package, the court concludes that the contraband found in the package inevitably would have been discovered. As set forth, *supra*, the NJSP acted lawfully to stop the Garrett Vehicle for traffic violations, arrest him and impound his vehicle based on his suspended license and the outstanding arrest warrant, and tow the Garrett Vehicle from the roadside, which would have led to the lawful discovery of the vacuum-sealed package in plain view. At the moment of Trooper Trent's decision to bring the package back to Hope Police Station based on her probable cause determination that the package contained CDS, she called to inform the NJSP officers at Hope Police Station that she found a package in the Garrett Vehicle that she suspected contained CDS. Even if Trooper Trent left the vacuum-sealed package in the trunk, Detective Shotwell[16] and the NJSP officers at Hope Police Station had been alerted by

---

[16] Mr. Garrett asserts that Detective Shotwell might not have been involved in the case but for the discovery of the vacuum-sealed package in the trunk. (Garrett Post-Hr'g Mots. at 9.) However, the court finds that it was the lawful discovery of the vacuum-sealed package, not its seizure, that raised suspicions that it contained CDS and alerted Detective Shotwell to the events pertaining to Mr. Garrett's car stop. Thus, whether Detective Shotwell would have been involved in the investigation is not a "contingency" to be analyzed under the inevitable discovery doctrine.

Trooper Trent to the vacuum-sealed package suspected to contain
CDS in the trunk of the Garrett Vehicle. With the knowledge that
a package, suspected by a state trooper to contain CDS, was
found in the trunk of the Garrett Vehicle, the NJSP officers
would have continued to investigate the contents of the package.
In light of the historical fact that the NJSP officers had found
a marijuana blunt in Mr. Garrett's shoe, had investigated Mr.
Garrett's criminal history of narcotics-related charges, and had
recovered two pre-paid phones and one other mobile phone from
the Garrett Vehicle at Mr. Garrett's request, the court finds,
with a high degree of confidence, that even had the package not
been opened, the NJSP officers would have requested a canine
sniff of the Garrett Vehicle to gather additional evidence to
support their application for a search warrant. Thereafter, the
canine would have alerted to the trunk, as it did before.
Certainly, at this point, if not before, the NJSP officers would
have applied for a warrant to search the Garrett Vehicle based
on the following facts: Trooper Trent's discovery of a vacuum-
sealed package that she reasonably suspected contained CDS; a
marijuana cigarette was discovered in Mr. Garrett's shoe; a
criminal history check of Mr. Garrett's record revealed multiple
prior convictions for drug distribution; three cellular phones
were found in the car, including two pre-paid phones; and the
strong likelihood that a canine sniff would have been conducted

and yielded an alert to the trunk of the Garrett Vehicle. The
court finds that there would have been more than sufficient
probable cause at this juncture to justify the issuance of a
search warrant for the search of the Garrett Vehicle for CDS.
Based on the foregoing, and in light of the fact that Trooper
Trent had already been in a position to lawfully view the
vacuum-sealed package, the NJSP officers would have obtained the
search warrant, opened the trunk, found the vacuum-sealed
package in the spare tire compartment of the Garrett Vehicle,
and opened it pursuant to the warrant.

### B. Motion to Suppress Mr. Garrett's Post-Arrest Statements

Mr. Garrett moves to suppress all statements that he
made after his arrest in this case on June 12, 2013 on the
grounds that the statements were made in violation of his rights
under *Miranda v. Arizona*, 384 U.S. 426 (1966). (Garrett Mots. at
3-4.) In light of the government's representation that it will
not seek to introduce Mr. Garrett's post-arrest statements in
its case-in-chief, the court denies the motion as moot.[17] (Opp.
at 78.)

---

[17] The court agrees with the government that Mr. Garrett's statements, even if
obtained in violation of *Miranda*, may be admissible for impeachment purposes
where they are voluntary and uncoerced. *See Parsad v. Greiner*, 337 F.3d 175,
184 (2d Cir. 2003). Here, Garrett has presented no evidence that his post-
arrest statements resulted from any coercion by NJSP officers, so the court
finds that Garrett's statements are admissible for impeachment purposes at
trial.

### C. Motion for Immediate Disclosure of *Brady* Material

Mr. Garrett moves to compel the immediate production of all evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and other exculpatory evidence. Mr. Garrett also cites *Giglio v. United States*, 405 U.S. 150 (1972), which touches upon the government's burden to produce impeachment evidence.

### 1. Legal Standard

"Under *Brady* and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.'" *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 91 (2d Cir. 2014) (quoting *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)). "Favorable evidence" that must be disclosed for purposes of *Brady* "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness," also known as "*Giglio* material." *Id*. "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different." *Coppa*, 267 F.3d at 142.

The government must disclose all *Brady* and *Giglio* material "in time for its effective use at trial." *Id*. The required timing of such a disclosure depends on the materiality

of the evidence and the particular circumstances of each case;
accordingly, the Second Circuit has refrained from defining the
phrase "in time for effective use." *United States v. Taylor*, 17
F. Supp. 3d 162, 177 (E.D.N.Y. 2014). A defendant has "no
pretrial discovery right to *Giglio* materials." *United States v.
RW Prof'l Leasing Servs. Corp.*, 317 F. Supp. 2d 167, 179
(E.D.N.Y. 2004) (citing *United States v. Nixon*, 418 U.S. 683,
701 (1974)). "A district court has the discretion to order
*Brady*/*Giglio* disclosure at any time as a matter of sound case
management." *Taylor*, 17 F. Supp. 3d at 177 (internal citation
omitted).

### 2. Application

In its opposition memorandum, the government has
represented to the court and Mr. Garrett that it is aware of its
obligations under *Brady*, that it is unaware of any *Brady*
material in its possession, and that it will immediately produce
such material if it becomes aware that such material exists.
(*See* Opp. at 78-79.) Because Mr. Garrett has not given the court
reason to believe that the government is not in compliance with
its *Brady* obligations, the court denies, without prejudice, Mr.
Garrett's motion to compel under *Brady*. *RW Prof'l Leasing Servs.
Corp.*, 317 F. Supp. 2d at 179.

Additionally, the government plans to produce *Giglio*
material "in advance of trial" to the extent advance production

of the materials is possible. (Opp. At 79-80.) Thus, as there is no pre-trial right to *Giglio* material and the government has represented that it will produce *Giglio* materials in advance of trial, the court denies Mr. Garrett's motion for immediate disclosure of *Giglio* material.

**D. Motion for Timely Disclosure of Evidence Pursuant to Federal Rule of Evidence 404(b)**

Mr. Garrett requests that the government list any evidence pursuant to Federal Rule of Evidence 404(b) in a timely manner. Rule 404(b) requires that the government provide "reasonable notice in advance of trial" of its intent to introduce evidence of a defendant's other crimes or bad acts. Fed. R. Evid. 404(b). In light of the fact that the court has already ordered the government to submit its motion to admit evidence pursuant to Rule 404(b) by February 13, 2015 (Third Criminal Pretrial Scheduling Order, ECF No. 139), the court denies Mr. Garrett's motion as moot.

**E. Motion to Sever and Order Disclosure of Statements Offered Against Each Defendant**

Mr. Garrett moves to sever his trial from that of Mr. Rivera on the basis that the introduction of Mr. Rivera's confessions (e.g., his proffer statements to government agents on August 30, 2012) would violate Mr. Garrett's constitutional confrontation rights as set forth in *Bruton v. United States*, 391 U.S. 123 (1968). Defendant also argues that a joint trial

will "impermissibly poison the jury against Garrett" due to the anticipated admission of "certain evidence against Rivera that is largely inadmissible against Garrett." (Garrett Mots. at 4-5.) Mr. Garrett also requests the court to direct the government to identify defendants' statements it intends to introduce so that Mr. Garrett may make a comprehensive request for severance.

### 1.    Legal Standard

Rule 8(b) of the Federal Rules of Criminal Procedure ("Rule 8(b)") provides that an indictment or information may charge multiple defendants who allegedly "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  The Supreme Court has recognized and reaffirmed "a preference in the federal system for joint trials of defendants who are indicted together" because they promote efficiency and prevent the injustice of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  Where "the crime charged involves a common scheme or plan," a joint trial of the participants is typically proper. *United States v. Girard*, 601 F.2d 69, 72 (2d Cir. 1979) (citing *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1144 (2d Cir. 1978); *United States v. Green*, 561 F.2d 423 (2d Cir. 1977), *cert. denied*, 434 U.S. 1018 (1978). Joint trials also "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and

38

permit the entire story to be presented to a single jury."
*United States v. Rucker*, 32 F. Supp. 2d 545, 547 (E.D.N.Y.
1999).

Nevertheless, if a court finds that a joint trial
would prejudice a defendant or the government, the court may
sever the defendants' trial pursuant to Federal Rule of Criminal
Procedure 14(a) ("Rule 14(a)").[18] In *Bruton v. United States*, the
Supreme Court has specifically recognized that introduction at a
joint trial of "the powerfully incriminating extrajudicial
statements of a co-defendant, who stands accused side by side
with the defendant" deprives the defendant of his Sixth
Amendment right of confrontation, even if the jury is instructed
to consider the confession only against the co-defendant. 391
U.S. 123, 136 (1968). In order to address a *Bruton* problem, the
Second Circuit has established that courts may (1) sever the
trial; (2) carefully redact the confession to eliminate
references to co-defendants; or (3) exclude the confession at
the joint trial. *See United States v. Jass*, 569 F.3d 47, 56 n.5
(2d Cir. 2009).

"[T]he appropriate analysis to be used when applying
the *Bruton* rule requires that [the court] view the redacted

---

[18] Rule 14(a) provides: "If the joinder of offenses or defendants in an
indictment, an information, or a consolidation for trial appears to prejudice
a defendant or the government, the court may order separate trials of counts,
sever the defendants' trials, or provide any other relief that justice
requires." Fed. R. Crim. P. 14(a).

confession in isolation from other evidence introduced at trial." *United States v. Williams*, 936 F.2d 698, 700 (2d Cir. 1991). The *Jass* court explained that *Bruton* and its progeny "do not construe the Confrontation Clause to demand further that a confession be redacted so as to permit no incriminating inference against the non-declarant defendant." 569 F.3d at 60. The Court further explained that "[t]he critical inquiry is [] not whether a jury might infer from other facts . . . that a declarant's neutral allusion to a confederate might have referenced the defendant" but "whether the neutral allusion sufficiently conceals the fact of explicit identification to eliminate the overwhelming probability that a jury hearing the confession at a joint trial will not be able to follow an appropriate limiting instruction." *Id*. at 61.

When employing redaction to avoid *Bruton* concerns, the Second Circuit thus recognizes two acceptable types of redactions: (1) redactions eliminating altogether any reference to a co-defendant's existence; and (2) redactions replacing a co-defendant's name with neutral pronouns so that the statement, standing alone, does not refer to the co-defendant. *Jass*, 569 F.3d at 388.

In addition, courts should sever defendants who are properly joined under Rule 8(b) when the prejudice against a defendant is so great that "there is a serious risk that a joint

40

trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (quoting *Zafiro*, 506 U.S. at 539). A defendant seeking severance under Rule 14 bears an "'extremely difficult burden' of proving . . . that the prejudice would be so great as to deprive him of his right to a fair trial." *United States v. Bellomo*, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (quoting *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989)).

The determination of whether such prejudice exists is highly fact-specific and must be evaluated on a case-by-case basis. *Id.* Moreover, the decision of whether to sever a trial is committed to the sound discretion of the district court. *United States v. Wilson*, 11 F.3d 346, 353 (2d Cir. 1993).

### 2.    Application

With respect to Mr. Garrett's argument that severance is necessary because the government's introduction of Rivera's "multiple confessions" will violate Mr. Garrett's rights under *Bruton*, the court respectfully disagrees. The government may, under certain conditions articulated in its submissions[19], seek to introduce Mr. Rivera's statements made at his August 30, 2012

---

[19] Mr. Rivera's statements, made pursuant to a proffer agreement, will not be offered by the government unless Mr. Rivera presents testimony or makes arguments that are inconsistent with the proffered statements.

proffer session. The government attached to its opposition memorandum Exhibit O, a "Brutonized" document containing "*all* of the statements from Rivera's proffer session that it may seek to introduce at trial." (emphasis added) (Opp. at 85.)

