UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA        **MEMORANDUM AND ORDER**

      - against -           13-CR-149(KAM)

PAUL RIVERA,

MICHAEL GARRETT,

         Defendants.

------------------------------------X

**MATSUMOTO, United States District Judge:**

Jury selection is scheduled to begin on April 20, 2015 in this case. The government has moved to empanel an anonymous and partially sequestered jury for the upcoming trial. The government has requested that "(1) the names, addresses and workplaces of members of both the *venire* and *petit* juries not be revealed; and (2) the jurors eat lunch together and be accompanied in and out of the courthouse by members of the United States Marshals Service." (Gov't Mem. of Law in Supp. of Mot. for Anon. and Partially Sequestered Jury ("Gov't Mot."), ECF No. 149, at 16.) For the reasons set forth below, the court grants the government's motion for an anonymous and partially sequestered jury.

**I.**    **BACKGROUND**

The defendants Michael Garrett ("Mr. Garrett") and Paul Rivera ("Mr. Rivera") (collectively, "defendants") came to

the attention of the Federal Bureau of Investigation ("FBI")
after Mr. Rivera was stopped for a traffic violation while
driving a vehicle on January 18, 2012 by the Pennsylvania State
Police ("PSP"), and a subsequent search of the vehicle yielded
quantities of cocaine and heroin. (Compl. filed 2/5/13, ECF No.
1.) On February 5, 2013, the Honorable Ramon E. Reyes, Jr.,
United States Magistrate Judge for the Eastern District of New
York, issued an arrest warrant for Mr. Rivera based on a
complaint charging him with conspiracy to distribute one or more
controlled substances in violation of 21 U.S.C. § 846. (Compl.)
Mr. Rivera was subsequently removed from Pennsylvania to federal
custody. On March 11, 2013, a federal grand jury in the Eastern
District of New York returned an indictment charging Mr. Rivera
with conspiring to distribute one or more controlled substances
in violation of 21 U.S.C. § 846. (Indictment as to Paul Rivera
filed 3/11/2013, ECF No. 11.)

On June 24, 2013, defendants Messrs. Rivera and
Garrett were charged together in a superseding indictment
alleging a conspiracy to distribute one or more controlled
substances and possession of cocaine and heroin with intent to
distribute. (Superseding Indictment filed 6/24/13, ECF No. 31.)
On October 7, 2013, the grand jury returned a second superseding
indictment. (Superseding Indictment (S-2) filed 10/7/13, ECF No.
62.)

On April 28, 2014, the grand jury returned the current third superseding indictment. (Superseding Indictment (S-3), ECF No. 94.) Defendants are charged in the third superseding indictment with racketeering (Count I), racketeering conspiracy (Count II), interstate prostitution (Count III), conspiracy to engage in sex trafficking and sex trafficking of children (Count IV), sex trafficking and sex trafficking of children (Count V), conspiracy to distribute and possess with intent to distribute heroin, cocaine base, cocaine and marijuana (Count VI), possession with intent to distribute heroin and cocaine (Count VII), conspiracy to commit murder in-aid-of racketeering (Count IX), murder in-aid-of racketeering (Count X), murder while engaged in a narcotics trafficking offense (Count XI), using, carrying and possessing a firearm (Count XIV), and causing death through use of a firearm (Count XV). (*Id.*) Mr. Garrett also is charged with money laundering (Count VIII), and Mr. Rivera is charged with witness tampering (Count XII) and attempted obstruction of justice (Count XIII). (*Id.*)

These charges arise from the defendants' alleged involvement in a group known as "Together Forever" or "TF Mafia" that was founded by defendants and operated in the neighborhood of Brownsville in Brooklyn, New York as well as in Scranton, Pennsylvania. (Indictment at 2.) Members of TF Mafia allegedly engaged in narcotics trafficking, prostitution, money laundering

3

and acts of violence, including murder and assault. (*Id.*) The
indictment alleges that defendants are both leaders of TF Mafia.
(*Id.*)

## II.  Legal Standard

"In resolving motions for anonymous and partially
sequestered juries, courts must balance 'the defendant's
interest in conducting meaningful *voir dire* and in maintaining
the presumption of innocence, against the jury's interest in
remaining free from real or threatened violence and the public
interest in having the jury render a fair and impartial
verdict.'" *United States v. Khan*, 591 F. Supp. 2d 166, 168
(E.D.N.Y. 2008) (quoting *United States v. Quinones*, 511 F.3d
289, 295 (2d Cir. 2007)).  The Second Circuit consistently has
made clear that "[w]hen genuinely called for and when properly
used, anonymous juries do not infringe a defendant's
constitutional rights." *United States v. Kadir*, 718 F.3d 115,
120 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 160 (2013) (quoting
*United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012)).