The court has reviewed the government's Exhibit O and finds that Exhibit O's modifications "sufficiently conceal[] the fact of explicit identification" such that a jury hearing the confession at a joint trial will be able to follow an appropriate limiting instruction. *Jass*, 569 F.3d at 61. First, because Mr. Rivera's statements were made at a proffer session, instead of in a written or recorded form, the government has represented that if it does introduce Mr. Rivera's statements at trial, it will do so through the testimony of a law enforcement agent present at the proffer session. (Opp. at 86.) Therefore, as demonstrated in the government's Exhibit O, the risk of clumsy redactions, which are prohibited by the Confrontation Clause, is minimized. *See Gray v. Maryland*, 523 U.S. 185, 192 (1998)("Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result.") Furthermore, the court has reviewed the government's Exhibit O, and notes that the government's

modifications have eliminated all references to Mr. Garrett in accordance with the Second Circuit's decision in *Jass*.

The court also finds that Mr. Garrett has failed to meet his heavy burden of proving that severance is warranted because he will be so greatly prejudiced that he will be deprived of a fair trial if the court permits "the admission of certain evidence against Rivera that is largely inadmissible against Garrett." (Garrett Mots. at 4-5.) Mr. Garrett is particularly concerned that prejudice may result from the admission of statements by Mr. Rivera that implicate Mr. Garrett. (Garrett Mots. at 4.)

First, with respect to Mr. Garrett's concern about "the admission of certain evidence against Rivera that is largely inadmissible against Garrett," the court notes that the statements about which Mr. Garrett is concerned would likely be admitted against Mr. Garrett in a separate trial. Statements (as distinguished from Mr. Rivera's proffer statement, which may implicate *Bruton*) made by co-defendants in furtherance of a conspiracy during the period of the charged conspiracy, even statements by one defendant that may implicate another defendant, are admissible as co-conspirator declarations and are "not hearsay" under Federal Rule of Evidence 801(d)(2)(E). Fed. R. Evid. 801(d)(2)(E); *United States v. DeVillo*, 983 F.2d 1185, 1193 (2d Cir. 1993).

Second, severance is not necessarily required simply because evidence is admissible against one defendant but not another. *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983); *see also United States v. Rucker*, 586 F.2d 899, 902 (2d Cir. 1978) ("The fact that evidence may be admissible against one defendant but not against others does not require separate trials."); *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) (noting that "disparit[ies] in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance").

The court recognizes that there could be instances in which severance is necessary because the volume of evidence adduced at trial that is only relevant against one defendant is grossly disproportional to that of his or her co-defendants. In *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992), for example, the Second Circuit found reversible error in the trial court's denial of severance as to certain defendants because "an infinitesimal fraction" of evidence offered during a sixteen-month trial related to those certain defendants, who were therefore "swamped" by a "mass of irrelevant evidence." *Id*. at 844–45.

The concerns in *DiNome* will be absent in the instant trial, which is estimated to last six weeks and involves just

44

two defendants, Mr. Garrett and Mr. Rivera, both of whom are alleged to be members of the same conspiracy. The court accepts and the defendants do not challenge the government's representations that Mr. Rivera and Mr. Garrett "are fairly equally represented in the government's voluminous discovery to date." (Opp. at 88; see Opp. at 28-30.) Indeed, the Second Circuit has stated that joint trials are often "particularly appropriate" where, as here, defendants allegedly participated in the same criminal conspiracy. *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

Furthermore, the court denies Mr. Garrett's request that the government identify "which statements it intends to introduce so defendant may make a comprehensive request for severance." As previously discussed, the statements which Mr. Garrett references would likely be admissible against Mr. Garrett under Rule 801(d)(2)(E), even in a separate trial. Thus, the government's disclosure of these statements is unlikely to bolster Mr. Garrett's argument for severance. In any event, the court finds that the disclosure of this information would likely be insufficient to establish that a joint trial would be so prejudicial as to constitute a "miscarriage of justice." *United States v. Locascio,* 6 F.3d 924, 947 (2d Cir. 1993). Should the parties object at trial, the court will certainly evaluate all statements that the government seeks to introduce for prejudice

against each defendant and exclude testimony when the interests of justice so require.

### F. Motion for a Bill of Particulars

Mr. Garrett maintains that the superseding indictment and the government's discovery disclosures do not provide adequate information to defend against the money laundering allegations charged as Count Eight and Racketeering Act Five. (Garrett Mots. at 16-17.) Mr. Garrett thus seeks a bill of particulars that includes specific descriptions of Garrett's actions and detailed information about each alleged money laundering transaction. (*Id.* at 17.)

### 1. Legal Standard

Federal Rule of Criminal Procedure 7(f) allows a defendant to seek a bill of particulars in order to (1) "identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial"; (2) "to prevent surprise"; and (3) "to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987). The determination of whether a bill of particulars is warranted is within the discretion of the district court and turns on "whether the information sought is necessary, not whether it is helpful." *United States v. Perryman,* 881 F. Supp. 2d 427, 430 (E.D.N.Y. 2012) (internal

citations omitted). It is well-established in this circuit that a bill of particulars should not be used as a "discovery device" or a "general investigative tool for the defense." *Id.* at 430– 31; *see also United States v. Torres,* 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus,* 628 F.3d 36 (2d Cir. 2010).

A defendant's request for a bill of particulars may be denied "if the information sought by defendant is provided in the indictment or in some acceptable alternate form," such as discovery. *Bortnovsky,* 820 F.2d at 574. "[O]nly where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused" is a bill of particulars required. *Perryman,* 881 F. Supp. 2d at 430 (quoting *Torres,* 901 F.2d at 234).

### 2.   Application

Having reviewed the superseding indictment and the letters that have accompanied the government's production of discovery to date (*see, e.g.*, Letter re Rule 16 Discovery (#2) as to Michael Garrett, ECF No. 60)(containing Garrett's and TF Mafia Muzik LLC's tax records and bank account records), the court respectfully denies Mr. Garrett's motion for a bill of particulars. The court recognizes that "[a] bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's

47

investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory." *United States v. Bellomo,* 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003).

The superseding indictment provides information as to the nature of the alleged money laundering offense, its timing, and Mr. Garrett's alleged participation. Moreover, during discovery, the government provided Mr. Garrett with TF Mafia Musik's banking records and tax records and the report of Mr. Rivera's proffer wherein Mr. Rivera articulated Mr. Garrett's alleged role in facilitating money laundering (Opp., Ex. K; Garrett Mots., Ex. C, at 10). The superseding indictment and subsequent discovery is sufficient to advise Mr. Garrett of the nature of the charges and the acts of money laundering of which he is accused, thereby enabling him to prepare for trial. *See, e.g., United States v. Walters*, 963 F. Supp. 2d. 125, 134 (E.D.N.Y. 2013) (denying defendant's request for bill of particulars for alleged wire fraud conspiracy and money laundering conspiracy where government has provided bank records showing various banking transactions).

### G. Request To Bring Further Motions Upon the Basis of Newly Discovered Information and to Join the Motions of Mr. Rivera

In his notice of motion, Mr. Garrett also requests that the court permit him to bring further motions upon the basis of newly discovered information. Other than the motions addressed in the Third Criminal Pretrial Scheduling Order (ECF No. 139), the court permits Mr. Garrett to bring further motions upon the basis of newly discovered information, but he must do so no later than 45 days before trial. The court requests that counsel for Mr. Garrett first file a letter with the court explaining the grounds of the motion prior to filing any such motions.

Mr. Garrett also requests permission to join in the motions of his co-defendant as appropriate. The court grants Mr. Garrett's request to join in Rivera's motions.

## II. Mr. Rivera's Motions

### A. Motion to Suppress Physical Evidence from Mr. Rivera's January 18, 2012 Car Stop

Mr. Rivera moves to suppress evidence seized from the vehicle he was driving when he was stopped on January 18, 2012 by a Pennsylvania State Police ("PSP") trooper for an alleged traffic violation on the grounds that the PSP trooper lacked probable cause to stop Rivera's vehicle. (Rivera Mots. at 3-4.) Mr. Rivera also argues that his prolonged roadside detention

after the traffic stop was unlawful and the PSP troopers did not have probable cause for his arrest and the search of his vehicle. (*Id.* at 4-9.) The government responds that the PSP trooper had a valid basis for stopping Mr. Rivera's vehicle, and that Mr. Rivera's roadside detention and the search of his vehicle were reasonable. (Opp. at 52-57.)

At the evidentiary hearings, the government presented the testimony of several witnesses relating to the January 18, 2012 car stop: Trooper Thomas Horan ("Trooper Horan"), who initially stopped Mr. Rivera's vehicle; Trooper Paul J. Lindsay ("Trooper Lindsay") who arrived at the scene to assist Officer Horan; and Trooper Gerald L. Powell ("Trooper Powell"), who handled the K-9 unit that reported to the scene. Mr. Rivera did not present any witnesses regarding his motion to suppress and relied upon his affidavits submitted in connection with his motion papers. (*See* Rivera Aff. filed with Rivera Mots. ("Rivera Aff."), ECF No. 113-1; Second Rivera Aff. Filled with Rivera Mots. ("Second Rivera Aff."), ECF No. 113-2.) Mr. Rivera and the government filed post-hearing submissions with the court. (*See* Memo. of Law in Supp. of Paul Rivera's Pre-Trial Mots. to Suppress ("Rivera Post-Hr'g Memo."), ECF No. 146; Gov. Post-Hr'g

Memo, ECF No. 148; Reply Br. in Supp. Of Paul Rivera's Pre-trial

Mots. to Suppress ("Rivera Post-Hr'g Reply"), ECF No. 150)[20]

### 1.    Factual Findings

During the evidentiary hearing, the witnesses for the

government presented a credible and largely consistent account

of Mr. Rivera's car stop on January 18, 2012.

### a. Testimony from the Government Witnesses

According to PSP Trooper Horan, who the court found to

be credible, he was on duty and patrolling Interstate 81 ("I-

81") in Susquehanna County, Pennsylvania on the morning of

---

[20] The court declines to consider the attachment, dated December 2, 2014, and
filed on December 3, 2014 by Mr. Rivera with his post-hearing memorandum
titled "Memorandum in Support" that consists of fourteen pages from Mr.
Rivera's prison email account ("Rivera *Pro Se* Br.", ECF No. 146-1.) On page
four of the attachment, the subject line of the email states "Motion Draft -
1 Part 2." (Rivera *Pro Se* Br. at 4.) The post-hearing memorandum submitted by
Mr. Rivera's counsel does not make any mention of the attachment, nor does it
request that the court consider the attachment. The court construes the
attachment to be a brief filed by Mr. Rivera, *pro se*, in support of his
motion to suppress. The court declines to consider the Mr. Rivera's *pro se*
brief, because Mr. Rivera has presented no "compelling reason" for the court
to permit this so-called "hybrid representation." *United States v. Tutino*,
883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States v. Wolfish*, 525
F.2d 457, 462 (2d Cir. 1975), *cert. denied*, 423 U.S. 1059 (1976) (finding
that defendant "had an experienced counsel and, so long as he retained him,
he could not appear *pro se*); *United States v. Muyet*, 985 F. Supp. 440, 441
(S.D.N.Y 1998)(denying defendant's motion to submit *pro se* amendments to his
attorney's post-trial motions). The court also denies Mr. Rivera's January
16, 2015 request to file a *pro se* motion in support of his pre-trial motions
and his *Pro Se* Motion to Impeach/Disqualify Government's Witnesses Based on
Grounds of Perjury and Coercion. (Letter dated 1/13/2015 from Paul Rivera,
docketed 1/16/2015, ECF No. 166; *Pro Se* Motion docketed 1/16/2015, ECF No.
167.) Mr. Rivera previously has been cautioned by this court in sum and
substance that his "[d]efense counsel has superior experience with the
criminal process and detailed, objective knowledge of the strengths and
weaknesses in the defendant's case." *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir.
1997). That Mr. Rivera may not always agree with his counsel about every
tactical decision does not obligate the court to accept his *pro se* motion.
*See generally Florida v. Nixon*, 543 U.S. 175, 187 (2004). Moreover, the court
has shared its concern with Mr. Rivera that his *pro se* filing could
"unwittingly prejudice his own case by making an unwary admission or a
statement contradicting" one of his earlier statements. *United States v.
D'Souza*, No. CR-88-00372, 1992 WL 151920, at *2 (E.D.N.Y. June 17, 1992).