A court may order the empaneling of an anonymous and
partially sequestered jury upon "(a) concluding that there is
strong reason to believe the jury needs protection, and (b)
taking reasonable precautions to minimize any prejudicial
effects on the defendant and to ensure that his fundamental
rights are protected." *United States v. Paccione*, 949 F.2d

1183, 1192 (2d Cir. 1991). Within those parameters, however, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." *Id.*

Courts in this Circuit typically consider the following factors when determining whether the jury needs the protection of anonymity: (1) the dangerousness of the defendants; (2) whether the defendants or their associates have engaged in past attempts to interfere with the judicial process; (3) whether the defendants have the ability to interfere with or intimidate the jury; and (4) whether the trial is likely to attract media attention and publicity. *See United States v. Ashburn*, No. 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (Nov. 7 2014); *see also Paccione*, 949 F.2d at 1192. Although "it is unclear whether any of these factors individually justif[ies] [e]mpaneling an anonymous jury," "there are numerous cases indicating that anonymity is appropriate when some combination of these factors is present." *Khan*, 591 F. Supp. 2d at 169 (citing *Quinones*, 511 F.3d at 296).

"If a district court determines that an anonymous jury is appropriate, the court must take 'reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights.'" *Kadir*, 718 F.3d at 120 (quoting *United States v. Thai*, 29 F.3d 785, 801) (2d Cir. 1994)).

5

## III.   Application

### A. Need for Protection

        With respect to the first prong of the analysis—
whether there is strong reason to believe the jury needs
protection—the government argues that each of the four factors
weighs in favor of protecting the jurors' identities: the
defendants have been charged with a number of violent offenses,
have taken steps to intimidate witnesses in the instant case and
have interfered with the judicial process during their past
interactions with the criminal justice system, are leaders of a
criminal organization, and have sought and received media
attention. (Gov't Mot. at 16-23.) The defendants argue the
contrary, that evaluating each factor militates against finding
that an anonymous jury is warranted: the "government has not
demonstrated the likelihood of obstruction for justice nor that
the trial evidence will depict a pattern of violence . . . ."
(Def.'s Mem. of Law in Opp. to the Gov't Mot. for an Anon. Jury
("Rivera Opp."), ECF No. 161; *see also* Mem. of Law in Opp. to
Gov't Mot. for a Partially Sequestered Anon. Jury ("Garrett
Opp."), ECF No. 162.) After considering each of the relevant
factors, the court concludes that the balance of interests
ultimately weighs in favor of empanelling an anonymous and
partially sequestered jury.

## 1. Dangerousness of the Defendants

Courts evaluate defendants' dangerousness by considering the seriousness of the charged crimes. *See, e.g., United States v. Barnes*, 604 F.2d 121, 130 (2d Cir. 1979) (affirming use of anonymous jury where lead defendant was charged with operating a "continuing criminal enterprise," numerous defendants were charged with conspiring to distribute narcotics, and one defendant was charged with carrying a firearm during the commission of a federal felony). Courts have considered participation in, and especially leadership of, a criminal enterprise to be indicative of a defendant's dangerousness. *See, e.g.*, *Khan*, 591 F. Supp. 2d at 170-71 (reasoning that "leadership of a criminal organization indicates a Defendant's propensity for violence"); *United States v. Gotti*, 459 F.3d 296, 346 (2d Cir. 2006) (observing that defendants were charged with both membership in and leadership of an organized crime family, and that defendants had been detained pending trial due to their "dangerousness"); *United States v. Wilson*, 493 F. Supp. 2d 397, 399-401 (E.D.N.Y. 2006) (observing that defendant was charged with murdering two police officers and was a member of a violent gang).