January 18, 2012. (T2 at 289-92.) The government introduced
Exhibit U, which Trooper Horan testified was the mobile unit log
reflecting all calls that Trooper Horan made to the radio
dispatcher from his January 18, 2012 shift. (*Id.* at 289-90.)
According to Exhibit U, Trooper Horan indicated a traffic stop
at 8:08 a.m. on January 18, 2012. Trooper Horan testified that
at that approximate time, he was driving north on I-81 in the
left lane of the highway when he observed a silver Honda Accord
with New York license place FWH5874 (the "Rivera Vehicle")
directly in front of him in the left lane at approximately mile
marker 206.9. (*Id.* at 292-96; Gov. Ex. U.) Trooper Horan
testified that he observed the Rivera Vehicle move into the
right lane, at which point he passed the Rivera Vehicle on the
left. (T2 at 292.) Immediately after he passed the Rivera
Vehicle, Trooper Horan observed the Rivera Vehicle move back
into the left lane behind his police vehicle. (*Id.*)[21] Trooper
Horan testified that he continued to travel in the left lane
with the Rivera Vehicle behind him for "approximately a quarter
mile," after which Trooper Horan pulled into an emergency
turnaround area on the left side of the highway. (*Id.* at 292-

---

[21] On cross examination, counsel for Mr. Rivera pointed out that Trooper Horan
did not specify that he initially observed Mr. Rivera in the left lane in his
testimony from the preliminary hearing on April 3, 2012 before Judge Suzanne
Brainard of the Court of Common Pleas of Susquehanna County, Pennsylvania. At
the prior state court hearing, Trooper Horan testified: "I passed the
vehicle, looked in my rearview, and noted that the vehicle I had just passed
was immediately into the left lane." (Gov. Ex. SH-3500-TH-14 at 7.) The court
does not find that Trooper Horan's testimony at the hearing is contradicted
by his state court testimony at the preliminary hearing.

93.) Trooper Horan testified that he then observed the Rivera Vehicle continue past him, still traveling in the left lane. (*Id.*) Thereafter, Trooper Horan pulled behind the Rivera Vehicle in the left lane and observed that the Rivera Vehicle continued to travel in the left lane. (*Id.*) Trooper Horan testified that the amount of time he observed the Rivera Vehicle traveling in the left lane after he initially passed it was approximately two minutes. (*Id.* at 295-96.) In his incident report, which was admitted into evidence for the evidentiary hearing, Trooper Horan noted that he observed no vehicles in the right lane during that time and the Rivera Vehicle did not pass any other vehicles. (T2 at 312-13; Gov. Ex. V.)

Trooper Horan testified that pursuant to Pennsylvania state law, remaining in the left lane when the right lane is available on a limited access highway such as I-81 is a traffic violation known as a "left-lane violation." (T2 at 288.) Trooper Horan initiated a traffic stop of the Rivera Vehicle, because he observed the Rivera Vehicle travelling in the left lane on I-81 when the right lane was available,. (*Id.* at 296; Gov. Ex. V.) Trooper Horan activated the emergency lights on his patrol vehicle and pulled over the Rivera Vehicle at approximately mile marker 209.4 on I-81.[22] (*Id.*)

_____

[22] Trooper Horan's police vehicle was equipped with a dashboard camera that was programmed to automatically record the period starting 60 second from before the emergency lights go on until the end of the incident. (T2 at 319-

Trooper Horan testified that he then radioed the Rivera Vehicle stop to the local barracks, exited his vehicle, and approached the passenger side of the Rivera Vehicle. (T2 at 296.) Trooper Horan testified that a female occupant sitting in the front passenger seat, who was later identified as Shelby Rivera, opened the front passenger window. (*Id.* at 296-97.) Trooper Horan testified that he spoke to the vehicle occupants through the open window and explained that he pulled over the Rivera Vehicle for a left-lane violation. (*Id.* at 297.) Trooper Horan noted that there were five occupants in the vehicle including Shelby Rivera in the front passenger seat, and three back seat occupants: a man later identified as John Portalatin ("Mr. Portalatin"), a minor female, and a woman later identified as Kathryn Rivera. (*Id.*) Trooper Horan further testified that Mr. Rivera stated that he understood the left-lane violation and did not deny that he had not been driving in the left lane. (*Id.* at 298.)

Trooper Horan testified that as he was speaking to the vehicle occupants, he noticed a strong smell of perfume coming from inside the vehicle, and that as the smell of perfume

---

20.) Trooper Horan testified that he observed the video screen was operative on January 18, 2012. (*Id.* at 320-22.) However, when Trooper Horan requested the video from the traffic stop from the dashboard camera, he was informed that the hard drive was inoperable. (*Id.* at 321.) Trooper Horan also explained that the hard drive for the dashboard camera is in the trunk of his patrol vehicle, and that he cannot personally access the hard drive. (*Id.* at 325.) The court finds credible Trooper Horan's testimony that he was not aware that his hard drive was not functioning when he initiated the stop of the Rivera Vehicle on the morning of January 18, 2012.

dissipated, he could detect the odor of marijuana. (*Id*. at 297.)
Trooper Horan testified that the smell of marijuana was
significant to Trooper Horan, because he immediately suspected
the presence of criminal activity in addition to the traffic
violation. (*Id*. at 297-98.) Trooper Horan testified that he then
proceeded to ask who the vehicle belonged to, and Mr. Rivera
informed him that it belonged to his boss, Michael Garrett.
(*Id.*) Trooper Horan testified that Mr. Rivera appeared
"extremely nervous"; Trooper Horan noticed that Mr. Rivera would
not make eye contact and Mr. Rivera's carotid artery was visibly
pulsating. (*Id*. at 298-99.)

Trooper Horan testified that, because he smelled
marijuana, he returned to his patrol vehicle and contacted the
local barracks, PSP Gibson, to request backup. (*Id*. at 299.)
Trooper Horan testified that, while in his vehicle, he also
checked the criminal histories of the vehicle occupants and
learned that Mr. Rivera had an extensive criminal history for
narcotics and weapons possession and that Mr. Portalatin, one of
the vehicle occupants, had been charged with narcotics
possession. (*Id*. at 299-300.) He also checked the car's license
plate against a database and learned that the Rivera Vehicle was
registered to a car dealership in Brooklyn, New York. (*Id*. at
300.) Trooper Horan testified that he found this fact to be
significant, because Mr. Rivera had previously stated that the

Rivera Vehicle belonged to Mr. Garrett. (*Id.*) He was at his
vehicle for approximately ten or fifteen minutes, stating "it
took a little bit of time, if I recall, to run the histories."
(*Id.* at 300.)

Trooper Horan testified that he thereafter re-
approached the Rivera Vehicle and asked Mr. Rivera who owned the
car, and Rivera again stated that his boss, Michael Garrett,
owned the car. (*Id.*) Trooper Horan then asked Mr. Rivera to
retrieve the car's registration, and Mr. Rivera was unable to do
so. (*Id.*) Trooper Horan then asked where the Mr. Rivera Vehicle
was going, and Mr. Rivera responded that he was going to
Binghamton, New York to drop off Shelby Rivera to meet her
sister. (*Id.* at 301.) When Trooper Horan asked how long the
duration of the trip would be, Mr. Rivera stated that they were
going "down and back." (*Id.*) Trooper Horan testified that he
also asked whether any of the vehicle occupants had been
arrested, and all five passengers stated that they had never
been arrested. (*Id.* at 302.)

Trooper Horan testified that while he was speaking to
the vehicle occupants, he again smelled both perfume and
marijuana. (*Id.* at 301.) Trooper Horan began to ask more
questions, and Mr. Rivera began to sweat, with "beads of sweat
dripping off of his head." (*Id.*) Trooper Horan also observed
that Mr. Portalatin would not look at Trooper Horan, was visibly

shaking, and his hands were trembling. (*Id.*) Trooper Horan testified that he continued to be suspicious that there was criminal activity going on at that point. (*Id.*)

Trooper Horan testified that Trooper Lindsay then arrived to the scene, responding to his call for backup. (*Id.* at 301-302.) Trooper Lindsay testified that he arrived at approximately 8:35 a.m., parked his vehicle behind Trooper Horan's, and proceeded to discuss the situation with Trooper Horan. (*Id.* at 378-79.) Trooper Lindsay testified that while Trooper Horan was conducting some "traffic business", Trooper Lindsay approached the Rivera Vehicle and asked Mr. Rivera to step out and to the rear of the Rivera Vehicle. (*Id.*) Trooper Lindsay spoke briefly with Mr. Rivera about where he was going. (*Id.*) Trooper Horan testified that he then joined Mr. Rivera and Trooper Lindsay's conversation at the rear of the Rivera Vehicle. (*Id.*) Trooper Horan testified that when Mr. Rivera was asked where he was going, he stated that he was going to Binghamton, New York to drop off the "girls" with their families and then he and "Young," referring to Mr. Portalatin, were going to record for a record label. (*Id.* at 302.) Trooper Horan testified that he stated: "I thought you were just going down and back" to which Mr. Rivera responded: "I am." (*Id.*) Trooper Horan then asked Mr. Rivera for a second time whether he had ever been arrested, at which point Mr. Rivera responded that he

was arrested for extortion in 2000, but failed to mention any of the other arrests on his criminal record. (*Id*.) Trooper Horan also asked if he knew "Young's" real name, and Mr. Rivera stated that he did not. (*Id*. at 304.)

Trooper Horan testified that during the conversation, he observed that Mr. Rivera was sweating, which was notable, because it was a cold day. (*Id*. at 303.) Trooper Horan also testified that he noticed that Mr. Rivera was repeatedly sticking out his tongue, which Trooper Horan found to be odd. (*Id*.) Trooper Lindsay also testified that during the conversation, he noticed that Mr. Rivera's carotid artery was "pounding, considerably" and that Mr. Rivera's tongue was coming out of his lips. (*Id*. at 379-80.)

Trooper Horan then issued Mr. Rivera a traffic citation for the left-lane violation. (*Id*. at 304.) Trooper Horan testified that Mr. Rivera did not dispute the citation and seemed "actually happy" to receive the ticket, which Trooper Horan found to be "odd." (*Id*.) Trooper Horan testified that in his experience, people are usually unhappy to receive a traffic citation and that Mr. Rivera appeared as if "he just wanted to get his ticket and out of there." (*Id*.)

Trooper Horan testified that based on "the indicators that [he] had seen at this point" and the smell of marijuana, he decided to request a "K-9" unit, comprised of a trooper and a

canine trained to detect narcotics, to report to the scene. (*Id.* at 305.) Trooper Horan then asked Mr. Rivera for consent to search the Rivera Vehicle and Mr. Rivera refused to give consent. (*Id.* at 306.)

Trooper Horan testified that the PSP are typically required to use their own PSP canine units, if they are able, and that there was only one K-9 unit for the entire northeast. (*Id.* at 305.) Trooper Horan testified that it took approximately 30 to 35 minutes from the time he requested the K-9 unit to its arrival at the scene of the vehicle stop, which Trooper Horan characterized as a "good turnaround" for that area. (*Id.* at 305-306.)