Defendants do not dispute that the crimes with which they are charged are serious. (Garrett Mot. at 3-4; Rivera Mot. at 3.) The Superseding Indictment alleges that defendants, as

members of TF Mafia, committed racketeering conspiracy and racketeering, with specified predicate acts of narcotics trafficking, sex trafficking, money laundering, witness tampering, the August 22, 2011 murder of Robert Barber, and using, possessing, and carrying weapons. (*See* S-3.) The government also alleges that the defendants are leaders of TF Mafia and that Mr. Rivera was the founder of TF Mafia.[1] (*See* S-3 at ¶¶ 2-3.) The parties do not dispute that if they are convicted, both defendants face mandatory life imprisonment on the murder in aid of racketeering charge, and Mr. Garrett also faces mandatory life imprisonment if he is convicted of the narcotics trafficking charges due to the filing of a prior felony information. Where, as here, defendants face lengthy prison sentences and substantial financial penalties, defendants have a "stronger motive to tamper with a jury." *United States v. Mayes*, No. 12-CR-385 (ARR), 2013 WL 6175824, at *4 (citing *Paccione*, 949 F.2d at 1192; *Locascio*, 357 F. Supp. 2d at 561).

Although the defendants are correct that affiliation with a violent criminal organization, by itself, is insufficient

---

[1] According to the affirmation of Agent Thomas Duane ("Agent Duane"), in video recordings depicting the defendants and other TF Mafia members (including a documentary that was produced at Mr. Garrett's direction about TF Mafia) (the "TF Documentary"), Mr. Rivera and Mr. Garrett acknowledged that they were members of TF Mafia. (Duane Aff. at ¶ 4.) Mr. Garrett also identifies Mr. Rivera as a founder of TF Mafia in the video recordings, and the TF Documentary depicts Garrett leading TF Mafia meetings in Mr. Garrett's home. (*Id.*) Agent Duane avows that cooperating witnesses associated with TF Mafia have advised, and are expected to testify at trial, that the defendants were the leaders of TF Mafia. (*Id.* at ¶ 5.)

to warrant empaneling an anonymous jury, *see Vario*, 943 F.2d at 241, the court finds, based on defendants' past criminal history and the seriousness of the charges and their leadership roles, that the dangerousness factor is satisfied. The government has submitted evidence that defendants engaged in "a pattern of violence as would cause a juror to reasonably fear for his own safety," *id.*, and the court finds that the dangerousness factor weighs in favor of empaneling an anonymous jury.

### 2. Past Attempts to Interfere with the Judicial Process

When defendants have previously attempted to interfere with the judicial process, courts weigh this factor in favor of determining that there is a "strong reason" to believe the jury needs protection. Courts typically consider whether there is evidence of prior attempts by the defendants to engage in intimidation or bribery of, or violence toward, either witnesses or jurors. *See, e.g.*, *United States v. Aulicino*, 44 F.3d 1102 1116 (2d Cir. 1995) (upholding anonymous jury where defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence); *Paccione*, 949 F.2d at 1192-93 (upholding anonymous jury where a government witness had received anonymous, middle-of-the-night phone calls advising him to "remember [ ] nothing" and that defendant had threatened others with a baseball bat and pistol"). "This factor has been

described as 'crucial' to the determination to empanel an
anonymous jury." *United States v. Locascio*, 357 F. Supp. 2d 558,
561 (E.D.N.Y. 2005) (citing *Vario*, 943 F.2d at 239).

　　　　The government argues that both defendants, as well as
their associates, "have taken steps to intimidate and/or tamper
with witnesses in this case." (Gov't Mot. at 7.) The Superseding
Indictment charges Mr. Rivera, in predicate act seven to the
racketeering charge, and in counts twelve and thirteen, with
witness tampering and attempted obstruction of justice. (S-3 at
¶¶ 19; 37-38.) Specifically, the government asserts that in
April 2013, after he was indicted in this case, Mr. Rivera
"attempted to intimidate, threaten and persuade" an individual
he suspected was a cooperating witness (the "Witness") to change
the Witness's prior statements regarding Rivera's culpability in
connection with the charges in the superseding indictment.[2]
(Gov't Mot at 7; Duane Aff. at ¶ 12.) Mr. Rivera allegedly
advised the Witness that if the Witness did not change his/her
testimony and begin working with Mr. Rivera, the Witness would
be charged with the murder of Robert Barber. (*Id.*) According to
the government, the Witness reportedly felt threatened by
statements that Mr. Rivera made about the location of where the

---

[2] Agent Duane stated in his affirmation that this assertion is substantiated
by information provided by the Witness, a document that Mr. Rivera wrote for
the Witness to copy in the Witness's handwriting, testimony of a handwriting
expert, and prison records establishing that the witness and Mr. Rivera were
incarcerated together at the time of the incident. (Duane Aff. at ¶ 12.)