Trooper Powell was on duty on the morning of January 18, 2012 and received a call at 8:40 A.M. and traveled approximately 30 miles to reach the scene at 9:15 A.M. (T2 at 406-407; Gov. Ex. X (Canine Section Utilization Report).) Trooper Horan testified that when Trooper Powell arrived on the scene, he informed Trooper Powell that Mr. Rivera had denied consent to a search, so that Trooper Powell would have the canine conduct an exterior sniff of the vehicle. (*Id.* at 306.)

Trooper Horan then had all of the passengers in the Rivera Vehicle exit and walked them to the front of Trooper Horan's patrol vehicle away from traffic. (*Id.* at 306-307.) Trooper Horan testified that other than asking the occupants to

vacate the vehicle, he did not make any changes to the Rivera Vehicle at the time of the canine search. (*Id.* at 307.) Trooper Powell testified that prior to conducting a canine sniff, he would inspect the vehicle for metal pieces or anything that might hurt the canine, but otherwise would leave the vehicle the way it was left by the occupants. (*Id.* at 400-401.) Troopers Horan and Lindsay testified that during the canine sniff they were primarily focused on the occupants who were standing outside the vehicle on the side of the highway to ensure their safety. (*Id.* at 306-307; 381.)

Trooper Powell testified that he did not have any independent memory of Mr. Rivera's car stop on January 18, 2012 (*id.* at 407), but that generally when he arrives with his canine, he speaks with the officer involved to determine whether there is "reasonable suspicious [sic] of criminal activity" prior to conducting the canine sniff. (*Id.* at 399-400.) Trooper Powell explained that his practice during a canine sniff of the exterior of a vehicle was to first walk the dog around the exterior of the vehicle (a "fast pass") and then to walk the dog around a second time more slowly, moving his hand over the vehicle in a "V" pattern to direct the dog's nose to higher and lower points on the vehicle (a "detail"). (*Id.* at 400-404.) When the dog alerts to an odor, it will enter the vehicle to follow the odor. (*Id.*) Trooper Powell also testified that a dog's sense

of smell is a thousand times better than a human's sense of smell, and that a dog is able to detect residual odors. (*Id.* at 409.)

Trooper Horan testified that the canine alerted to the smell of a controlled substance from an open door or window and entered the Rivera Vehicle. (*Id.* at 307.) According to Trooper Horan, after Trooper Powell finished with the canine sniff, he informed Trooper Horan that the canine had alerted to the center console of the vehicle. (*Id.* at 307-309.) Trooper Horan then informed Mr. Rivera that he intended to seize the vehicle. (*Id.* at 309.) Trooper Horan also testified that Mr. Rivera contemplated permitting Trooper Horan to search the vehicle, telling him to "just toss it." (*Id.* at 309-10.) Mr. Rivera proceeded to discuss with Mr. Portalatin whether he should consent to the search of the car. (*Id.*) Trooper Horan testified that he did not believe any consent from Mr. Rivera would be valid, because he was so "wishy washy," and because he believed he already had probable cause to obtain a search warrant for the Rivera Vehicle. (*Id.*)

Thereafter, at approximately 9:29 a.m., Mr. Rivera and the other vehicle occupants were taken into custody and the vehicle was brought to the PSP station. (T2 at 310; Gov. Exs. U and V). Trooper Horan then applied for a warrant to search the vehicle, which was granted by the Honorable Jodi Ellen Cordner.

(T2 at 310-12; Gov. Ex. D.) Pursuant to the search warrant, at approximately 12:40 P.M., the Rivera Vehicle was searched and the PSP recovered a red plastic bag that contained two vacuum-sealed packages from the trunk compartment that typically contains the spare tire. (T2 at 312-14; Gov. Ex. V.) Inside each of the vacuum-sealed packages was a black plastic bag: one plastic bag contained approximately six ounces of what Trooper Horan believed to be crack cocaine at the time. (*Id*.) A field test was conducted on the white chunky substance recovered from one of the black bags, and the results of the field test determined that the substance was cocaine. (*Id*. at 317.) The other black plastic bag contained a clear plastic bag with 170 bags of heroin stamped "Monster Mash." (*Id*.)

According to Trooper Horan's incident report, after finding the narcotics in the vehicle, all five vehicle occupants were formally placed under arrest. (Gov. Ex. V.) Trooper Horan also testified that the search of Mr. Portalatin yielded a blue capped vial of vegetable matter which tested positive for marijuana and the search of Kathryn Rivera yielded a balloon-type object that was suspected of being drug paraphernalia. (T2 at 318-19.) During Kathryn Rivera's interview after her arrest, she advised that Mr. Portalatin and Mr. Rivera had been smoking marijuana prior to the traffic stop. (*Id*. at 319.)

### b. Testimony from Mr. Rivera's Affidavit

In his affidavit dated June 6, 2014, Mr. Rivera
asserted that on the morning of January 18, 2012, he was driving
a vehicle that had been loaned to him by his cousin[23] on I-81.
(Rivera Aff. At ¶ 2). Mr. Rivera's affidavit attests that he was
driving in the right-hand land, was not in violation of any
traffic laws, and that nobody in the Rivera Vehicle was smoking
marijuana. (*Id.*) Mr. Rivera's affidavit states that at
approximately 8:00 a.m., a police vehicle began to follow his
vehicle "very closely" in the right-hand land of the highway
"for some time." (*Id.* at ¶ 3.) Mr. Rivera notes that at one
point, the police vehicle pulled ahead of the Rivera Vehicle,
slowed down, changed lanes, and then continued to follow behind
the Rivera Vehicle. (*Id.*) Mr. Rivera's affidavit stated that
after approximately five minutes, the police vehicle's lights
and sirens were activated and Mr. Rivera pulled his vehicle over
on the highway. (*Id.*)

According to Mr. Rivera's affidavit, a police officer
exited the police vehicle and approached Mr. Rivera and
requested Mr. Rivera's driver's license, vehicle registration
and insurance. (*Id.* at ¶ 4.) Mr. Rivera states he produced the
requested documents and the officer returned to his vehicle with

---

[23] Based on the statements made by defendants' counsel during court
appearances in this case, and the evidence at the hearing, the parties appear
to agree that Mr. Rivera and Mr. Garrett are cousins. (*See, e.g.*, Gov. Ex. K,
at 2; T3 at 277.).

the documents. (*Id.*) Mr. Rivera states that several minutes later, the officer approached his vehicle and "demanded" that each vehicle occupant produce identification. (*Id.*) Mr. Rivera states that after the officer took the vehicle occupants' identification documents, another police vehicle arrived with a second police officer approximately 30 minutes later. (*Id.*) Mr. Rivera states that thereafter he was instructed to exit the vehicle and that the officers questioned him about where he was going for "several minutes." (*Id.* at ¶ 5.) According to Mr. Rivera's affidavit, the officers then permitted him to return to his vehicle while the officers proceeded to interview each of the vehicle occupants, "one at a time, outside the vehicle." (*Id.*)

Mr. Rivera states that the officers then gave him a citation and told him that they were going to search his vehicle and that a canine unit was en route. (*Id.* at ¶ 6.) Mr. Rivera denies ever giving consent to search the vehicle. (*Id.*) Mr. Rivera states that approximately one and a half hours after he was initially pulled over, a third police officer arrived to the scene with a canine. (*Id.* at ¶ 7.) According to Mr. Rivera's affidavit, the officers then opened up all of the doors to the Rivera Vehicle without his permission and proceeded to lead the canine around the vehicle and permitted the canine to enter the vehicle. (*Id.*) Mr. Rivera states that he observed the canine

enter the interior of his vehicle through the front door on the driver's side and then again through the back door on the driver's side. (*Id.*) Mr. Rivera avers that he did not hear the canine make any noises at any point. (*Id.*)

Mr. Rivera states that thereafter, the officers removed the dog from the back seat of the vehicle and began to search the entire "passenger compartment" of the vehicle. (*Id.*) According to Mr. Rivera's affidavit, after the officers searched the interior of the vehicle, an officer asked to search the trunk of the vehicle. (*Id.* at ¶ 8.) Mr. Rivera states that he refused to give the police permission to search the trunk. (*Id.* at ¶ 9.) Mr. Rivera states that the police then stated that all of the occupants would have to be detained and the vehicle would be brought to the nearest police station to be searched. (*Id.*) Mr. Rivera states that he continued to refuse consent for the police to search the trunk of the vehicle, at which point all of the vehicle occupants, including Mr. Rivera, were placed under arrest and taken to a police station, where they remained under arrest for several hours. (*Id.* at ¶ 10.) Mr. Rivera states that the police searched the trunk of his vehicle, and he was informed that they recovered narcotics. (*Id.* at ¶ 11.)

### 2.    Application and Conclusions

Mr. Rivera seeks to suppress the physical evidence recovered from the Rivera Vehicle on the grounds that Trooper

Horan did not have probable cause to stop the Rivera Vehicle, the prolonged roadside seizure of the Mr. Rivera and his vehicle was unreasonable, and that the PSP troopers did not have probable cause to arrest Rivera or search his vehicle. The court respectfully denies Mr. Rivera's motion, finding that there was probable cause to stop the Rivera Vehicle and that the PSP troopers acted reasonably throughout the course of the car stop.

Mr. Rivera's affidavit offers a significantly different account of the circumstances of his car stop on January 18, 2012 from that of the government witnesses and exhibits. In particular, contrary to the testimony of the government witnesses, Mr. Rivera claims that (1) he was driving in the right-hand lane on I-81; (2) nobody in his car was smoking marijuana; (3) the police officers opened all of the doors to the Rivera Vehicle prior to the K-9 unit search; and (4) after the canine search, the officers searched the entire interior of the vehicle.

### a. Testimony from the Government Witnesses Was Credible

The court finds that the testimony of Trooper Horan, Trooper Lindsay, and Trooper Powell was credible, consistent, and reliable. The only inconsistency that Mr. Rivera has identified is that Trooper Horan failed to specify that he initially observed Mr. Rivera in the left lane in his

preliminary hearing testimony before Judge Suzanne Brainard of Susquehanna County, Pennsylvania. However, the court does not find this omission to be inconsistent. In the state court hearing, Trooper Horan testified that he "passed a vehicle, looked in [his] rearview, and noted that the vehicle [he] had just passed was immediately into the left lane," which is entirely consistent with Trooper Horan's testimony before this court that he first observed the Rivera Vehicle driving in the left lane in front of the police vehicle, the Rivera Vehicle then moved into the right lane, at which point Trooper Horan passed the Rivera Vehicle and observed the Rivera Vehicle immediately move back into the left lane behind Trooper Horan's police vehicle. That Trooper Horan neglected to mention in specific detail his initial observation of the Rivera Vehicle at the prior hearing does not diminish the credibility of his testimony before this court.

In contrast, the court declines to give significant weight to Mr. Rivera's affidavit. As this court previously noted with co-defendant Garrett's affirmations, because Mr. Rivera invoked his right not to testify and was not subject to cross-examination, his affidavit is accorded little weight.

Mr. Rivera's claim that he was driving in the right lane on I-81 on the morning of January 18, 2012 is contradicted by Trooper Horan's testimony that he observed the Rivera Vehicle

traveling in the left lane for approximately two minutes, and Trooper Horan's contemporaneous incident report stating that he observed "a silver passenger car driving in the left lane when the right lane was available." (Gov. Ex. V.) In light of Mr. Rivera's failure to present any evidence other than his affidavit to support his claim, the court declines to credit Mr. Rivera's statement that he was driving in the right lane.

The court also declines to credit Mr. Rivera's claim that "nobody inside [his] vehicle was smoking marijuana." Trooper Horan testified that he smelled the odor of perfume and marijuana emanating from the Rivera Vehicle two times when he approached the Rivera Vehicle; Trooper Horan's incident report also stated that he smelled the "faint odor of marijuana" (Gov. Ex. V.); Kathryn Rivera, in a post-arrest interview, stated that Mr. Portalatin and Mr. Rivera had been smoking marijuana prior to the traffic stop; and Mr. Portalatin was found to be in possession of marijuana pursuant to a search incident to arrest. In light of the substantial evidence contradicting Mr. Rivera's affidavit, the court declines to credit Mr. Rivera's self-serving claim that none of the vehicle occupants was smoking marijuana.