Witness's family members lived, and Mr. Rivera persuaded the Witness to copy and sign a statement containing false information that Mr. Rivera had written in his own handwriting. (*Id.*)

The government also submitted information regarding Mr. Rivera's 1997 conviction for conspiracy to persuade a New York City police officer before Judge Gleeson. (Gov't Mot. at 14.) According to the government, Mr. Rivera and a fellow member of TF Mafia, Nicholas Nagler, were engaging in the sale of firearms and illegally cloned cellular phones and consequently were charged with conspiracy to commit access device fraud and with being a felon in possession. (*Id.*; Duane Aff. at ¶¶ 21-23.) When Mr. Rivera learned that Mr. Nagler had agreed to be a cooperating witness in the case, Mr. Rivera and William Krueger, another TF Mafia member, assaulted Mr. Nagler. (*Id.*) Mr. Rivera and Mr. Krueger also persuaded Mr. Krueger's former girlfriend to file a false police report against Mr. Nagler so that Mr. Nagler would be arrested prior to the hearing and would be unable to testify against Mr. Rivera. (*Id.*) Mr. Krueger brought his former girlfriend to a local police station in Brooklyn where she filed a false police report claiming that Mr. Nagler had robbed her and Mr. Krueger at gunpoint. (*Id.*) The night before Mr. Rivera's hearing, Mr. Rivera drove that girlfriend and another individual to the police station to advise the

police that Mr. Nagler would be at the Brooklyn Federal Courthouse the next morning. (*Id.*) If Mr. Nagler were arrested on his way to court, he would not be able to testify against Mr. Rivera. (*Id.*) Despite the falsified report, Mr. Nagler testified at the hearing, and although Mr. Rivera persuaded Mr. Krueger to testify and repeat the false story alleging that Mr. Nagler had robbed him at gunpoint, Judge Gleeson did not find Mr. Krueger's testimony to be credible and remanded Mr. Rivera. (*Id.*) Mr. Rivera was charged with, and convicted of, conspiring to persuade a New York City police officer. (*Id.*)

The government also proffered evidence that Mr. Garrett and his girlfriend, Erina Henry, took steps to intimidate Mr. Rivera, Kathryn Rivera, Shelby Rivera, and John Portalatin following the January 18, 2012 car stop and their arrest in Pennsylvania. (Gov't Mot. at 8; Duane Aff. at ¶¶ 14-18.) In the TF documentary, Mr. Garrett purportedly asks an attorney, Frederick J. Meagher (who is identified by subtitle in the documentary) to make sure that "nobody is talking on nobody," and the attorney responds that he has advised the local district attorney that he represents all of the individuals who were in the vehicle driven by Mr. Rivera (*Id.*) Referring to the occupants of Mr. Rivera's vehicle, Mr. Garrett states in the TF Documentary: "They're gonna keep their mouth shut," because "he represents all of them . . . ." (*Id.*) According to the

government, Ms. Henry is also shown in the TF documentary driving to the Susquehanna County Correctional Facility, where Mr. Rivera, Kathryn Rivera, Shelby Rivera, and John Portalatin where being detained, and stating that she needed to speak with them, because "I've gotta let them know they're good, keep their mouths shut." (*Id.*)

Mr. Garrett argues that Mr. Garrett's and Ms. Henry's statements made in the TF Documentary are not evidence of intimidation, but rather, were "a dramatic flourish," because the TF Documentary was "obviously produced as an entertainment piece." (Garrett Mot. at 5.) In light of the serious charges facing the defendants, which include violent acts to "preserv[e] and protect[ ] the power, territory and criminal ventures of the enterprise" (S-3 at ¶ 5), and Mr. Garrett's failure to present any evidence other than his bald assertions that the videos that the government reference are "fictionalized entertainment pieces" (Garrett Mot. at 5), the court finds that the examples from the TF Documentary indicate that Mr. Garrett was attempting to intimidate potential witnesses and obstruct justice.