Mr. Rivera's claim that the police officers opened all of the doors to the Rivera Vehicle prior to the canine sniff is contradicted by Trooper Horan's testimony that he did not make

any changes to the Rivera Vehicle prior to the canine sniff, and Trooper Powell's testimony that he also would not make any changes to the vehicles he searched. The occupants had exited the Rivera Vehicle before the canine sniff which may explain Mr. Rivera's recollection that the doors were opened. Again, Mr. Rivera has not presented any evidence other than his affidavit to support his claim, and the court declines to credit his assertion that the PSP officers opened all the doors.

In his affidavit, Mr. Rivera also claims that after the canine sniff of the Rivera Vehicle, the PSP troopers searched the interior of his vehicle. Troopers Horan and Lindsay testified that they did not search the car after the canine sniff, because they did not have Mr. Rivera's consent or a search warrant, which were required by Pennsylvania law at the time. The court finds the PSP troopers' testimony to be credible and declines to credit Mr. Rivera's contrary assertion.

### b. Trooper Horan Had Probable Cause to Stop the Rivera Vehicle

The Supreme Court has "long acknowledged that stopping an automobile and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment." *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984). An "automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United*

*States*, 517 U.S. 806, 810 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id*. Officers are within their authority to stop vehicles for even minor traffic violations. *See United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994)("Although [defendant's] traffic violation, failure to signal while changing lanes as required by New York Vehicle and Traffic Law § 1163(d), was minor, the officers acted within their authority in stopping [defendant] for violation of the state law.").

The court finds that Trooper Horan had probable cause to stop the Rivera Vehicle after he observed the Rivera Vehicle traveling in the left lane, when the right lane was available, in violation of Pennsylvania law. *See, e.g.*, *United States v. Walker*, 719 F. Supp. 2d 586, 589 (W.D. Pa. 2010) (upholding a stop where a Pennsylvania state police officer observed a vehicle traveling in the left lane in violation of Pennsylvania's "right lane" rule, which requires vehicles to travel in the right lane except when passing or in certain other circumstances); 75 Pa. C.S.A. § 3313(d). Trooper Horan also observed that the Rivera Vehicle was not passing any other vehicles. (Gov. Ex. V at 5.)

Mr. Rivera also asserts that because Trooper Horan did not expressly disclaim each of the exceptions to Pennsylvania's

"right lane" rule, the government fails to demonstrate probable
cause. [24] (Rivera Mots. at 7.) Probable cause for a traffic stop
only requires that the police "reasonably believe that an
offense has been or is being committed." *Scopo*, 19 F.3d at 781–
82 (internal quotations omitted) (citing *United States v. Cruz*,
834 F.2d 47, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077
(1988)). The facts before the court are more than sufficient to
support a finding that Trooper Horan reasonably believed that
the driver of the Rivera Vehicle had committed a violation of
Pennsylvania's "right lane" rule. Mr. Rivera's argument that
Trooper Horan must expressly address every exception to
Pennsylvania's "right lane" rule misapplies the probable cause
standard.

### c. The Duration of the Mr. Rivera's Detention Was Reasonable

"[A] seizure that is lawful at its inception can
violate the Fourth Amendment if its manner of execution
unreasonably infringes interests protected by the Constitution."
*Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United
States v. Jacobsen*, 466 U.S. 109, 124 (1984)). "[T]he Fourth
Amendment demands that the scope and duration of the detention

---

[24] Under Pennsylvania's "right lane" rule, drivers are permitted to drive in
the left lane "(i) [w]hen overtaking and passing another vehicle proceeding
in the same direction; (ii) [w]hen traveling at a speed greater than the
traffic flow; (iii) [w]hen moving left to allow traffic to merge; (iv) [w]hen
preparing for a left turn at an intersection, exit or into a private road or
driveway when such left turn is legally permitted." 75 Pa. C.S.A. § 3313(d).

be reasonable. In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *United States v. Bailey*, 743 F.3d 322, 336 (2d Cir. 2014) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

In *United States v. Place*, the Supreme Court declined to adopt any "outside time limitation for a permissible *Terry* stop," because "[s]uch a limit would undermine the [] important need to allow authorities to graduate their responses to the demands of any particular situation." 462 U.S. 696, 709, 709 n.10 (1983). Additionally, "[a] traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, No. 2:12-cr-0091, 2013 WL 4710591, at *4 (D. Vt. May 7, 2013) (citing *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)); *see also United States v. Farjada-Guevara*, 507 F. App'x 365, 366-67 (5th Cir. 2013)("In order to prolong a detention after issuing a citation or determining that no citation should be issued, an officer must have developed a reasonable suspicion of additional criminal activity in the course of the stop and before the initial purpose of the stop has been fulfilled.").

Mr. Rivera contends the duration of his detention pursuant to his January 18, 2012 car stop was unreasonably long.[25] The duration of Mr. Rivera's car stop was approximately 81 minutes (from approximately 8:08 a.m. to 9:29 a.m.). Despite what the court acknowledges is a relatively lengthy detention after the traffic stop, the court finds that the PSP troopers diligently pursued their investigation of the traffic stop to properly confirm or dispel their suspicions of additional criminal activity, based on articulable facts.

After the Rivera Vehicle was initially stopped by Trooper Horan who, based on his observations, had probable cause to believe that a left-lane violation had occurred, Trooper Horan approached the Rivera Vehicle and noticed the odor of marijuana and that Mr. Rivera appeared nervous as indicated by his avoidance of eye contact and his throbbing carotid artery. Based on these specific and articulable facts, Trooper Horan had reasonable suspicion to continue his investigation. Upon checking the vehicle against the vehicle background check system, he learned that the vehicle's registered owner was a

---

[25] Mr. Rivera repeatedly describes the detention as "prolonged and invasive" but makes no specific arguments and cites no law to support his claim that the detention was in any way unreasonably "invasive." (Rivera Mots. at 5-6.) Regardless, the court finds that running a check on the Rivera Vehicle, a criminal background check on Mr. Rivera and the other vehicle occupants, and the dog sniff are not unreasonably invasive. *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) ("Both the computer search and the dog sniff were minimally intrusive means of confirming or dispelling the officers' suspicion.")

Honda dealership in Brooklyn, not Michael Garrett, the
individual whom Rivera identified as the owner of the vehicle.
Over the course of approximately twenty minutes, Trooper Horan
also ran criminal background checks on the vehicle occupants,
which revealed that Mr. Rivera and Mr. Portalatin were not
forthcoming when they initially denied any criminal history, and
awaited the arrival of a backup officer. The court finds that
Trooper Horan diligently pursued the investigation by gathering
additional information, using data systems to conduct background
checks and vehicle registration and ownership queries to confirm
or dispel the suspicions raised by his initial interaction with
the vehicle occupants. Furthermore, Trooper Horan's decision to
await support from another PSP trooper is reasonable in light of
the need to protect the safety of the five vehicle occupants,
the Rivera Vehicle, and Trooper Horan. Especially in light of
the Supreme Court's warning that a court should not "indulge in
unrealistic second-guessing" as to the means law enforcement
officers employ to conduct their investigations, the court finds
Trooper Horan's investigative actions to be reasonable. *Sharpe*,
470 U.S. at 686.

Troopers Horan and Lindsay's discussion with Mr.
Rivera and the vehicle occupants continued to raise, rather than
dispel, their suspicions: Trooper Horan again smelled the odor
of marijuana when he re-approached the car; Mr. Rivera continued

to appear nervous, was avoiding eye contact and repeatedly sticking out his tongue[26], and appeared to be sweating; the vehicle occupant, Mr. Portalatin, was visibly shaking; Mr. Rivera and Mr. Portalatin did not provide truthful answers when questioned about their criminal histories and provided inconsistent answers about their travel plans; and according to Trooper Lindsay, "Interstate 81 is a drug corridor to New York State." (T2 at 381.)

Based on the totality of the circumstances, the increasing indicia of criminal activity relating to narcotics, and the fact that Mr. Rivera refused consent to search the car, Troopers Horan and Lindsay reasonably decided to request a K-9 unit to confirm or dispel their suspicions. That Mr. Rivera and his vehicle remained at the location of the stop for almost thirty minutes awaiting the arrival of the K-9 unit does not invalidate the detention. *See, e.g., United States v. Mendoza,* 468 F.3d 1256, 1260 (10th Cir. 2006) ("Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband."); *United States v. Davis,* 430 F.3d 345 (6th Cir. 2005) (finding that, following the completion of a

---

[26] Trooper Horan testified that he was trained to observe facial expressions, including the repeated sticking out of the tongue, which he thought was "a good indication that somebody is being deceitful." (T2 at 380.)

traffic stop, reasonable suspicion of narcotics related activity justified detaining a motorist for "the additional approximately thirty to forty-five minutes it took" for a drug-sniffing dog to arrive at the scene); *United States v. Rivera*, No. 3:07CR285EBB, 2008 WL 2229917, at *3 (D. Conn. May 28, 2008) *aff'd,* 353 F. App'x 535 (2d Cir. 2009) (collecting cases).

In *United States v. Glover*, 957 F.2d 1004, 1009-10 (2d Cir. 1992), the defendant was stopped at a bus terminal under reasonable suspicion of transporting narcotics. The police questioned the defendant and upon receiving contradictory responses and based on the fact that the defendant appeared very nervous, brought the defendant to an administrative office for further investigation. *Id*. at 1006-07. Although the *Glover* court found that the detention terminated when Glover was told he was free to leave, the court stated:

> Even assuming, however, that Glover remained seized under the Fourth Amendment, despite being told that he was free to leave, *see id.,* we do not believe that detaining him along with his bags until the arrival of the narcotics dog converted an otherwise permissible detention based on reasonable suspicion into an arrest requiring probable cause. Upon returning to the NFTA office, the officers acted diligently and in a non-threatening manner to confirm or dispel their suspicions that Glover was engaged in narcotics trafficking. They promptly conducted a computer check to verify Glover's identification, and learned, contrary to Glover's representations, that he had prior narcotics convictions, had also used aliases, and had given an incorrect birthdate. Once Glover refused

> consent to search his bags, the officers
> immediately arranged for the narcotics dog, which
> arrived about twenty minutes later. 957 F.2d at
> 1013.

As in *Glover*, the PSP troopers investigating Mr. Rivera promptly conducted background and vehicle registration checks to confirm or dispel their suspicions of criminal activity. Upon further confirmation and enhancement of those suspicions, they immediately arranged for a K-9 unit to confirm or dispel their suspicions of criminal activity relating to narcotics.

In his motion to suppress, Mr. Rivera relies heavily on *United States v. Place*, 462 U.S. 696 (1983). (Rivera Mots. at 8.) In *Place*, law enforcement agents stopped the defendant after his arrival in an airport and seized his luggage for 90 minutes to take it to a narcotics detection dog for a "sniff test." The Supreme Court decided that an investigative seizure of personal property could be justified under the *Terry* doctrine, but that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id*. at 709. However, as the Supreme Court acknowledged in *United States v. Sharpe*, the rationale underlying the *Place* Court's decision was that the police did not diligently pursue their investigation, because "the police knew of respondent's arrival time for several hours beforehand,

and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes." *Sharpe*, 470 U.S. at 684-85. Here, as in *Sharpe*, the court does not find that the police acted less than diligently or that they in any way unnecessarily prolonged the detention of Mr. Rivera and his vehicle.

### d. The PSP Troopers Had Probable Cause to Arrest Mr. Rivera and Search His Vehicle

At the outset, the Supreme Court has established that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). As previously discussed, the court has already found that the PSP troopers acted reasonably by requesting the K-9 unit after the odor was marijuana was detected, the background and vehicle checks revealed information that was at odds with the responses of Messrs. Rivera and Portalatin, and Mr. Rivera refused to consent to search the vehicle.