Defendants' argument that "it does not logically follow" from witness tampering that "the defendants will engage in jury tampering" is unavailing. (Rivera Mot. at 6.) As another court in this district has held, "to support a finding that an anonymous jury is warranted, obstruction of justice need

13

not relate to prior jury tampering efforts, but instead may
relate solely to efforts to tamper with witnesses . . . ."
*United States v. Prado*, No. 10-CR-74, 2011 WL 3472509, at *3
(E.D.N.Y. Aug. 5, 2011). Instead, the court is to determine if
the defendants or their associates have engaged in past attempts
to interfere with the judicial process, a broader standard than
jury tampering. *See Paccione*, 949 F.2d at 1192. Consequently,
"[a] court . . . may appropriately consider a defendant's
propensity to threaten witnesses or otherwise to tamper with the
judicial process in evaluating the need for an anonymous jury."
*Quinones*, 511 F.3d at 296 n.6; *see Aulicino*, 44 F.3d at 1116-17
(upholding use of anonymous jury where defendants attempted to
tamper with witnesses); *see also United States v. Blackshear*,
313 F. App'x 338, 343 (2d Cir. 2008) (finding that "[i]t does
not seem unreasonable to infer that jurors might also be
threatened" by defendant previously found to intimidate
potential witnesses); *Prado*, 2011 WL 3472509, at *2 (granting
motion for anonymous and partially sequestered jury "in light of
defendants' and their associates' alleged history of witness
tampering . . . combined with their alleged membership in a
large-scale, violent gang with numerous members still at
liberty--who have both the means and a demonstrated willingness
to obstruct justice").

The court considers the past attempts by the
defendants to obstruct justice and intimidate witnesses by
violence, threats, and the falsification of evidence and finds
that this "crucial" factor weighs significantly in favor of
empaneling an anonymous jury.

### 3. Means to Harm the Jury

Defendants argue that because they are incarcerated,
they are unable to "corrupt the judicial process." (Rivera Mot.
at 6; *see* Garrett Mot. at 4.) "When a defendant is under
pretrial detention, whether he has the means to harm the jury
often hinges on the extent of his connections outside of
prison." *United States v. Herron*, 2 F. Supp. 3d 391, 396
(E.D.N.Y. 2014) (citing *Wilson*, 493 F. Supp. 2d at 400 (granting
motion for anonymous jury in part because defendant was "a
member of the Stapleton Crew and . . . this organization has
other members and associates who are currently, and will be, at
large at the time of the trial")). Here, notwithstanding the
arrest and prosecution of Messrs. Rivera and Garrett, other
members and associates of TF Mafia remain at liberty, including
Ms. Henry who previously participated in efforts to silence
potential witnesses. Accordingly, the court the government has
established that defendants' ongoing ability to interfere with
the judicial process, especially as alleged leaders of a
criminal organization, weighs in favor of an anonymous and

partially sequestered jury. *See, e.g.*, *Mayes*, 2013 WL 6175824, at *3 ("In numerous cases, courts in this Circuit have found that defendants' membership in a criminal organization with members still at large demonstrates an ongoing ability to interfere with the judicial process."); *United States v. Bellomo*, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003) (noting that with leaders of criminal organizations, "their potential ability to influence and exercise control over its members is of a different magnitude").

### 4. Publicity

When a trial is likely to attract media attention, this factor weighs in favor of empaneling an anonymous jury. Courts have typically analyzed the nature and degree of pretrial publicity to evaluate whether a trial is likely to attract media attention. *See, e.g.*, *Vario*, 943 F.2d at 240 ("Pre-trial publicity may militate in favor of an anonymous jury because it can enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public.") (internal quotations and citations omitted).

The government argues that this case is likely to attract media attention, because TF Mafia has "over many years, courted the press in order to promote the activities of TF Mafia" and that the case has already garnered public attention