To the extent that Mr. Rivera argues that the K-9 unit's sniff of the interior of the Rivera Vehicle was unlawful, the court disagrees. At the time the canine sniff was conducted,

the PSP troopers had probable cause to search the passenger area

of the vehicle[27] (even though there is no credible evidence that

such a search occurred before the warrant was obtained) based on

the totality of the circumstances, particularly the smell of

marijuana and Mr. Rivera's untruthful denial of prior narcotics

related arrests. *See, e.g.*, *United States v. Johns*, 469 U.S.

478, 482 (1985) (upholding a warrantless search of packages

three days after their seizure from vehicles, finding that when

officers "detected the distinct odor of marihuana, they had

probable cause to believe that the vehicles contained

contraband").

Furthermore, although the Second Circuit has yet to

decide the issue, several appeals courts have held that no

constitutional violation has occurred where a canine's entry

into the car was instinctual rather than orchestrated and the

officers did not open any part of the vehicle. *See United States

v. Vazques*, 555 F.3d 923, 930 (10th Cir. 2009) (no

constitutional violation where "(1) the dog's leap into the car

was instinctual rather than orchestrated, and (2) the officers

---

[27] Mr. Rivera's Post-Hearing Reply Brief argues that the totality of the
circumstances "would only have provided Trooper Horan with probable cause
sufficient to conduct a warrantless search of the *passenger* area of Mr.
Rivera's vehicle—not the trunk." (Rivera Post-Hr'g Reply, ECF No. 150, at 1)
(emphasis in original). There was, however, no credible evidence presented
that a warrantless search of the trunk or the passenger area of the Rivera
Vehicle occurred. Rather, the record establishes that Trooper Horan applied
for a warrant to search entire the vehicle, which was granted by a judge in
Susquehanna County, Pennsylvania, and only thereafter did the PSP troopers
search the Rivera Vehicle, including the trunk.

did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog"); *United States v. Sharp,* 689 F.3d 616, 619–20 (6th Cir. 2012), *cert. denied,* 898 F.3d 616 (2012) ("It is a Fourth Amendment violation for a narcotics detection dog to jump into a car because of something the police did, like training the dog to jump into cars as part of the search or facilitating or encouraging the jump," but no violation occurs "as long as the canine enters the vehicle on its own initiative and is neither encouraged nor placed into the vehicle by law enforcement." (citations omitted)); *United States v. Pierce,* 622 F.3d 209, 213–15 (3d Cir. 2010) (same); *United States v. Lyons,* 486 F.3d 367, 373–74 (8th Cir. 2007) (same).

According to the credible testimony of Trooper Powell, the canine handler, his usual practice is to have the dog sit in front of the passenger side outside of the vehicle, and then direct the dog to sniff the exterior of the vehicle while moving in a counter-clockwise direction. If, as here, the dog alerts to the odor of narcotics through a change in body posture, the dog is trained to follow the odor and then sit where the odor is the strongest. Once a dog alerts, the vehicle is seized, no one is allowed to enter, and a search warrant is obtained. (T2 at 400-408; Gov. Ex. V at 6.) There is no evidence that the canine was directed to enter the Rivera Vehicle.

Mr. Rivera also disputes that the canine ever indicated the presence of drugs, stating in his affidavit that he "did not hear the dog make any noises at any point." Although neither Trooper Horan nor Trooper Powell testified to their specific observations of the canine sniff, because they were focused on the safety of the passengers during the canine sniff, Trooper Powell credibly testified that the canine he used alerts silently, by pinpointing the area where the odor was strongest and proceeding to sit and stare. (T2 at 422.) The court accepts the credible testimony of the troopers and finds that the canine did alert to the odor, entered the vehicle and followed the odor to the center console of the vehicle.

In light of the canine alert and the additional substantial indicia of criminal activity, the court finds that there was probable cause for Mr. Rivera's arrest. *See United States v. Waltzer*, 682 F.2d 370, 372 (2d Cir. 1982) ("We regard the dog's designation of the luggage itself as establishing probable cause, enough for the arrest, more than enough for the stop.")

### B. Motion to Suppress Mr. Rivera's August 30, 2012 Proffer Statements

Mr. Rivera moves to suppress all "involuntary statements" that Mr. Rivera made to law enforcement agents. (Rivera Mots. at 10.) In his Post-Hearing Memorandum, Mr. Rivera

specifies that he seeks to suppress statements made at an August 30, 2012 proffer session, because he made those statements while fearing for his life. (Rivera Post-Hr'g Memo. at 7-8.) Mr. Rivera claims that the government led him to believe his life was in danger, because he was notified that he was the target of a planned "hit" and that the government threatened him with the death penalty if he did not cooperate. (*Id.*) The government denies Mr. Rivera's claims that he was threatened with the imposition of the death penalty. (Opp. at 75.) Furthermore, the government argues that the proffered statements were not made under circumstances that meet the standard of physical or psychological coercion required for the statements to be considered involuntary. (*Id.* at 67.)

At the evidentiary hearings, the government presented the testimony of several witnesses: Warden Nicholas Conigliaro ("Warden Conigliaro"), the warden at Susquehanna County Correctional Facility ("SCCF"); Major Brian Keller ("Major Keller"), the head security officer at the Pennsylvania State Correctional Institution Frackville ("Frackville"); and Task Force Officer Daniel Mimnaugh ("TFO Mimnaugh"), a PSP trooper and FBI Task Force Officer present at Rivera's August 30, 2012 proffer. Mr. Rivera presented the following witnesses: Patrick Daly ("Daly"), an attorney appointed by the Pennsylvania state court to represent Rivera in Susquehanna County; Deputy Warden

Joshua B. Weller ("Deputy Warden Weller"), the deputy warden at
SCCF; and Ingrid Cronin ("Cronin"), a Federal Defender in
Pennsylvania who represented Mr. Rivera before, during, and
after his August 30, 2012 proffer. Mr. Rivera also submitted an
affidavit dated June 8, 2014 in connection with his motion
papers. (*See* Second Rivera Aff. filed with Rivera Mots. ("Second
Rivera Aff."), Ex. B, ECF No. 113-2.) The court has considered
the parties' pre-hearing submissions, the testimony and exhibits
presented at the hearing, and the parties' post-hearing
submissions.

### 1.    Factual Findings

During the evidentiary hearing, the witnesses called
by both Mr. Rivera and the government presented a credible and
largely consistent account of Mr. Rivera's confinement at SCCF
and Frackville, and the circumstances of his August 30, 2012
proffer.

### a. Testimony from the Parties' Witnesses

After Mr. Rivera's arrest on January 18, 2012 in
connection with his car stop, he was held in custody at SCCF[28],
where he would remain until July 2012. (T1 at 13.) Attorney
Patrick Daly was appointed to represent Mr. Rivera. (T3 at 5.)

---

[28] Mr. Rivera was charged with several violations of Pennsylvania law,
including but not limited to, possession of a controlled substance,
possession of a controlled substance with intent to deliver, conspiracy with
respect to the possession with intent to deliver, and driving in the right
lane. (T3 at 5-6.)

The warden at SCCF was Nicholas Conigliaro.[29] (T1 at 8.) Warden Conigliaro testified to the conditions at SCCF at the time Rivera was in custody: inmates are fed three times a day; are permitted to shower without any restriction; are given three one-hour recreation periods per day, two two-hour visitation days per week, and unlimited legal visits; and are permitted to freely mingle in the common area during the remainder of the day. (T1 at 8-9.) SCCF passed all of its inspections for cleanliness. (T1 at 13.)

Warden Conigliaro testified that while Mr. Rivera's was an inmate at SCCF, he was provided with the same care and privileges as all other SCCF inmates. (T1 at 14.) While incarcerated at SCCF, Mr. Rivera did not file any grievances about the conditions of his confinement.[30] (T1 at 38-39.) Court appointed counsel Daly also testified that Mr. Rivera never voiced any concerns about his conditions of confinement during Daly's representation. (T3 at 11.) Federal Defender Ingrid Cronin, who represented Mr. Rivera in the subsequent federal investigation, also testified that Mr. Rivera never discussed any concerns about the conditions at SCCF. (T3 at 29-30.)

---

[29] Warden Conigliaro has worked at SCCF since 2002. (T1 at 7-8.) He been warden of the facility for approximately five years and was a deputy warden and corrections officer prior to his role as warden. (*Id.*)

[30] Mr. Rivera did file two formal grievances and an appeal while at SCCF that related to a single incident in March 2012 where Mr. Rivera was cited for misconduct for attempting to communicate with Shelby Rivera for which Mr. Rivera received a verbal warning. (T1 at 38-39; Gov. Ex. Y at 18, 21.)

During the evidentiary hearing, the government introduced Mr. Rivera's document file relating to his incarceration at SCCF, which included his intake process and numerous misconduct reports, some of which resulted in misconduct charges and discipline. (T1 at 14-15; Gov. Ex. Y.) Misconduct reports were filed against Mr. Rivera for various violations of SCCF rules, which generally resulted in warnings rather than formal discipline. The violations included: standing at a window and staring at and upsetting Kathryn Rivera, his then co-defendant, after being told several times to cease doing so; wearing his sweatshirt turned inside out after previously being told not to do so; and attempting to communicate with then co-defendant Shelby Rivera after being warned not to. Mr. Rivera was called to a disciplinary hearing after he was observed entering other inmates' cells and throwing items into the cells of inmates in disciplinary segregation and received a ten day cell restriction during the time periods when other inmates were permitted to roam freely. (Gov. Ex. Y; T1 at 15-18.) Although Mr. Rivera requested disciplinary segregation at that time, he was given the ten day cell restriction. (Gov. Ex. Y at 15.)

On April 3, 2012, Mr. Rivera appeared in Pennsylvania state court with his counsel, Mr. Daly, for a preliminary

hearing. (Gov. Ex. E.[31]) Mr. Daly testified that Mr. Rivera was transported to the preliminary hearing in a bulletproof vest and shackles. (T3 at 8.) Mr. Daly testified that he did not remember whether Mr. Rivera was shackled at the hearing, did not recall Mr. Rivera expressing any discomfort about being in the bulletproof vest, and did not observe Mr. Rivera in any mental or physical distress. (*Id*. at 8-10.)

In a handwritten letter to Judge Kenneth Seamans, the Pennsylvania judge assigned to Mr. Rivera's case, postmarked April 18, 2012, Mr. Rivera first expressed his desire to cooperate with the federal government in an effort to have his state case dismissed. (T1 at 21-22, 78-81; Gov. Ex. F.[32]) The letter to Judge Seamans also enclosed a second handwritten letter that Mr. Rivera had previously sent to Warden Conigliaro (referred to in the letter as "Nick"). The letters detailed many criminal acts allegedly committed by Mr. Garrett and others and Mr. Rivera's desire to cooperate. (Gov. Ex. F.)

Meanwhile, the United States Attorney's Office in the Middle District of Pennsylvania ("MDPA") was investigating the activities of TF Mafia. (T1 at 77-78.) Mr. Rivera's letters came to the attention of Assistant United States Attorney William

---

[31] Government Exhibit E is a copy of Mr. Rivera's criminal docket in the Court of Common Pleas of Susquehanna County.

[32] These letters were admitted into evidence as Gov. Ex. F through the testimony of TFO Mimnaugh. (T1 at 80.)

Houser ("AUSA Houser") and TFO Mimnaugh, and they arranged a
visit with Mr. Rivera at SCCF in April 2012. (T1 at 78-81.) TFO
Mimnaugh credibly testified that neither he nor AUSA Houser
threatened Mr. Rivera in any way at this meeting. (*Id.* at 81-
82.) TFO Mimnaugh also credibly testified that neither he nor
AUSA Houser told Mr. Rivera that if he did not cooperate, he
would receive the death penalty. (*Id.*) TFO Mimnaugh stated that
after AUSA Houser asked Mr. Rivera if he wanted the court to
appoint a federal defense attorney, Mr. Rivera stated that he
wanted an attorney, at which time TFO Mimnaugh and AUSA Houser
stopped speaking with Mr. Rivera. (*Id.*) Following the initial
meeting, neither AUSA Houser nor TFO Mimnaugh ever met with Mr.
Rivera without his attorney present. (*Id.*) After the meeting,
Mr. Rivera sent a letter to AUSA Houser on or about April 30,
2012 stating that he wanted "to do the right thing," indicating
that he wanted to cooperate with the federal government's
investigation, and stating that he influenced Michael Garrett in
a negative way. (T1 at 82-84; Gov. Ex. G.)