in New York and Pennsylvania. (Gov't Mot. at 23.) The government
cites to media coverage of this case, as well as an interview by
Mr. Rivera as part of a documentary on the Investigation
Discovery Channel discussing TF Mafia, and Mr. Garrett's
appearance on a local radio station in 2011 to discuss his
lawsuit against the New York Police Department and the
activities of TF Mafia. (Gov't Mot. at 10 (citing *Cold Blood:
Burning Betrayal* (Season 3, Episode 10) (Investigation Discovery
Channel broadcast May 4, 2011); YouTube video titled "Shade
45/G-Unit Radio Interview w/MISS MIMI & RAB/TF MAFIA on POLICE
brutality!," https://www.youtube.com/watch?v=rBad3B917nc).) The
government also cites several articles published, both in print
and online, about the defendants and TF Mafia. (*Id.* (citing John
Marzulli, *Rapper Faces 10 years to Life After Hiring Video Crew
to Film Drug Deal*, New York Daily News, June 22, 2013, *available
at* http://www.nydailynews.com/new-york/brooklyn/rapper-faces-
prison-drug-deal-filmed-article-1.1379588; Julian Kimble, *When
Keeping it Real Goes Wrong: Aspiring Brooklyn Rapper Busted for
Allegedly Recruiting Crew to Film Drug Deal*, Complex (June 22,
2013), http://www.complex.com/pop-culture/2013/06/michael-rab-
garrett-new-york-drug-deal; A.R. Shaw, *38-Year-Old Rapper Hires
Videographers to Film Drug Deal and Now Faces Life in Prison*,
RollingOut (June 22, 2013), http://rollingout.com/criminal-
behavior/38-year-old-rapper-hires-videographers-to-film-drug-

deal-and-now-faces-life-in-prison/; Staci Wilson, *Four Arrested in Heroin, Crack Seizure*, Independent Weekender, January 25, 2012, *available at* http://independentweekender.com/index.php/2012/01/25/four-arrested-in-heroin-crack-seizure/).)

Defendants assert that the media coverage thus far does not support protecting the jury, because the "coverage cited by the government largely consists of secondary media, at websites catering to a niche crowd, hardly likely to have been viewed by the vast majority of prospective jurors" and that the media coverage cited by the government does not contain violent acts of TF Mafia so as to generate fear on the part of jurors. (Rivera Mot. at 7-8.)

It is not disputed that defendants have sought media attention in connection with their music careers and that this case has received some pre-trial publicity in the local press. Upon review of the articles, the court agrees with defendants that, other than the single article in *New York Daily News*, these articles reach largely local and niche audiences and do not mention defendants' alleged violent acts. Thus, although the court expects some media attention, it is unlikely to be pervasive. The court finds that the publicity factor weighs slightly in favor of empaneling an anonymous and sequestered jury.

### 5. Conclusion and Partial Sequestration

Based on the court's analysis of the relevant factors, all of which weigh in favor of empaneling an anonymous partially sequestered jury, there is "strong reason" to protect the jury in this case. In addition, because "the same reasons that warrant the use of an anonymous jury also warrant partial sequestration of the jury," *Prado*, 2011 WL 3472509, at *11, the court grants the government's motion for a sequestered jury. Specifically, the court will direct the United States Marshals Service to escort empaneled jurors between the courthouse and a central undisclosed location each day and at all times during recesses. *See, e.g.*, *Paccione*, 949 F.2d at 1191 (affirming district court's partial sequestration of jurors by "having the jurors transported at the end of each trial day to an undisclosed central location from which they could go home"); *United States v. Antico*, No. 08 CR 559, 2010 WL 2545877, at *5 (E.D.N.Y. June 11, 2010) (ordering that anonymous jury be picked up and dropped off by the United States Marshals at an undisclosed central location before and after trial each day); *United States v. Tomero*, 486 F. Supp. 2d 320, 325 (S.D.N.Y. 2007) (same); *United States v. Muyet*, 945 F. Supp. 586, 590 (S.D.N.Y. 1996) (same).

### B. Precautionary Measures

Having found that the balance of relevant factors weighs in favor of an anonymous and partially sequestered jury, the court must "tak[e] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected," *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009) (citation omitted). Such precautions include "conducting a thorough *voir dire* and providing the jurors with a plausible and nonprejudicial reason for not disclosing their identities." *Gotti*, 459 F.3d at 345 (citing *Paccione*, 949 F.3d at 1183); *see Prado*, 2011 WL 3472509, at *5 ("reasonable precautions" include "extensively questioning jurors during *voir dire* to explore prospective jurors' biases and providing the jurors with a neutral explanation for the anonymity that does not negatively implicate the defendants").