Federal Defender Ingrid Cronin[33] was appointed to serve
as Mr. Rivera's attorney in connection with the federal
investigation after her office received a "target letter". (T1

---

[33] Ms. Cronin is employed by the Federal Defender's Office for the Middle
District of Pennsylvania. (T3 at 22.) She has been a federal defender for
eight years and also served two years on the Criminal Justice Act panel and,
over the course of those years, she has handled hundreds of cases. (T3 at
36.)

at 82; T3 at 25-26.) Ms. Cronin first visited Mr. Rivera at SCCF in early May 2012 and met with Mr. Rivera at least nine times throughout the course of her representation. (T3 at 26-28, 37-38.)

A proffer session was scheduled on May 30, 2012[34] where AUSA Houser, TFO Mimnaugh, TFO Mark Malloy, Ms. Cronin, and Mr. Rivera were in attendance. TFO Mimnaugh testified that when AUSA Houser explained the proffer agreement to Mr. Rivera, he stated that he was not ready to cooperate with law enforcement at that time. (T1 at 85-86.) TFO Mimnaugh also testified that the tenor of the meeting was non-confrontational and polite. (*Id.*) Federal Defender Cronin and TFO Mimnaugh both testified that no one threatened Mr. Rivera, nor did anyone threaten him with the death penalty if he did not cooperate. (*Id.* at 86; T3 at 58.)

While Mr. Rivera was incarcerated at SCCF, the federal government notified prison officials that Mr. Rivera might be in danger from another member of TF Mafia. (T3 at 16-17.) Warden Conigliaro testified that he provided this information to the local sheriff's department which was responsible for transporting Mr. Rivera to and from court, as

---

[34] During the evidentiary hearing, Ms. Cronin recalled that a meeting took place on May 2nd, stating "I believe that meeting was probably May – that would have been May 2nd." (T3 at 31.) Ms. Cronin testified that she also visited SCCF on May 30, 2012, and her notes indicate visits on May 2nd and May 30th in 2012. (*Id.* at 28-29.) TFO Mimnaugh testified that he and other law enforcement officials only met with Mr. Rivera and Ms. Cronin once in May. The FBI 302 indicates a meeting on May 30, 2012 with Mr. Rivera, Ms. Cronin, and law enforcement, during which Mr. Rivera stated he did not want to cooperate. (Gov. Ex. H.)

the risk of harm to Mr. Rivera was higher when he was outside SCCF. (T1 at 23.) Warden Conigliaro testified that he never advised Mr. Rivera that anyone was trying to hurt him, never instructed anyone at SCCF to do so, and provided the information about the "hit" to his two deputy wardens and not to any correctional officers. (T1 at 23, 34.) Deputy Warden Weller also testified that he did not recall informing Mr. Rivera about the "hit." (T3 at 18.)

During Mr. Rivera's incarceration at SCCF in the spring and summer of 2012, he continued to violate prison rules and incurred approximately eight misconduct charges by failing to comply with the dress code; barking and causing excessive noise; standing on a table in the day room and removing an object that contained hot water; tampering with and jamming a lock in his cell and covering his cell door window; telling an officer that he planned to grab and detain a female correctional officer in his cell; flooding his cell; and throwing a full tray of food from his cell on the top tier that landed in the day room of the bottom tier. (Gov. Ex. Y.) For each of these infractions, disciplinary action was taken, ranging from cell restrictions and placing Mr. Rivera in disciplinary segregation. (*Id.*) While in segregation for twenty days in June and five days in July 2012, Mr. Rivera had daily showers, usually showed good behavior, and was offered time out of his cell. (Gov. Ex. Y at

41, 56.) Warden Conigliaro testified that due to these continliued infractions and the security risks, he decided to transfer Mr. Rivera to a state facility. (T1 at 20.) Mr. Rivera was transferred to Frackville in July 2012. (*Id.* at 21.)

Major Keller[35] testified that Frackville houses inmates in a number of different units, including a restrictive housing unit ("RHU") for inmates subject to administrative or disciplinary segregation, and a secured special needs unit with psychiatric observation cells ("POCs") for inmates with psychiatric issues. (T1 at 42-43.) Major Keller further testified that the RHU is also used to house inmates for other state and local institutions in cases where an inmate is disruptive and disorderly. (*Id.*)  Keller testified to the conditions for the RHU inmates at Frackville: they are fed three times a day; are permitted to exercise five days per week for a minimum of one hour per day; are permitted to shower three times per week; are permitted visits either once per week or once per month, depending on status; are permitted legal visits as requested without restriction; and are permitted to speak to inmates in other RHU cells and during periods of exercise. (T1 at 43-45, 54-55.) According to Major Keller, inmates in the POCs

---

[35] Major Keller has worked with the Pennsylvania Department of Corrections since 1992. (T1 at 40-41.) He has served as a corrections officer, a lieutenant, a unit manager, and a staff assistant to the Regional Deputy Security. (*Id.*) For the past three years, he has been the major of the guard who is in charge of all other correctional security staff at Frackville. (*Id.*)

are also fed three times per day, are permitted to shower three times a week, and are permitted legal visits as requested without restriction. However, because they have been deemed a danger to themselves and others, they are permitted less time for exercise, are not permitted non-legal visits, and are visited regularly by a psychiatrist. (T1 45-46, 50.)

According to Mr. Rivera's Frackville record, admitted as Government Exhibit Z at the evidentiary hearing, Mr. Rivera was housed within the RHU for the entire time he was at the facility, with the exception of the week of August 3, 2012 to August 10, 2012, when Mr. Rivera was housed in the POC. (T1 at 49-50; Gov. Ex. Z at 79.) Major Keller testified that Mr. Rivera was transferred to the POC for that one-week period, because Mr. Rivera refused a chest X-ray for tuberculosis. (T1 at 62.) Major Keller testified that Mr. Rivera was reported for two disciplinary infractions while at Frackville; he reportedly refused to comply with a strip search, and he reportedly covered up a surveillance camera in his cell and refused to uncover the camera when requested to do so. (T1 at 51-53; Gov. Ex. Z at 71-78.)

Upon reviewing Mr. Rivera's records from Frackville, Major Keller testified that Mr. Rivera communicated with other inmates in the RHU, received both legal and non-legal visits, received phone calls, was fed regularly, and was permitted to

shower and exercise regularly. (T1 at 53-58; Gov. Ex. Z.) Ms. Cronin testified that she did not remember a time when Mr. Rivera seemed under duress due to the conditions at the facility, but stated that he apparently "felt calm and at peace." (T3 at 32-33.)

TFO Mimnaugh testified that Federal Defender Cronin notified AUSA Houser that Mr. Rivera was interested in cooperating with law enforcement. (T1 at 86.) Another proffer session was held on August 30, 2012, where Mr. Rivera, Federal Defender Cronin, John Brunza, an investigator from Cronin's office, AUSA Houser, TFOs Mimnaugh and Malloy, and Special Agent Denise Cole of the Internal Revenue Service Criminal Division were present. (T1 at 88; Gov. Ex. K.[36]) TFO Mimnaugh and Federal Defender Cronin both credibly testified about the August 30, 2012 proffer. Mr. Rivera was held in a smaller cell within the interview room during the August 30, 2012 proffer session, but Federal Defender Cronin and TFO Mimnaugh do not recall Mr. Rivera being handcuffed during the session. (T1 at 106; T3 at 33-34.)

Prior to signing the proffer agreement at the outset of the proffer session, Federal Defender Cronin and Mr. Rivera spoke privately. (Gov. Ex. K at 1.) Thereafter, Mr. Rivera asked

---

[36] The government introduced the report drafted by TFO Malloy regarding the August 30, 2012 proffer session as government exhibit K, and the notes were admitted into evidence for purposes of the evidentiary hearing. (T1 at 88.)

to speak to AUSA Houser alone, but AUSA Houser explained that he would only speak to Mr. Rivera with an investigator and Ms. Cronin present. (T1 at 89; Gov. Ex. K at 1.) AUSA Houser then explained the terms of the proffer agreement and advised Mr. Rivera of the charges that he may face as a result of the MDPA's investigation. (T3 at 43-44; T1 at 89-90; Gov. Ex. K at 1.) Ms. Cronin testified that she remembered that AUSA Houser specifically said that certain weapons charges could result in a life sentence. (T3 at 57-58.) Ms. Cronin did not remember any discussion about possible application of the death penalty. (*Id.*) TFO Mimnaugh testified that he believed that AUSA Houser explained the possibility of a death penalty charge. (T1 at 101-103.) Both Federal Defender Cronin and TFO Mimnaugh testified that no one threatened that Mr. Rivera would receive the death penalty if he did not cooperate. (T1 at 90; T3 at 58.)

Mr. Rivera and Federal Defender Cronin then signed the proffer agreement. (Gov. Ex. K at 1.) Ms. Cronin testified that she observed Mr. Rivera reach out and fist-bump AUSA Houser, which Ms. Cronin understood to be a friendly gesture. (T3 at 44.) After signing the proffer agreement, TFO Mimnaugh read Mr. Rivera his *Miranda* rights. *(*T1 at 91; T3 at 44; Gov. Ex. K.) TFO Mimnaugh testified that Mr. Rivera acknowledged that he understood his rights and was ready to proceed with the proffer session. (T1 at 91; Gov. Ex. K.) Ms. Cronin testified that

Rivera appeared to understand the purpose of the August 30, 2012 meeting and what cooperation meant in the federal criminal justice system. (T3 at 58-59.) She also testified that she would not have permitted the proffer to proceed if Mr. Rivera did not understand the purpose of the proffer or the proffer agreement. (*Id*.) During the proffer, Mr. Rivera made numerous inculpatory statements, as well as statements detailing the criminal activities of others, including Mr. Garrett. (Gov. Ex. K.)

TFO Mimnaugh and Federal Defender Cronin testified that throughout the proffer session, Mr. Rivera appeared to be in good physical condition, and that he appeared relaxed and was cordial and talkative. (T1 at 91; T3 at 44, 52.) TFO Mimnaugh testified that no one verbally or physically threatened Mr. Rivera during the session. (T1 at 92, 104-105.)

### b. Testimony from Mr. Rivera's Affidavit

In his affidavit dated June 6, 2014, Mr. Rivera generally stated that while he was held at SCCF, "[v]iolence and incidents of sexual assault" were common and that he felt threatened by members of the Aryan Nation at the facility, but he did not provide specific information. (Second Rivera Aff. at ¶ 2.) He states that his attorney only visited him one time during his incarceration at SCCF and that the court did not honor his request for new counsel. (*Id.* at ¶ 3-4.) Mr. Rivera states that when he was taken to court for pre-trial matters, he

was placed in a "full-body armor suit." (*Id*. at ¶ 4.) According to Mr. Rivera's affidavit, SCCF Warden Conglinaro informed Mr. Rivera that his cousin had put a "hit" on him. (*Id*. at ¶ 5.) Mr. Rivera asserts that he made contact with federal law enforcement, because he believed that was the only way to obtain an attorney to advance his interests. (*Id*. at ¶ 6.)

According to Mr. Rivera's affidavit, after he was transferred to Frackville, he was placed in solitary confinement for "a lengthy period of time," and he was denied all privileges and rehabilitative programming. (*Id*. ¶ 7.) Mr. Rivera states that due to this seclusion, he was "willing to do anything whatsoever to end [his] imposed seclusion, even if it meant providing involuntary statements to law enforcement agents." (*Id*.) Mr. Rivera also asserts that he was told by an agent that if he did not cooperate with the government "they would be sure that [he] received the death penalty." (*Id*. at ¶ 7.)