## 1. Thorough Voir Dire

The use of thorough questioning during the *voir dire* process will ensure that the use of an anonymous jury does not infringe on the defendants' Sixth Amendment right to a fair and impartial jury. In *United States v. Wong*, for example, the Second Circuit reviewed a district court's decision to preclude disclosure of the jurors' names, addresses, and employers, and to "question[ ] prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquire[ ] about their neighborhoods, marital status, employment, spouse's

and children's employment, education, organizational
affiliations, ethnicity, military service" and other matters.
40 F.3d 1347, 1377 (2d Cir. 1994). The Second Circuit found
that the district court took "adequate precautions to safeguard
the defendants-appellants' constitutional rights" and determined
that the "extensive *voir dire* adequately explored prospective
jurors' bias as to issues in the case and as to the defendants,
and was more than sufficient to enable the defendants to
exercise their challenges meaningfully, and to obtain a fair and
impartial jury." *Id.* (internal citations, alterations and
quotation marks omitted); *see Vario*, 943 F.2d at 241-42 ("[T]he
district court conducted a searching *voir dire* which
sufficiently enabled Vario to exercise his challenges
meaningfully and to obtain a fair and impartial jury.").

        The court will adopt a similar approach in the instant
case.  In so ruling, the court notes that it is not an abuse of
discretion to withhold the jurors' names, addresses, and places
of work from the parties and their counsel. *See Vario*, 943 F.2d
at 239-242 (finding no error in district court's empanelment of
anonymous jury in which jurors did not reveal their names,
addresses, or places of work to the parties or counsel because
such limitations were reasonable in light of the court's
"searching" *voir dire* that was "designed to uncover bias as to
issues in the cases and as to the defendant himself"); *see also*

*Barnes*, 604 F.2d at 142-43 (no error in *voir dire* procedure in which "[b]oth the prosecutor and defense were equally in the dark as to names and addresses of the prospective panelists" because counsel for both parties "had an arsenal of information about each person that was based on his responses to questions concerning his own life, as well as his attitudes about the issues that would arise in the case").

## 2. Neutral Explanation

In addition, the court will provide the jury with a neutral explanation similar to that which the Second Circuit approved in *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), where the district court gave the following instruction to jurors:

> It is a common practice followed in many cases in the Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual. It is a procedure being followed in this case.

*Id*. at 1133. The court proposes that the jury be advised that for purposes of organization and convenience, the court will assign numbers to each juror during the selection process and trial, and will refer to jurors by number rather than by name. The court will also advise the jurors that they will be escorted by the United States Marshal Service to, from, and within the courthouse each day "to ensure a timely start to each day of

what promises to be a long trial," *United States v. Urso*, No.
03-CR-1382, 2006 WL 1210886, at *3 (E.D.N.Y. 2006) and to
protect their privacy from possible media attention.  The court
finds that these explanations are both "plausible and
nonprejudicial," as required by the Second Circuit.  *See*
*Aulicino*, 44 F.3d at 1116 (use of anonymous jury does not
infringe on defendants' constitutional rights where court
conducts a searching *voir dire* and gives jurors a "plausible and
nonprejudicial reason for not disclosing their identities").

The court finds that the foregoing procedures will
adequately address the need to protect the jury while minimizing
the effect of such measures on the jurors' opinions of the
defendants.  Accordingly, the court grants the government's
motion for an anonymous and partially sequestered jury.

### 3. Jury Questionnaire

The government contends that a jury questionnaire is
unnecessary, because the court can conduct "'thorough and
probing' *voir dire* without the use of a written questionnaire."
(Gov't Mot. at 27 (citing *United States v. Salameh*, 152 F.3d 88,
120-121 (2d Cir. 1998).) Mr. Garrett objects and requests that
"the decision on that issue be reserved," because a
questionnaire may be an "appropriate compromise in order to
allow counsel to make informed challenges during *voir dire*."
(Garrett Mot. at 6.) At the status conference held on February

13, 2015, defendants moved to request a jury questionnaire, and the government maintained its position that a jury questionnaire is unnecessary. The parties are ordered to submit a joint proposed jury questionnaire by March 2, 2015. The court reserves its decision on whether a written questionnaire will be used to conduct *voir dire* until after it has the opportunity to review the proposed questionnaire.

## CONCLUSION

For the foregoing reasons, the court GRANTS the government's motion for an anonymous and partially sequestered jury. The parties are ordered to submit a joint proposed jury questionnaire by March 2, 2015.

SO ORDERED.

Dated: February 13, 2015
Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York