## 2.    Application and Conclusions

Mr. Rivera seeks to suppress the statements he made during the August 30, 2012 proffer session on the grounds that the statements were involuntary. The court respectfully denies Mr. Rivera's motion, finding Mr. Rivera's allegation that an "agent" threatened him with the death penalty to be incredible and contradicted by the credible testimony of the witnesses that were called by the government and Mr. Rivera. The court also

finds that Mr. Rivera's allegations regarding violence, sexual assaults, and threats from the Aryan Nation at SCCF, and that he was denied all privileges at Frackville, are not supported by the records before the court, which reflect no complaints by Mr. Rivera regarding the alleged threats or conditions. Moreover, Mr. Rivera's allegations do not meet the standard of coerciveness that is required to render his proffer statements involuntary.

**a. Testimony from the Parties' Witnesses Regarding the Prison Conditions and the August 30, 2012 Proffer Was Credible**

The court finds Warden Conglinaro's and Deputy Warden Keller's testimony about conditions at their respective facilities and their knowledge of and involvement with Mr. Rivera's detention to be credible, consistent, and reliable. The court also finds that the testimony of defense counsel Daly relating to his representation of Mr. Rivera was credible, consistent, and reliable. With respect to the proffer sessions, the court finds the testimony of TFO Mimnaugh and Federal Defender Cronin to be reliable and credible.

The court does note some minor inconsistencies with respect to the testimony by Federal Defender Cronin and TFO Mimnaugh. Ms. Cronin testified that she believed, based on her memory, that the initial proffer session where Mr. Rivera did not provide any information was on May 2, 2012 – "I believe that

meeting was probably May – that would have been May 2nd" (T3 at

31) – but the government's records indicate that the proffer

session took place on May 30, 2012. (Gov. Ex. H.) In addition,

Ms. Cronin testified that she did not recall any discussion

about the possible application of the death penalty in Mr.

Rivera's case (T3 at 58), whereas TFO Mimnaugh testified that

AUSA Houser "possibly" explained that the death penalty was a

potential consequence. (T1 at 103.) The court continues to find

the testimony of TFO Mimnaugh and Federal Defender Cronin to be

credible despite these minor inconsistencies in their testimony.

The witnesses suggested that their memories of these specific

facts may not be entirely accurate by their use of equivocal

language (e.g., "I believe" and "possibly"), which the court

finds to be credible, because the events took place more than

two years ago. Additionally, the court's observation of the

witnesses' demeanor supports its finding that the testimony by

Federal Defender Cronin and TFO Mimnaugh was truthful and

credible.

The court declines to give significant weight to Mr.

Rivera's affidavit discussing his incarceration and proffer. The

court did not have the opportunity to observe Mr. Rivera's

demeanor, because Mr. Rivera did not testify, as was his right,

and was not subject to cross-examination. Accordingly, his

affidavit is accorded little weight.

The court declines to credit Mr. Rivera's claim that he was placed in solitary confinement at Frackville where he was "completely prevented from having contact whatsoever with anyone either inside or outside the prison." The records from Mr. Rivera's incarceration at Frackville and the testimony of Deputy Warden Keller indicate that Mr. Rivera received legal and non-legal visitors, made and received phone calls, was fed regularly, and was permitted to shower and exercise regularly. (Gov. Ex. Z.)

The court also declines to credit Mr. Rivera's claim that during the proffer session, he "was told by an agent that if [he] did not cooperate with the government then they would be sure that I received the death penalty." Whether or not the death penalty was even discussed at the August 30, 2012 proffer session, TFO Mimnaugh and Federal Defender Cronin both testified that Mr. Rivera was not threatened in any way, nor was he specifically threatened with the application of the death penalty. Both TFO Mimnaugh and Federal Defender Cronin described the proffer sessions as cordial and Mr. Rivera's demeanor as relaxed. In light of Mr. Rivera's failure to present any evidence other than his affidavit to support his claim that his statements were made under coercive conditions, the court declines to credit Mr. Rivera's statement that he was threatened by law enforcement agents to cooperate.

### b. Mr. Rivera's August 30, 2012 Proffer Statements Were Voluntary and Made After His Knowing and Voluntary *Miranda* Waiver

A confession is involuntary, and therefore inadmissible, if it is obtained by "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Oregon v. Elstad,* 470 U.S. 298, 304 (1985) (citation and internal quotation marks omitted). The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).

The inquiry into voluntariness is objective; it asks whether, based on the totality of circumstances, "the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba,* 999 F.2d 47, 51 (2d Cir. 1993) (quoting *United States v. Guarno,* 819 F.2d 28, 30 (2d Cir .1987)). Factors relevant to this determination include "the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir. 1987); *see Deskovic v. City of Peekskill,* 894 F. Supp. 2d 443, 457–58 (S.D.N.Y. 2012). The government must prove that a confession is

voluntary by a preponderance of the evidence. *Connelly,* 479 U.S. at 168.

Here, the totality of the circumstances demonstrates that the conduct of the AUSAs and federal law enforcement officials was neither coercive nor threatening as to overbear Mr. Rivera's will. First, except for Mr. Rivera's first meeting with law enforcement officials in the spring of 2012 which Mr. Rivera himself requested and during which Mr. Rivera did not proffer any statements, Mr. Rivera was accompanied and represented by Ms. Cronin at each subsequent meeting. "The presence or absence of counsel is a significant condition because counsel can 'assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.'" *Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) (quoting *Miranda v. Arizona*, 384 U.S. 436, 469 (1966)). Ms. Cronin, an experienced federal defender, testified that she would not have permitted the proffer to proceed if she thought Mr. Rivera had been threatened or felt threatened, or if he did not understand the purpose of the proffer, the proffer agreement, or his *Miranda* warnings. The court finds that Ms. Cronin's representation of Mr. Rivera throughout his initial engagement with the federal government in 2012, and particularly Ms. Cronin's presence at the August 30, 2012 proffer session,

weighs in favor of finding that Mr. Rivera's proffer statements were voluntary.

Second, the evidence supports a finding that the government did not coerce Mr. Rivera to make the August 30, 2012 proffer statements. Facts bearing on a determination of coercive government conduct include:

> the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); whether there was physical mistreatment such as beatings, *see Brown v. Mississippi,* 297 U.S. 278 (1936); or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, *see Schneckloth,* 412 U.S. at 226; or even of clothing, *see Bram v. United States,* 168 U.S., 532, 561 (suspect was taken to police detective's office and there "he was stripped of his clothing") for a prolonged period. In addition—as specifically raised in the instant case—such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

*Green v. Scully*, 850 F.2d at 902. There is no evidence in the record that any of the above factors existed at any time with regard to Mr. Rivera's proffer.

As previously discussed, the court finds that the law enforcement officials here did not make any threats against Mr. Rivera. Rather, the witnesses' credible testimony established that Mr. Rivera initiated the proffer sessions by sending letters stating that he wanted to cooperate with the federal

investigation and that their meetings with Mr. Rivera were cordial, relaxed, and friendly. At the proffer session on August 30, 2012, where Mr. Rivera made inculpatory statements, AUSA Houser and the law enforcement agents first took care to inform Mr. Rivera of his *Miranda* rights, which he knowingly waived. Before Mr. Rivera made any statements, AUSA Houser also explained the proffer agreement to Mr. Rivera, which Mr. Rivera and Federal Defender Cronin signed after they consulted privately. Any discussion of the death penalty or other penal consequences that took place during the proffer session was in the context of providing Mr. Rivera with information about potential charges and penalties. It is well settled that informing a defendant of potential charges as well as the potential benefits of cooperation does not amount to coercion. *See United States v. Bye*, 919 F.2d 6, 9-10 (2d Cir. 1990) (provision of information about possible sentence facing defendant and benefits of cooperation does not render statements involuntary). Although the court finds credible Mr. Rivera's statement that he became aware of a threat from another member of TF Mafia, Mr. Rivera has failed to show any evidence that the threat was the result of any improper conduct on the part of government officials.

The conditions of an individual's confinement prior to confession may bear on question of whether government conduct

was coercive. *See Brooks v. Florida*, 389 U.S. 413, 414-15 (1967) (defendant's confession was deemed involuntary where the defendant was confined naked in a "windowless sweatbox" that had no furnishings or facilities except for a hole in the floor, and was fed only twelve ounces of thin soup and eight ounces of water each day for 35 days). The mere fact that a defendant was held in disciplinary segregation or solitary confinement prior to making a statement does not render the circumstances of his confession coercive. *See, e.g.*, *United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Afr.)*, 552 F.3d 177, 214 (2d Cir. 2008) ("Taking into account the totality of the circumstances, as we must, we cannot conclude that, because Al-'Owhali was detained incommunicado for fourteen days, the statements he made after waiving his *Miranda* rights were involuntary.") Here, Mr. Rivera has failed to introduce any evidence that the conditions of his confinement were so harsh as to be coercive. Rather, the evidence showed that Mr. Rivera was fed and allowed to shower and exercise regularly; had regular visits, both legal and non-legal; often spoke on the phone; had the ability to communicate in writing; and communicated with other inmates. Evidence at the hearing established that both Frackville and SCCF provide meals to inmates three times a day, permit inmates to shower and exercise regularly and receive visitors and phone calls. To the extent that Mr. Rivera's

confinement was restricted, it was the result of Mr. Rivera's own misconduct, which, at times, posed a risk to the safety of correctional officers and other inmates and the orderly operation of the facilities.

Mr. Rivera's personal history and characteristics also support a finding that his proffer statements were voluntary. Relevant characteristics of the defendant include the individual's age, education, and level of intelligence, as well as their familiarity with the criminal justice system. *See Schneckloth*, 412 U.S. at 226; *Green*, 850 F.2d at 902. At the time of the proffer session, Mr. Rivera was 45 years old. Federal Defender Cronin and TFO Mimnaugh both testified that Mr. Rivera appeared physically well, relaxed, and friendly during their encounters with him and at the August 30, 2012 proffer session. The court has also reviewed numerous letters written by Mr. Rivera in connection with this case and finds Mr. Rivera's sound prose to be indicative of his intelligence and basic understanding of the criminal justice system, including but not limited to his rights and obligations during and pursuant to the proffer session, a proffer agreement, and his attempts to cooperate. It is also undisputed that Mr. Rivera has an extensive criminal history. These characteristics all weigh in favor of a finding that Mr. Rivera's August 30, 2012 proffer statements were voluntary.

Based on the record before the court, there is no basis to conclude that Mr. Rivera's statements were coerced or involuntarily made. Accordingly, the court respectfully denies Mr. Rivera's motion to suppress his August 30, 2012 proffer and other statements.[37]

---

[37] Although Mr. Rivera, in his initial pre-trial motion, sought to suppress "all involuntary statements," Mr. Rivera has not specifically pointed to any other statements that he seeks to suppress. For the foregoing reasons, and particularly in light of Mr. Rivera's personal history and characteristics and the court's finding that Mr. Rivera's prison conditions were not so harsh as to be coercive, the court respectfully declines to suppress Mr. Rivera's other statements.

## CONCLUSION

For the foregoing reasons, the court grants Mr. Garrett's requests to bring further motions upon the basis of newly discovered information, provided he does so at least 45 days before trial, and permits Mr. Garrett to join in the motions of his co-defendant as appropriate. The court respectfully denies Mr. Garrett's remaining motions: to suppress physical evidence recovered from a September 1, 2010 car stop; to suppress Mr. Garrett's post-arrest statements; to direct the government to disclose all *Brady* material; to direct the government to disclose any prior bad acts or criminal convictions that the government intends to use at trial pursuant to Rule 404(b); and Mr. Garrett's request for a bill of particulars.

The court respectfully denies Mr. Rivera's motion to suppress physical evidence recovered from a January 18, 2012 car stop, and motion to suppress Mr. Rivera's statements made to the government, including during a proffer session dated August 30, 2012.

**SO ORDERED.**

Dated: February 4, 2015
      Brooklyn, New York

 

                                    _____ /s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York