UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

<u>**MEMORANDUM AND ORDER**</u>

   -against-                     13-CR-149 (KAM)

PAUL RIVERA,
MICHAEL GARRETT,

                    Defendants.   X
----------------------------------
                 Table of Contents

BACKGROUND.................................................1

DISCUSSION.................................................3

I. Legal Standard.........................................3

  A. Direct Evidence of and Evidence that is Inextricably
     Intertwined with the Enterprise and Conspiracy ..........4

  B. Federal Rule of Evidence 404(b) .........................8

II. Application............................................9

  A. TF's Criminal Activities Prior to January 2007 ..........10

     1. Drug Trafficking Conspiracy .........................11

        a.    Direct Evidence of and Evidence that is
           Inextricably Intertwined with the Enterprise and
           Conspiracy ...................................12

        b.    Rule 404(b) ..............................16

     2. Prostitution .......................................18

     3. Obstruction of Justice .............................19

        a.    Mr. Garrett...............................19

        b.    Mr. Rivera................................22

     i.   Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy ............................24

     ii.  Rule 404(b) ............................25

B. Defendants' Prior Convictions and Records of Imprisonment 26

    1. Mr. Garrett .......................................26

       a.   Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy ....................................27

       b.   Rule 404(b) ............................30

       c.   Mr. Garrett's Request to Preclude Testimony Related to the Mafia or the Bloods ...........31

    2. Mr. Rivera .......................................33

       a.   Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy ....................................34

       b.   Rule 404(b) ............................37

C. TF's Methods and Means of Control over its Membership ....42

    1. Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy ......46

    2. Rule 404(b) .......................................50

D. Garrett Supplying Firearms and Posting Bail for a Cooperating Witness .....................................51

E. Defendants' Drug Use ...................................53

III. Co-conspirator Statement................................56

IV. Mr. Garrett's Request for a Hearing.....................58

CONCLUSION ................................................58

**MATSUMOTO, United States District Judge:**

Defendants Michael Garrett ("Mr. Garrett") and Paul Rivera ("Mr. Rivera" and collectively, "defendants") are charged with various racketeering and conspiracy offenses between January 2007 and April 2013 (the "Indictment period"), as well as sex trafficking, drug possession with intent to distribute, murder, using and possessing firearms, money laundering, witness tampering, and attempted obstruction of justice in a third superseding indictment filed on April 28, 2014. (*See generally* ECF No. 94, Superseding Indictment ("Indictment").) Pending before the court is the government's motion to admit evidence of certain crimes and acts not charged in the Indictment that the government contends is (1) direct evidence of and inextricably intertwined with the charged conspiracy and racketeering offenses, and (2) admissible pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"). For the reasons set forth below, the court grants the government's motion in part and denies the motion in part.

## BACKGROUND[1]

The government moves in the instant motion to admit evidence of defendants' uncharged crimes and other activity.

---

[1] The court assumes familiarity with defendants' charged conduct as described in its prior Memoranda and Orders. (*See* Mem. and Order dated 2/13/15, ECF No. 179; Mem. and Order dated 2/5/15, ECF No. 177.)

Specifically, the government has organized the evidence it seeks to introduce into the following categories: (i) Together Forever's ("TF") criminal activities prior to the conspiracy period charged in the Indictment, (ii) defendants' prior convictions and records of imprisonment, (iii) TF's methods and means of exercising control over its membership, (iv) testimony from a cooperating witness (identified in the government's memorandum as "CW #3") that Mr. Garrett provided him with weapons and paid his bail after his arrest for possessing weapons, and (v) evidence of defendants' drug use. (Mem. in Supp. of the Gov't's Mot. to Admit Evid. of Other Acts ("Gov't Other Acts Mem."), ECF No. 182, at 12-26; *see also* Gov't Mem. of Law in Reply to Defs.' Responses ("Gov't Reply"), ECF No. 198.) The government describes the evidence it seeks to admit, states the relevance of the evidence to the charged offenses, and sets forth the grounds for its admission. The government asserts the admissibility of other acts evidence as direct evidence of, and inextricably intertwined with, the charged racketeering and conspiracy offenses. In the alternative, the government asserts that the evidence is admissible pursuant to Rule 404(b).

In response, defendants contend that the evidence the government seeks to admit is inadmissible propensity evidence and that the probative value of the aforementioned evidence is far outweighed by the risk of unfair prejudice, jury confusion,

and delay.  (*See* Mr. Garrett's Mem. of Law in Opp. to the

Gov't's Mot. to Admit Uncharged Crimes Evid. ("Garrett Opp."),

ECF No. 190, filed 2/27/15; Letter from Mr. Rivera's Counsel in

Response to the Gov't's Mem. ("Rivera Opp."), ECF No. 192, filed

2/27/15.)  Mr. Rivera also argues that statements by Mr.

Garrett, including a statement by Mr. Garrett to a cooperating

witness (identified in the government's motion as "CW #1") that

he sought to keep his subordinates poor to ensure their

dependence upon him, do not fall within the co-conspirator

exception to hearsay and, thus, should be excluded.  (Rivera

Opp. at 5.)

## DISCUSSION

### I.   Legal Standard

The Indictment charges the defendants with, *inter

alia*, racketeering (Count I), racketeering conspiracy (Count

II), conspiracy to commit murder-in-aid of racketeering (Count

IX), and murder-in-aid of racketeering (Count X).  For each of

these counts, the government intends to prove, *inter alia*, the

existence of an enterprise and that the enterprise had an effect

on interstate commerce.  *See* 18 U.S.C. §§ 1959(b), 1962(c) and

(d).  The government further intends to prove, with regard to

the racketeering and racketeering conspiracy counts, that the

defendants were associated with or employed by the enterprise

and engaged in a pattern of racketeering activity.  *See* 18

U.S.C. § 1962(c) and (d).

## A. Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy

When a defendant has been charged with racketeering

offenses, it is well settled that "the government may introduce

evidence of uncharged offenses to establish the existence of the

criminal enterprise."  *United States v. Baez*, 349 F.3d 90, 93

(2d Cir. 2003).  The Second Circuit explained in *United States

v. Mejia*, 545 F.3d 179, 206-07 (2d Cir. 2008), that:

> Where . . . the existence of a racketeering enterprise
> is at issue, evidence of uncharged crimes committed by
> members of that enterprise, including evidence of
> uncharged crimes committed by the defendants
> themselves, is admissible "to prove an essential
> element of the RICO crimes charged—the existence of a
> criminal enterprise in which the defendants
> participated."  *Matera,* 489 F.3d 115, 120 (2d Cir.
> 2007) (upholding admission of evidence of uncharged
> murders).

The *Mejia* court also found that evidence of uncharged crimes was

"admissible to show the existence of the conspiracy" with which

the defendants were charged.  *Id.*  Evidence of uncharged acts is

also admissible to prove the "nature of the RICO enterprise" and

"a pattern of racketeering activity on the part of each

defendant by providing the requisite relationship and continuity

of illegal activities."  *United States v. Basciano*, 599 F.3d

184, 207 (2d Cir. 2010).  The Second Circuit explained in

*Basciano* that:

[A] defendant charged with substantive racketeering may not be accountable for the racketeering acts of others, but such acts can constitute some evidence of the nature of the enterprise, which, in turn, can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO. Thus, while the district court correctly observed that the predicate acts attributed to Basciano's co-defendants in Count One of [the indictment] cannot provide the two predicates necessary to convict Basciano of the substantive RICO charge, it erred in concluding that predicate acts charged to co-defendants do nothing to establish the RICO charge against Basciano.

(internal quotations and citations omitted). *Id*. at 206-207.

Additionally, it is also well established in the Second Circuit that where an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks and alterations omitted); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself").

Evidence of uncharged criminal conduct or other bad acts is relevant and not considered "other crimes" evidence under Rule 404(b) if the uncharged conduct "arose out of the same transaction or series of transactions as the charged offense, if it is ***inextricably intertwined*** with the evidence regarding the charged offense, or if it is necessary to complete

the story of the crime on trial." *United States v. Gonzalez*,
110 F.3d 936, 941-42 (2d Cir. 1997) (internal quotations
omitted) (emphasis added); *see also United States v. Khan*, 591
F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (same); *United States v.
Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004) (same). On
this basis, "the trial court may admit evidence that does not
directly establish an element of the offense charged, in order
to provide background for the events alleged in the Indictment.
Background evidence may be admitted to show, for example, the
circumstances surrounding the events or to furnish an
explanation of the understanding or intent with which certain
acts were performed." *Gonzalez,* 110 F.3d at 941; *see also
United States v. Inserra,* 34 F.3d 83, 89 (2d Cir. 1994)
(evidence of other bad acts may be admitted "to provide the jury
with the complete story of the crimes charged by demonstrating
the context of certain events relevant to the charged offense").
In racketeering and racketeering conspiracy cases in particular,
this rule has been applied repeatedly to admit evidence of prior
acts "to inform the jury of the background of the conspiracy
charged, in order to help explain how the illegal relationship
between participants in the crime developed, or to explain the
mutual trust that existed between coconspirators." *Diaz,* 176
F.3d at 79.

Although evidence may be relevant as directly probative of or inextricably intertwined with the defendant's charged conduct, this evidence may nonetheless be inadmissible pursuant to Federal Rule of Evidence 403 ("Rule 403") if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403; *see also United States v. Bourne,* No. 08-CR-888, 2011 WL 4458846, at *12 (E.D.N.Y. Sept. 23, 2011) ("Evidence of uncharged acts may be admissible, subject to limitations imposed by Rule[ ] 403 . . . ."). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States,* 519 U.S. 172, 180 (1997). To determine whether evidence is unfairly prejudicial, the court considers it in the context of the crime alleged. Evidence shall be excluded as unfairly prejudicial when it is "more inflammatory than the charged crime." *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir. 1999); *cf. United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'") (quoting *United States v. Roldan-Zapata,* 916 F.2d 795, 804 (2d Cir. 1990)).

## B. Federal Rule of Evidence 404(b)

Federal Rule of Evidence 404(b) provides that:

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b). A district court exercising its discretion under Rule 404(b) must find that evidence of a prior crime, wrong, or other act is "(1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial. In addition . . . at the defendant's request, the district court should give the jury an appropriate limiting instruction." *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988)).

Under the Second Circuit's "inclusionary approach to evaluating Rule 404(b) evidence," *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003), "uncharged bad acts may be admitted into evidence for any relevant purpose other than propensity, provided that the probative value of the evidence outweighs the danger of unfair prejudice." *United States v. Graziano*, 391 F. App'x 965, 966 (2d Cir. 2010). District courts should not, however, assume the relevance or admissibility of

evidence under Rule 404(b) just because the evidence serves some purpose other than showing the defendant's bad character. *See United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). "'[Other] act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *United States v. LaFlam*, 369 F.3d 153, 157 (2d Cir. 2004) (quoting *Huddleston*, 485 U.S. at 689).

If the evidence is relevant, the court must assess its potential for unfair prejudice. The probative value of the evidence "depends largely on whether or not there is a close parallel between the crime charged and the acts shown." *United States v. Gordon,* 987 F.2d 902, 908 (2d Cir. 1993) (internal quotation marks omitted). "The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir. 1980). The district court abuses its discretion when it admits "other act" evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue. *Curley*, 639 F.3d at 57.

## II. Application

The court addresses each category of evidence that the government seeks to introduce as direct evidence of the

defendants' charged conduct and the defendants' objections
thereto.

## A. TF's Criminal Activities Prior to January 2007

The government seeks to introduce evidence that the
defendants and other members and associates of TF "engaged in a
broad range of criminal activities, including drug trafficking,
prostitution, and obstruction of justice" prior to January 2007,
the start of the alleged conspiracy period.  (*See* Gov't Other
Acts Mem. at 12.)  The government argues that this evidence is
direct evidence of, and inextricably intertwined with, the
defendants' charged offenses, and, in the alternative, that the
evidence is being offered for acceptable purposes and to prove
the defendants' character or propensity under Rule 404(b).  The
government contends that TF's criminal activities prior to
January 2007 prove the existence of TF as an enterprise "by
demonstrating how TF has a long history of members who both
self-identified with the organization and who were recognized
both in Brooklyn and Scranton to be associated with the
organization." (*Id.* at 35.)  The government asserts that these
acts "also show the defendants' personal history with the
organization, including how they served as leaders, and the long
relationship of history and trust both between the defendants
and between the defendants and coconspirators like CW #1." (*Id.*)

Mr. Garrett objects that the evidence that the government intends to introduce prior to the start of the conspiracy period is "stale" and is "unnecessary" to show how the defendants know each other and "simply paints [Mr. Garrett] as a violent man with a propensity to engage in charged conduct." (Garrett Opp. at 5-6.)

The court addresses each of the categories of conduct and the defendants' specific arguments below.

### 1. Drug Trafficking Conspiracy

The government expects that a cooperating witness (CW #1) will testify that he met Mr. Garrett in 1998 and "shortly thereafter, began selling crack cocaine for him." (*Id.* at 13.) CW #1 is also expected to testify that in the late 1990s until 2001, when Mr. Garrett was incarcerated for state and federal drug-related convictions, Mr. Garrett had multiple individuals selling drugs at his direction in the Bedford-Stuyvesant area of Brooklyn. (*Id.*) The government anticipates that CW #1 will testify that he began traveling to Scranton, Pennsylvania for Mr. Garrett to sell drugs during this period, because Mr. Garrett found that selling drugs in Scranton was more profitable. (*Id.* at 13-14.)

The government also seeks to introduce evidence that Mr. Garrett kept guns at his residence for protection, gave CW #1 access to his guns if necessary, and committed violent acts

to protect his drug territory. (*Id.* at 13.)  In particular, the government seeks to introduce testimony from CW #1 that on at least one occasion Mr. Garrett hired another individual to shoot a person with whom he was having a dispute.  (*Id.*)  CW #1 is also expected to testify that Mr. Garrett was involved in two shootouts on an unspecified day, one "with a rival drug dealer over drug territory" and the other because an individual from the neighborhood stole a gold chain from Mr. Garrett.  (*Id.*)

> a. <u>Direct Evidence of and Evidence that is Inextricably Intertwined with the Enterprise and Conspiracy</u>

The government argues that TF's involvement in drug trafficking prior to the Indictment period "shows how TF was an organization that historically controlled specific drug territory in both Brooklyn and Scranton" and is admissible to "demonstrate the effect of TF on commerce."  (Gov't Other Acts Mem. at 35.)

Mr. Garrett opposes the government's requests for admission of evidence related to his alleged drug trafficking prior to January 2007, because such evidence is "remote in time, a discrete offense, and unrelated."  (Garrett Opp. at 7.)  Specifically, Mr. Garrett argues that he will not contest that he knows CW #1 and thus, the government's sole reason for introducing the evidence is to establish a propensity for criminal activity.  (*Id.*)  Mr. Garrett also contends that CW

#1's claim that Mr. Garrett came to believe selling drugs in Scranton was more profitable than in New York is inadmissible hearsay.

The court finds that the testimony of CW #1 about Mr. Garrett's prior drug trafficking activities with TF associates and members in Brooklyn and Scranton, that Mr. Garrett kept guns and provided a gun to CW #1 for protection, and that Mr. Garrett was involved in a shootout with a rival drug dealer over drug territory, is admissible as necessary background information to complete the story of the racketeering enterprise, the charged offenses, and the relationships between the defendants and associates and members of TF and the drug trafficking conspiracy. *See Diaz*, 176 F.3d at 79-80 (upholding district court's decision to admit evidence of prior bad acts when it was relevant to proving the existence, nature and operations of the RICO enterprise, as well as informing the jury "how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators"). The defendants are charged with conspiracy to distribute heroin, cocaine and marijuana (Counts I (Racketeering Act II), II (Racketeering Act II), and VI) and with the use of firearms in furtherance of the drug trafficking conspiracy (Count VI) in territories in Brooklyn and Scranton. The evidence of Mr. Garrett's prior drug trafficking activities in

Brooklyn and Scranton provides relevant historical background to the development of the geographic scope of the enterprise's alleged drug trafficking activities and elaborates the relationships of defendants with members and associates of the enterprise and drug trafficking conspiracy that are relevant to these charges. That CW #1 allegedly sold drugs for Mr. Garrett in the late 1990s is crucial evidence to explain why CW #1 was allegedly directed and entrusted by Mr. Garrett to sell drugs in Pennsylvania and oversee the Scranton drug trafficking operation during the Indictment period. (Gov't Reply at 5.)

Mr. Garrett's specific arguments to exclude his drug trafficking activities prior to the Indictment period are unavailing. Mr. Garrett's willingness to stipulate that he had a relationship with CW #1 does not preclude the introduction of evidence regarding the background of Mr. Garrett's relationships with CW #1 and members and associates of TF. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 122 (2d Cir. 1998) (stating that a defendant "may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it"). The court finds that Mr. Garrett's statement about the profitability of drug dealing in Scranton to CW #1 is not hearsay and is admissible as a statement of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A). Mr. Garrett's statement to CW #1 about the profitability of drug dealing in

Scranton may also be admissible as statement by a co-conspirator during the charged conspiracies under Federal Rule of Evidence 801(d)(2)(E). *See infra* Part III (analyzing the admissibility of CW #1's statements under Rule 801(d)(2)(E)).

The court, however, finds that the government has failed to demonstrate that Mr. Garrett's alleged acts of violence prior to the conspiracy period that are unconnected to drug trafficking constitute direct evidence of the defendants' charged offenses. For example the government does not specify when Mr. Garrett allegedly hired an unidentified individual to shoot an unidentified person with whom Mr. Garrett was having a dispute and whether either of the individuals were associated with TF. Nor does the government explain when Mr. Garrett allegedly had a shootout in the street with an unidentified individual who stole a gold chain from Mr. Garrett and its relevance to the charged offenses. (*See* Gov't Other Acts Mem. at 13-14.) The government's reply provides a date "in the 1990s," but does not provide further detail. (Gov't Reply at 5.) Nor are these alleged acts of violence involving unidentified individuals relevant to explaining the relationship between the members and associates of TF and Mr. Garrett; for example, CW #1 does not appear to be the individual who Mr. Garrett allegedly hired "to shoot a person with whom he was having a dispute." (*Id*. at 13.) While evidence that Mr.

15

Garrett allegedly "got into a shootout" with an individual "who stole his gold chain," may be probative of a personal dispute, it does not appear to provide any relevant background regarding the members or activities of the alleged enterprise and conspiracy. (*Id.*) The court does not find that evidence that Mr. Garrett hired an individual to shoot another person and his involvement in a shootout over the theft of the a gold chain in the 1990s is admissible as direct evidence of the defendants' charged offenses.

### b. Rule 404(b)

The court addresses the government's argument, in the alternative, that evidence of TF's alleged drug trafficking activities prior to the Indictment period is admissible pursuant to Rule 404(b). Because the court has found that evidence of Mr. Garrett's drug trafficking, that he kept guns at his residence and provided a gun to CW #1 for protection, and his involvement in a shootout with a rival drug dealer is admissible as direct evidence of and inextricably intertwined with the defendants' charged offenses, the court need not analyze the admissibility of this evidence under Rule 404(b).

The court also considers whether Mr. Garrett's acts of violence prior to the Indictment period are admissible under Rule 404(b). The government makes similar arguments in support of the admission of Mr. Garrett's other acts involving violence

under Rule 404(b) to its arguments for admission as direct evidence, contending that evidence of TF's criminal activities prior to the conspiracy period explains how the defendants became leaders in TF, how CW #1 and Mr. Garrett developed a close relationship, and completes the story of TF's narcotics and sex trafficking operations. (Gov't Other Acts Mem. at 45.) The government contends that because defendants have been charged with weapons use and possession in furtherance of crimes of violence and drug trafficking, the introduction of this evidence is not overly prejudicial. (Gov't Reply at 4.) Mr. Garrett argues that evidence of the shootouts and weapons possession is irrelevant under a Rule 404(b) analysis, and is overly prejudicial under Rule 403. (Garrett Opp. at 7.)[2]

For the reasons discussed above, the court finds unpersuasive the government's arguments for the admission of Mr. Garrett's purported involvement in the shootout over the theft of a gold chain and hiring of an individual to shoot another person prior to the Indictment period. The government does not argue that this evidence is offered for any other purposes under Rule 404(b) such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

---

[2] Unlike the government, the defendants generally did not organize their opposition into separate arguments relating to introduction of uncharged acts as "direct evidence" and as evidence under Rule 404(b). Where the court does not summarize a specific argument made by a defendant against admission under Rule 404(b), the court assumes familiarity with the defendants' arguments as previously summarized in this Memorandum and Order.

lack of accident." Rule 404(b). The court finds that the probative value of the government's vague assertions regarding Mr. Garrett's shootout over the gold chain and the shooting for hire, which have, at best, an attenuated connection to the charged conduct and are remote in time, is minimal. The probative value of such evidence is substantially outweighed by the risk that jurors will attribute a propensity for violence to Mr. Garrett. Indeed, the court finds that the government's argument that the only reason the events are "remote in time" from the crimes charged is because Mr. Garrett was incarcerated between 2001 and 2007, and "simply unable to commit other bad acts during this period" suggests that the government may be attempting to present evidence that Mr. Garrett has a criminal character. (Gov't Reply at 6.) Consequently, evidence of Mr. Garrett's gold chain shootout and shooting for hire prior to the period charged in the Indictment is inadmissible under Rule 404(b).

2. Prostitution

The government forecasts that CW #1 will testify that "in the late 1990s," at least two female individuals worked as prostitutes "for Garrett" in Scranton. (Gov't Other Acts Mem. at 14.) Mr. Garrett opposes the introduction of this evidence on the grounds that it is "stale," "strictly propensity driven" and that it is unduly prejudicial under Rule 403. (Garrett Opp. at

18

7-8.)  The court finds that this evidence is direct evidence of the origins of the Mr. Garrett's participation in the enterprise's sex trafficking activities.  The evidence explains how TF's sex trafficking operations developed in Brooklyn, NY and Scranton, PA, and is inextricably intertwined with the geographic scope of the enterprise during the Indictment period and its effect on commerce.

Moreover, the court does not find that probative value of the evidence is substantially outweighed by the risk of unfair prejudice under Rule 403, because the prior conduct is not "more inflammatory" than Mr. Garrett's charged offenses of sex trafficking and interstate prostitution (*see* Counts I, II, III, IV, V).  *See Livoti,* 196 F.3d at 326. Thus, the government may introduce evidence of Mr. Garrett's involvement in prostitution in Scranton in the late 1990s.  The court finds that analysis under Rule 404(b) is not necessary, because evidence of Mr. Garrett's involvement in sex trafficking prior to the indictment period constitutes direct evidence of and is inextricably intertwined with his charged offenses.

### 3. Obstruction of Justice

#### a. Mr. Garrett

The government intends to introduce evidence that, "[i]n the late 1990s," Mr. Garrett ordered CW #1 and other individuals who were allegedly involved in selling narcotics for

Mr. Garrett, to assist him in an assault on an individual in Brooklyn. (Gov't Other Acts Mem. at 15.) Thereafter, CW #1 was allegedly assaulted in retaliation, and Mr. Garrett directed CW #1 to file a false police report "in an apparent effort to have an individual with whom Garrett was having a dispute arrested." (*Id.* at 15.) Mr. Garrett objects to the introduction of evidence of his involvement in the filing of the false police complaint on the grounds that Mr. Garrett is not charged with obstruction of justice, the alleged act is very remote in time to the charged crimes, and the evidence is highly prejudicial. (Garrett Opp. at 8.)

The government contends that evidence of Mr. Garrett's prior obstruction of justice by directing CW #1 to file a false police report "in the late 1990s" is relevant to how he policed and protected his drug trafficking territory. (Gov't Other Acts Mem. at 35.) The government also argues that evidence of Mr. Garrett's obstruction of justice is admissible because the evidence that CW #1 filed a false police report constitutes witness impeachment evidence under *United States v. Giglio*, 419 F.3d 159 (1972).

The court finds that Mr. Garrett's attempt to persuade CW #1 to file a false police report "in the late 1990s" against an individual with whom Mr. Garrett was having a dispute is direct evidence of the existence of the enterprise, the pattern

of racketeering in which members and associates of the enterprise engaged, and continuity of the enterprise. This evidence is also background evidence of the relationship between Mr. Garrett and CW #1, establishing that Mr. Garrett was a leader and CW #1 was a subordinate who followed Mr. Garrett's directives. Evidence of this alleged incident is also probative of the manner in which Mr. Garrett employed and controlled the individuals who sold narcotics for him. The court further notes that the government is permitted to elicit impeachment material pursuant to *Giglio* on direct examination "in order to defuse the impact of bad acts on the witnesses' credibility and to avoid the appearance that the Government is concealing impeachment evidence from the jury," *United States v. Townsend*, No. 06-CR-34, 2007 WL 1288597, at *7 (S.D.N.Y. May 1, 2007) *aff'd sub nom. United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) (internal quotations and citations omitted), and that the jury could be misled if CW #1's involvement with Mr. Garrett in this incident and in drug trafficking was not disclosed.

The government concedes, and the court agrees, that the uncharged act of Mr. Garrett directing CW #1 to file a false police report is relevant to a Rule 403 analysis, because Mr. Garrett is not charged with a substantive count of obstruction of justice. (*See* Gov't Reply at 7.) Applying the Rule 403 balancing analysis, the court finds that the probative value of

the evidence regarding how Mr. Garrett historically directed and controlled CW #1 and other individuals who sold narcotics for Mr. Garrett, including the protection of Mr. Garrett's territory, outweighs the risk of unfair prejudice. Moreover, the evidence of Mr. Garrett's actions regarding this incident are not "any more sensational or disturbing" than the charged crimes. *Pitre*, 960 F.3d at 1120. If Mr. Garrett requests, the court will give a limiting instruction to the jury that evidence of Mr. Garrett's involvement in CW #1's filing of the false report may not be considered as evidence of Mr. Garrett's character or his propensity to engage in obstruction of justice. *See* Fed. R. Evid. 105; *United States v. Lofton*, 275 Fed. App'x 30, 32 (2d Cir. 2008) (upholding introduction of prior bad acts when court instructed the jury that it may not consider the evidence as proof that the defendant has a bad character or a criminal propensity). Because the court finds that evidence of Mr. Garrett's obstruction of justice in the late 1990s is relevant as direct evidence of and inextricably intertwined with evidence of the charged conduct, the court need not conduct an analysis under Rule 404(b).

### b. Mr. Rivera

The government seeks to admit evidence that Mr. Rivera was involved in other acts of obstruction of justice. The government proffers that Mr. Rivera and a member of TF were

arrested for the sale of firearms and illegally cloned cellular phones in the mid-1990s. The government further offers that Mr. Rivera, upon learning that his co-defendant agreed to be a cooperating witness in the case, assaulted him with another TF member. (Gov't Other Acts Mem. at 14.) The government also anticipates offering evidence that Mr. Rivera fabricated evidence against the cooperating witness: Mr. Rivera induced the former girlfriend of the TF member who helped Mr. Rivera assault the cooperating witness to file a false police report. Mr. Rivera also convinced the TF member to give false testimony in order to make the cooperating witness unavailable at Mr. Rivera's bail revocation hearing before Judge Gleeson. (*Id.* at 14-15; *see also* Mem. and Order Granting Anonymous and Partially Sequestered Jury, ECF No. 179, filed 2/13/15 (providing more detailed background of Mr. Rivera's obstruction of justice in connection with his bail revocation in 1997).) Mr. Rivera and other individuals involved in this plot were all subsequently charged with and convicted of conspiring to persuade a New York City police officer. (*Id.* at 15.) Mr. Rivera contends that the government "fails to demonstrate or even suggest" how the uncharged obstruction of justice claim "proves the crimes charged in the Indictment." (Rivera Opp. at 3.)

(i)  Direct Evidence of and Evidence that is
     Inextricably Intertwined with the
     Enterprise and Conspiracy

The court finds that Mr. Rivera's uncharged act of
obstruction of justice in 1997 is not admissible as direct
evidence of or inextricably intertwined with defendants' charged
conduct.  The government's arguments in support of its proffered
evidence regarding Mr. Rivera's conduct in connection with his
bail revocation hearing before Judge Gleeson in 1997,
approximately a decade preceding the indictment period, are
insufficient to establish that Mr. Rivera's 1997 actions were
direct evidence of the charged conduct or the TF enterprise's
pattern of racketeering.  Unlike the evidence of Mr. Garrett's
prior obstruction of justice conduct that is necessary to
explain his relationship with CW #1 in narcotics trafficking,
Mr. Rivera's prior obstruction appears to be unconnected to a
cooperating witness and is unnecessary to "complete the story of
the crime on trial." *Gonzalez*, 110 F.3d at 942.  Moreover, the
government does not assert that the purported TF members, Mr.
Krueger and Mr. Nagler, who were involved in Mr. Rivera's 1997
obstruction of justice are still connected to the TF enterprise,
Mr. Rivera, or the racketeering activities of the TF enterprise.
Indeed, neither Mr. Krueger nor Mr. Nagler's names appear on the
government's proffered list of names of individuals who may
testify or who may be discussed at trial. (*See* Jury

Questionnaire Attachment A, ECF No. 272, filed April 16, 2015.)
The government also has not explained why Mr. Rivera's conduct
in 1997 may be relevant background or provide context to the
instant charges; nor has the government proffered that Mr.
Rivera's relationships with any of the individuals involved in
the incident in 1997 are relevant to the defendants' charged
conduct during the indictment period.  Although Mr. Rivera's
obstruction may be minimally probative to the existence of TF
Pursuant to a Rule 403 analysis, the court thus finds that the
probative value of Mr. Rivera's obstruction of justice in 1997
is minimal and is substantially outweighed by the risk of unfair
prejudice and jury confusion.  Thus, Mr. Rivera's obstruction of
justice in 1997 is excluded as direct or inextricably
intertwined evidence of the charged conduct.

(ii) Rule 404(b)

The government makes no specific arguments under Rule
404(b) for admission of Mr. Rivera's 1997 obstruction of
justice.  (*See* Gov't Other Acts Mem. at 45; Gov't Reply at 7-8.)
Nonetheless, the court considers the evidence of Mr. Rivera's
obstruction of justice in 1997 and finds that it should also be
precluded under a Rule 404(b) analysis.  Again, the court finds
that the probative value of Mr. Rivera's obstruction of justice
in 1997 is only marginally probative to the existence of the TF
enterprise, is temporally attenuated from the charged offenses,

and is far outweighed by the risk that jurors will attribute to Mr. Rivera a propensity to obstruct justice.  Such evidence is inadmissible at trial under Rule 404(b).

### B. Defendants' Prior Convictions and Records of Imprisonment

The government seeks to introduce evidence of specific convictions and records of imprisonment the defendants, on the grounds that this evidence "provides context" for the testimony of one or more of the witnesses and is necessary to "complete the story" of the charged offenses.  (Gov't Other Acts Mem. at 16.)

#### 1. Mr. Garrett

The government states that one or more witnesses are expected to testify that following Mr. Garrett's release from prison in 2007 for drug-related convictions -- which coincides with the beginning of the Indictment period -- Mr. Garrett reconnected with certain TF members with whom he had been engaged in criminal activity in the 1990s, intensified TF's criminal activities, and began to develop TF's music business. (Gov't Other Acts Mem. at 17.)  In 2001, Mr. Garrett was convicted of a state charge of criminal sale of a controlled substance in the third degree (New York Penal § 220.39(1)), and federal charges of possession with the intent to distribute cocaine base (21 U.S.C. § 841(a)) and using a firearm in

connection with a drug trafficking crime (18 U.S.C. § 924(c)).
(*Id.* at 16.)  Mr. Garrett served his state and federal prison
sentences concurrently between 2001 and 2007.  (*Id.*)  The
government represents that one or more witnesses will testify
that after Mr. Garrett was released from prison, he began using
the name "TF Mafia" to refer to certain members of TF, which he
envisioned to be a subset of Together Forever, "similar to a
'set' or 'clique' within a gang like the Bloods."  (*Id.*)  At
least one cooperating witness is expected to testify that
Garrett claimed to have developed ties to the Gotti family while
in prison, which was the origin of the "mafia" reference in the
new TF Mafia name.  (*Id.*)  The government also intends to
present evidence of Mr. Garrett's conviction on June 29, 2010
for possession of marijuana in Weehawken Municipal Court in New
Jersey, for which he received a six month suspended sentence and
a $995 fine.  (*Id.*)

> a. <u>Direct Evidence of and Evidence that is
> Inextricably Intertwined with the Enterprise
> and Conspiracy</u>

The government argues that Mr. Garrett's 2001 state
and federal convictions and subsequent imprisonment until 2007
"provide[ ] context necessary" as a "bridge from TF's activities
in the late 1990s and early 2000s to the time period charged in
the indictment," so that the jury can understand why Garrett was
able to assume leadership of TF in 2007, the relationships

between members of TF and Mr. Garrett, and the structure of TF. (Gov't Other Acts Mem. at 36-37.)

Mr. Garrett opposes the government's introduction of Mr. Garrett's 2001 convictions on the ground that this background information is irrelevant because TF Mafia, TF, and TF Mafia Muzik LLC are related but distinct entities. (Garrett Opp. at 8.) Mr. Garrett also argues that evidence of his 2001 conviction is unduly prejudicial under Rule 403 and that the government "can introduce evidence that Garrett was a leader of the organization[ ] and knew Rivera" without eliciting Mr. Garrett's prior convictions. (*Id.* at 9.) Mr. Garrett also seeks to preclude any testimony identifying TF Mafia "as mafia or Bloods-related" as overly prejudicial with no probative value. (Garrett Opp. at 10.)

The court finds that Mr. Garrett's imprisonment between 2001 and 2007 is relevant as direct evidence of the charged conspiracy. In particular, CW #1's expected testimony about the evolution of TF Mafia from TF during and after Mr. Garrett's incarceration is "necessary to complete the story of the crime on trial," *Gonzalez*, 110 F.3d at 942. CW #1's testimony is also relevant to proving the nature of the enterprise, including the "relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO."

*Basciano*, 599 F.3d at 206-07.  Consequently, Mr. Garrett's imprisonment from 2001 to 2007 is relevant to the existence and continuity of the enterprise, including its origin, growth, and scope, and establishes the background for a pattern of racketeering and key relationships of the members and associates of the enterprise.

The court notes that "evidence of prior convictions merits particularly searching, conscientious scrutiny" under Rule 403.  *United States v. McCallum,* 584 F.3d 471, 475-76 (2d Cir. 2009).  The probative value of Mr. Garrett's imprisonment between 2001 and 2007 outweighs the risk of unfair prejudice and is therefore admissible.

The probative value of Mr. Garrett's particular crimes of conviction, however, does not outweigh the risk of unfair prejudice.  Evidence of Mr. Garrett's specific state and federal offenses of conviction in 2001 state and federal convictions for drug trafficking and weapons-related charges are likely to lead the jury to "generalized reasoning about a defendant's criminal propensity" to engage in illegal narcotics trafficking and illegal weapons possession, and would thereby undermine the presumption of innocence.  *Id*. at 476.  The government has not proffered any arguments as to how the specific charges of which Mr. Garrett was convicted in 2001, as opposed to his period of incarceration, are relevant to the charged offenses.

Accordingly, the government may introduce evidence that Mr. Garrett was convicted and consequently sentenced to a period of imprisonment between 2001 and 2007 to provide historical context to the charged offenses and Mr. Garrett's role in the TF enterprise.  The government may not present evidence that identifies the specific charges of Mr. Garrett's 2001 state and federal convictions.

The government also does not contend that Mr. Garrett's 2010 conviction for possession of marijuana in New Jersey is direct evidence of his charges, and the court declines to admit this conviction as direct evidence.

### b. Rule 404(b)

The court addresses the government's argument in the alternative that Mr. Garrett's 2001 state and federal convictions and his 2010 state marijuana conviction are admissible under Rule 404(b).  The government contends that evidence of Mr. Garrett's convictions in 2001 and 2010 is admissible under Rule 404(b), because it is evidence of Mr. Garrett's "knowledge and intent with respect to the drug trafficking offenses charged in the indictment."  (Gov't Other Acts Mem. at 46.)

To the extent that evidence of Mr. Garrett's 2001 and 2010 drug-related convictions may be minimally probative to his knowledge and intent regarding the charged drug trafficking

offenses, the risk of unfair prejudice substantially outweighs
its probative value.  As the court has previously discussed,
admission of evidence of a defendant's prior convictions risks
leading the jury to generalized reasoning about a defendant's
criminal propensity.  *See McCallum*, 584 F.3d at 476.  Especially
in light of the substantial evidence that may be introduced to
prove Mr. Garrett's knowledge and intent relating to the charged
drug trafficking crimes, the court declines to admit the
evidence of defendants' drug-related convictions prior to the
indictment period.  *See Id*. at 477 (quoting 2 Weinstein, Federal
Evidence § 403.03 (Joseph M. McLaughlin, Ed., Matthew Bender &
Co. 2009)) ("[A] trial judge applying the Rule 403 balancing
test to certain evidence must reject any method that treats each
item of evidence as an island and must instead evaluate all the
pieces of evidence going to the same point.") (internal
quotations omitted).

> c. Mr. Garrett's Request to Preclude Testimony
> Related to the Mafia or the  Bloods

The court also considers Mr. Garrett's objection to,
and request to preclude, testimony that TF Mafia is related to
the traditional La Cosa Nostra Mafia or the Bloods.  The court
finds, based on the current record, that evidence of TF Mafia's
association with the Mafia (specifically, testimony relating to
Mr. Garrett's acquaintance while in prison with an unidentified

member of associate of the Gotti family) and the Bloods gang has little, if any, probative value, and such evidence is substantially outweighed by the significant risk of unfair prejudice. The prolific portrayals of the La Cosa Nostra Mafia and the Bloods gang in the media are likely to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180; *see United States v. Locascio*, 357 F. Supp. 2d 536, 544 (E.D.N.Y. 2004) ("[T]he mere association with a Mafia family is, in itself, highly prejudicial."); *United States v. Price*, No. 05-cr-492, 2009 WL 973370, at *2 (E.D.N.Y. April 10, 2009) (recognizing that "media reports and portrayals have engraved a violent image of the Bloods in the popular conscience"). The Second Circuit has cautioned that trial courts must be vigilant where there is a "tendency of the evidence [in question] to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir. 1980). Here, neither defendant is charged with offenses involving the La Cosa Nostra Mafia or the Bloods gang. The government does not assert that TF or the defendants have any direct relationship to the La Cosa Nostra Mafia or the Bloods gang in connection with the charged offenses. Consequently, the court finds that the minimal probative value of Mr. Garrett's alleged inspiration by the

Bloods or the mafia is substantially outweighed by the grave danger of unfair prejudice and precludes evidence referencing the La Cosa Nostra Mafia and the Bloods gang.

### 2. Mr. Rivera

The government seeks to introduce the following convictions from Mr. Rivera's criminal history: (1) August 20, 1997 convictions for conspiracy to persuade a police officer and for being a felon in possession of a firearm for which Mr. Rivera was sentenced to 46 months incarceration and 3 years of supervised release; and (2) an August 16, 2002 conviction for conspiracy to commit extortion under the Hobbs Act for which Mr. Rivera was sentenced to 12 months in custody and an additional 24 months incarceration for violating his 1997 supervised release, plus an additional 3 years of supervised release. (Gov't Other Acts Mem. at 17-18.) Mr. Rivera was released in 2004 for his 2002 conviction. A cooperating witness ("CW #2") is expected to testify that he met Mr. Rivera at Lewisberg federal prison when Mr. Rivera was incarcerated at the facility for his August 16, 2002 Hobbs Act conviction. (*Id*. at 18.) CW #2 is expected to testify that after their respective releases from prison, he bumped into Mr. Rivera in 2005 on the subway, and they began regularly associating together. (*Id*.)

The government also seeks to introduce evidence of Mr. Rivera's violations of supervised release in connection with his

prior convictions, specifically: (1) on February 14, 2006, Mr.
Rivera was ordered to serve 90 days of community confinement for
two violations related to his illicit drug use and failure to
report his change of address; (2) on August 16, 2007, Mr. Rivera
pleaded guilty to a violation of his supervised release for drug
use; (3) on November 13, 2008, Mr. Rivera was found in violation
of his supervised release for his drug use and was ordered to
complete a 12-month drug treatment program; (4) on June 24, 2009
Mr. Rivera was found in violation of his supervised release for
failing to attend the drug treatment program. (*Id.* at 18-19.)
The government represents that one or more witnesses are
expected to testify at trial "about the timing of certain events
by reference to Rivera's terms of supervised release" or events
that occurred at Mr. Rivera's tattoo shop while Mr. Rivera was
in drug treatment or incarcerated. (*Id.*) For example, CW #1 is
expected to testify that he met Mr. Rivera following his release
from prison in 2004. (*Id.*)

> a. Direct Evidence of and Evidence that is
>    Inextricably Intertwined with the Enterprise
>    and Conspiracy

The government contends that Mr. Rivera's 1997
convictions for conspiracy to persuade a police officer and
being a felon in possession of a firearm are direct evidence of
the existence of the enterprise and its pattern of racketeering.
(*Id.* at 38.) The government also asserts that Mr. Rivera was

the leader of TF at the time and used his position to intimidate witnesses and obstruct justice with other TF members. (*Id.*) The government argues that Mr. Rivera's 2002 Hobbs Act conspiracy conviction and his subsequent term of imprisonment "provide essential background information necessary to complete the story at trial" by establishing the basis of trust between CW #2 and Mr. Rivera, and is therefore admissible as direct evidence of the racketeering charges. (*Id.*) The government further generally contends that Mr. Rivera's 2008 and 2009 supervised release violations are necessary to complete the story of the charged offenses, in particular how Mr. Rivera's relationship developed with CW #1 and "to understand certain events that will be discussed at trial." (*Id.* at 39.) The government makes no specific arguments for the introduction of Mr. Rivera's 2006-2007 supervised release violations.

Mr. Rivera objects to the government's arguments on the grounds that the government "makes no justifiable basis" for the introduction of Mr. Rivera's prior convictions and history of incarceration. (Rivera Opp. at 4.) Mr. Rivera also cites *United States v. McCallum*, 584 F.3d 471, 476 (2d Cir. 2009) for the proposition that "prior convictions are far more likely to be received as potent evidence of propensity than other prior bad acts." (*Id.*)

The probative value of Mr. Rivera's 1997 convictions for being a felon in possession of a firearm and for conspiracy to persuade a police officer is minimal when weighed against the risk of prejudice. The court finds that the particular offenses of these prior convictions are neither direct evidence of, nor inextricably intertwined with, the defendants' charged conduct. Moreover, the evidence that Mr. Rivera spent time in custody for offenses committed eleven years before the period charged in the indictment has minimal probative value and is substantially outweighed by the risk of unfair prejudice.

With respect to Mr. Rivera's 2002 Hobbs Act conspiracy conviction, which led to his initial meeting of CW #2 while serving his sentence, the court finds that Mr. Rivera's imprisonment is evidence that "adds context and dimension," *Gonzalez*, 110 F.3d at 941, to how Mr. Rivera's relationship and trust with CW #2 developed and is properly admitted as evidence that provides background and context for the charged racketeering conduct. The government, however, has failed to demonstrate how admission of the substantive offense, the Hobbs Act conspiracy, is relevant to, or is direct evidence of, conduct charged in the indictment. Furthermore, because prior convictions are marked with the "the imprimatur of the judicial system and indicia of official reliability," *McCallum*, 584 F.3d at 476, the risk of unfair prejudice by introducing evidence of

36

Mr. Rivera's 2002 Hobbs Act conspiracy conviction substantially outweighs its probative value and is not admissible as direct evidence.

The court also disagrees with the government's contention that Mr. Rivera's violations of supervised release are relevant to provide context for the charged conduct. That other unspecified "certain events" (Gov't Other Acts Mem. at 39) occurred while Mr. Rivera was in drug treatment or incarcerated between 2006 and 2009 is insufficient to find that Mr. Rivera's violations of supervised release are evidence of the charged offenses. Consequently, based on the current record, the court cannot find that Mr. Rivera's convictions for violations of supervised release are direct evidence of, or inextricably intertwined with, the charged offenses.

b. Rule 404(b)

The court addresses the government's arguments in the alternative to admit Mr. Rivera's prior convictions and record of incarceration pursuant to Rule 404(b). The government seeks admission of Mr. Rivera's 1997 conviction for conspiracy to persuade a New York City police officer, arguing that this evidence is admissible "to establish the knowledge and intent elements of the obstruction and witness-tampering counts charged in the indictment, as well as to prove lack of mistake or accident." (Gov't Other Acts Mem. at 47.) The government

further argues that the 2013 obstruction of justice and witness tampering charges against Mr. Rivera in the Indictment are similar to his conviction in 1997, because he "committed both offenses while he was a leader of TF" and "in both instances, he sought to prevent another member of TF from testifying against him." (Gov't Reply at 11-12.) Mr. Rivera argues that "the government fails to show how the prior activity and conviction is meaningfully probative of Rivera's intent," because the government has not adequately identified "a similarity or some connection between the prior and current acts" to satisfy the requirements of Rule 404(b). (Rivera Mot. at 4.)

The court finds unavailing the government's arguments for admission pursuant to Rule 404(b) of Mr. Rivera's 1997 conviction for persuasion of a police officer and the acts leading to that conviction. Approximately 16 years separate the instant witness tampering and attempted obstruction of justice charges in 2013, and Mr. Rivera's 1997 conviction, and they are not sufficiently similar to warrant the admission of Mr. Rivera's 1997 conviction. *See United States v. Curley*, 639 F.3d 50, 60 (2d Cir. 2011) (finding no connection between an act that occurred 12 years prior to charged conduct). Mr. Rivera did not employ the same methods in the two instances. In 1997 Mr. Rivera assaulted a cooperating witness and persuaded an individual to file a false police report that she had been

assaulted by the potential witness to prevent him from testifying against Mr. Rivera. (Gov't Other Acts Mem. at 14-15.) He also persuaded another individual to testify falsely at his bail revocation hearing. (*Id.*) After Mr. Rivera was indicted in the instant case, he attempted to intimidate, threaten, and persuade a suspected cooperator (identified as CW #2 in the government's memorandum) to change his prior statements concerning Mr. Rivera's culpability in connection with the charges in the Indictment. (*Id.* at 11) Mr. Rivera told CW #2 that he would also be charged in the murder of Mr. Barber if he did not change his testimony and work with Mr. Rivera. (*Id.*) Mr. Rivera persuaded CW #2 to hand copy and sign a false statement that Mr. Rivera had written. (*Id.*) The difference in the methods used by Mr. Rivera in connection with the 1997 conviction and the instant charged offenses warrants exclusion of the 1997 conviction. *See Curley*, 639 F.3d at 60 (excluding prior act where the charged conduct "did not parallel" any of the methods used in the prior act). Furthermore, as previously discussed, the government has not adequately shown that Mr. Rivera's actions in 1996 and 1997 that led to his 1997 conviction are part of the same conspiracy or enterprise that is charged in the indictment. Consequently, the court finds that the minimal probative value of Mr. Rivera's 1997 conviction for conspiracy to persuade a police officer is outweighed by the

substantial risk of prejudice and jury confusion under Rule 403, and excludes evidence of Mr. Rivera's 1997 conviction for persuading a police officer.

The government further argues that Mr. Rivera's 1997 conviction for being a felon in possession of a firearm is admissible to show Mr. Rivera's access to firearms. (Gov't Other Acts Mem. at 47.) The court finds that the minimal probative value of Mr. Rivera's 1997 felon in possession conviction is substantially outweighed by the risk of unfair prejudice that a jury will assume that Mr. Rivera has a propensity to possess illegal firearms, particularly when the jury is presented with the government's anticipated evidence of the defendants' access to, and use and possession of, firearms. Consequently, the court declines to admit evidence of Mr. Rivera's 1997 firearm conviction. *See McCallum*, 584 F.3d at 477 (finding that prejudicial evidence should be excluded as unnecessary when government "had available for presentation to the jury extensive testimony from [defendant's] co-conspirator . . . as well as the results of audio and visual surveillance").

The government also contends that Mr. Rivera's 2002 Hobbs Act extortion conviction is admissible, because "it is probative as to whether Rivera acted with the intent to kill when he shot Barber and not due to mistake or accident." (Gov't Other Acts Mem. at 47.) The court finds that the probative

value of Mr. Rivera's 2002 extortion conviction, to establish
Mr. Rivera's intent and whether he acted by mistake or accident
in the charged murder of Mr. Barber nine years later, is
minimal. There is a substantial risk that the jury is likely to
conclude that Mr. Rivera is guilty of Mr. Barber's murder
because Mr. Rivera committed and was convicted of a violent act
in 2002, and thus has a propensity for violence. Rule 404
specifically prohibits this type of character and propensity
evidence. The court finds that the substantial risk of
prejudice far outweighs the probative value of this apparently
unrelated conduct. Consequently, the court finds that evidence
of Mr. Rivera's 2002 Hobbs Act conviction is inadmissible
pursuant to Rule 404(b).

The court finds that Mr. Rivera's supervised release
violations for drug use during the Indictment period are
properly offered pursuant to 404(b) to prove intent, motive, and
knowledge. The government has proffered that (1) Mr. Rivera's
drug use allowed Mr. Garrett to assume a more powerful
leadership role in the TF enterprise and (2) that Mr. Rivera was
using heroin on the night of Robert Barber's murder and was paid
by Mr. Garrett in cash and heroin for the murder. Based on the
government's proffer, the court finds that evidence of Mr.
Rivera's drug use during the Indictment period, including
violations of his supervised release due to drug use, is

properly offered for a reason other than to establish
propensity. Specifically, Mr. Rivera's violations of supervised
release due to his drug use are highly probative of his intent
and motive for being involved in the charged drug trafficking
conspiracy and the alleged murder of Robert Barber. Here, the
highly probative value of the evidence of Mr. Rivera's drug use
during the indictment period, as established by the violations
of his supervised release, substantially outweighs the risk of
unfair prejudice. Should Mr. Rivera request a limiting
instruction, the court will provide an instruction to the jury
that it may not consider Mr. Rivera's violations of supervised
release as evidence of his propensity for drug use or criminal
behavior.

The court, however, finds that the probative value of
Mr. Rivera's February 2006 supervised release violation, prior
to the indictment period, is substantially outweighed by the
risk of unfair prejudice and jury confusion.

### C. TF's Methods and Means of Control over its Membership

The government intends to introduce evidence that the
defendants used beatings to discipline TF members and that these
beatings were carried out by Mr. Garrett and Mr. Rivera, and/or
by other TF members at their direction. (Gov't Other Acts Mem.
at 19.) Specifically, the government seeks to introduce the
following evidence: (1) that the defendants and another member

of TF (referred to as Individual #3 in the government's
memorandum) assaulted a TF member (referred to as Individual #2
in the government's memorandum) after learning from Individual
#3 that Individual #2 planned to rob a quantity of drugs from
Mr. Garrett's apartment while he was away in California "at some
point between 2008 and 2010."  The defendants had Individual #3
lure Individual #2 to Mr. Garrett's apartment, during which Mr.
Rivera hit Individual #2 with a hammer while Individual #3
punched him in the face.  The defendants threatened to kill
Individual #2 during the beating; (2) that Mr. Garrett hit a TF
member (referred to as Individual #4 in the government's
memorandum) in the head with a gun for attempting to steal drugs
from him, "leaving bloody cuts on his head" during the
conspiracy period; and (3) that Mr. Garrett assaulted CW #1 on
at least three occasions for a break-in that occurred at Mr.
Garrett's Brooklyn apartment in the late 1990s when CW #1 was
staying there, and on two occasions for engaging in sexual
contact with women with whom Mr. Garrett had relationships.
(Gov't Other Acts Mem. at 20; Gov't Reply at 14.)

The defendants object to the introduction of evidence
about these assaults because the government initially failed in
its moving memorandum to provide a time frame for the
allegations or identify the parties involved, (Garrett Opp. at
10; Rivera Opp. at 4-5), although the government's reply

memorandum provided the above time periods.  (Gov't Reply at 13-
15.)  Mr. Garrett argues that the government has proffered no
justifiable reason for the introduction of evidence of these
acts, characterizing the incidents as "brawling over women and a
perceived threat as proof of control."  (Garrett Opp. at 11.)
Mr. Rivera also argues that the evidence of his alleged
involvement in one of the assaults is "cumulative as to the
background of the enterprise and what it adds is so minor as to
be far outweighed by its prejudicial effect and confusion and
delay that will follow."  (Rivera Opp. at 5.)

        The government also seeks to introduce evidence that
Mr. Garrett used economic sanctions to punish TF members when
they did not follow his rules and obey his orders.  (Gov't Other
Acts Mem. at 21.)  For example, CW #1 is expected to testify
that Mr. Garrett fined him for pulling a gun on an individual in
the late 1990s without Mr. Garrett's permission and for engaging
in sexual contact with Mr. Garrett's girlfriend.  (*Id.*)  Mr.
Garrett objects to the introduction of this evidence, because it
is "not inextricably bound with the charged crime offense and is
remote in time," and asserts that the evidence should be
precluded under Rule 403.  (Garrett Opp. at 12.)

        The government also intends to introduce the following
examples of defendants' threats and intimidation to control the

TF members: (1) excerpts of the TF Video[3] depicting Mr. Garrett

and his girlfriend, Erina Henry, discussing whether Mr. Rivera,

Kathryn Rivera, Shelby Rivera, and John Portalatin were going to

provide information to the government following their arrest in

connection with the January 18, 2012 car stop in Pennsylvania

and the need and means to prevent them from doing so; (2)

testimony from one or more witnesses that at weekly meetings Mr.

Garrett verbally threatened Kathryn and Shelby Rivera if they

were to divulge information to law enforcement; (3) testimony

from a witness that Mr. Garrett offered $10,000 for Mr. Rivera's

murder after he learned that Mr. Rivera proffered a statement in

connection with his January 2012 arrest; and (4) testimony from

one or more witnesses and evidence that Mr. Garrett threatened

Kathryn and Shelby Rivera and their families and friends with

murder if they "ratted," "snitched," or did not prostitute

themselves to repay  Mr. Garrett for the cost of their bail

after their January 2012 arrests.  (*Id.* at 22-24.)

The government also intends to introduce evidence that

at the weekly meetings that Mr. Garrett held for TF members, he

"made efforts to collect a sum of money from each member of TF

---

[3] Mr. Garrett objects to the characterization of the video to which the
government refers as the "TF Documentary" as documentary, arguing that the
video "is an entertainment piece not a documentary."  (Garrett Opp. at 12
n.5.)  The government has indicated in another filing that "it is amenable
to" using a different term at trial.  (Gov't Reply Mem. in Support of Its
First Mots. *in Limine* at 26 n.6, ECF No. 193, filed 2/27/15.)  For the
purposes of this Memorandum and Order and at trial, the documentary/docudrama
at issue should be referred to as "the TF Video."

to finance TF's music activities" and discussed criminal
activities with TF members.  (*Id.* at 25.)  Mr. Garrett objects
to the introduction of the two videos as evidence of Mr.
Garrett's threats and intimidation on the grounds that they were
"designed for entertainment and promotional purposes."  (Garrett
Opp. at 12.)  In its Memorandum and Order dated April 17, 2015
regarding the introduction of video evidence, the court found
unavailing Mr. Garrett's arguments to exclude the TF Video
excerpts relating to the January 2012 car stop and search, and
the video where Mr. Garrett appears to direct warnings to "Yung
John" Portalatin and Kathryn and Shelby Rivera about not
"ratting."

       1. Direct Evidence of and Evidence that is
          Inextricably Intertwined with the Enterprise and
          Conspiracy

       The government characterizes the evidence of assaults,
fines, threats and intimidation, and weekly meetings described
above as evidence of the methods and means that the defendants
allegedly used to control its membership.  (Gov't Other Acts
Mem. at 19.)  The government argues that defendants' methods and
means of control are evidence of the existence of TF and its
pattern of racketeering in furtherance of the enterprise, as
well as the defendants' leadership roles in TF.  The government
also contends that this evidence is admissible as direct
evidence of the charged drug trafficking and sex trafficking

conspiracies without regard to Rule 404(b), because the evidence demonstrates how the defendants imposed order within the enterprise and signaled that "dissension would be dealt with harshly." (*Id*. at 41.)  The defendants argue that the evidence that the government seeks to introduce regarding the assaults, fines, threats and intimidation, and weekly meetings is vague and remote in time. (*See* Garrett Opp. at 10-12; Rivera Opp. at 4-5.)

The government's proffered evidence of TF methods and means of control during the indictment period is admissible as direct evidence of the existence of the charged enterprise, its pattern of racketeering activity, the operations in furtherance of the enterprise, and the alleged leadership roles of the defendants in the enterprise. *See, e.g.*, *United States v. Ulbricht*, No. 14-CR-68, 2015 WL 105799, at *14 (S.D.N.Y. Jan. 7, 2015) ("Evidence that Ulbricht solicited murders-for-hire of individuals who threatened Silk Road is relevant to show Ulbricht's supervisory role in the criminal enterprise—that he protected the criminal enterprise of which he was the leader."); *United States v. Bourne*, No. 08-CR-888, 2011 WL 4458846, at *15 (E.D.N.Y. Sept. 23, 2011) (stating that assault on member of criminal organization who stole cocaine "was done in furtherance of the continuing criminal enterprise, indicates Bourne's

leadership role and his participation and is inextricably tied to the charged conduct").

Additionally, the defendants' uncharged acts during the indictment period which the government categorizes as TF's methods and means of control (Gov't Other Acts Mem. at 19-25) are also admissible as direct evidence of, and inextricably intertwined with, the charged drug trafficking and sex trafficking conspiracies. *See, e.g.*, *United States v. Santos,* 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force . . . . Consequently, advancing the aim of a narcotics conspiracy can involve performing ancillary functions such as enforcing discipline and chastising rivals.") (internal quotations and citations omitted); *United States v. Kelly*, No. 07-CR-374, 2008 WL 5068820, at *6 (E.D.N.Y. July 10, 2008) (concluding that evidence of assaults is admissible to prove sex trafficking conspiracy). The court declines to exclude this evidence under Rule 403 because, under the Second Circuit's standard in *Livoti*, the evidence of TF's means and methods of control during the indictment period are no more inflammatory than the offenses with which defendants are charged.

The government also seeks to introduce defendants' uncharged conduct prior to the Indictment period or for which

the government has failed to specify any time period.

Specifically, the government has proffered examples that Mr.

Garrett assaulted CW #1 at least three times in the 1990s (*see*

Gov't Other Acts Mem. at 20) and that Mr. Garrett fined TF

members in the 1990s (*see id.* at 21).  The government has not

specified the time period for evidence that CW #1 "was banned

from selling drugs in Scranton for a period of time after CW #1

engaged in sexual conduct with the girl that Garrett claimed was

'his,'" that "[a]nother member of TF was fined when he lost

Garrett's guns," and a video from Mr. Rivera's computer

depicting Mr. Garrett burning TF members' money as a form of

discipline.  (Gov't Other Acts Mem. at 21.)   The government's

vague, undated proffers are inadequate to establish that these

incidents are direct evidence of or inextricably intertwined

with the defendants' charged offenses.  Based on the

government's representations of this evidence, the court is

unable to assess when these alleged incidents occurred and

whether they related to personal disputes or were related to

activities of the charged enterprise and the alleged pattern of

racketeering.  For example, it appears that CW #1's testimony

that Mr. Garrett stabbed his landlord and punched CW #1 in the

face following a break-in of Mr. Garrett's apartment in the late

1990s describes circumstances surrounding a personal dispute

rather than acts that are probative of the defendants' charged

conduct relating to the enterprise.  To the extent that evidence

of TF's "methods and means of control" prior to the Indictment

period could be minimally probative of the enterprise, the court

finds that the risk of unfair prejudice and jury confusion

substantially outweighs its probative value.   The jury is far

more likely to be lured into concluding that the defendants have

a violent propensity, rather than considering the evidence

solely as probative of the charged RICO enterprise and

conspiracy.  *Old Chief*, 519 U.S. at 180.

> 2. Rule 404(b)

The government also contends, in the alternative, that

evidence of TF's methods and means of control, including

evidence prior to the Indictment period, is probative of

defendants' intent, knowledge, and lack of mistake and is

therefore admissible under Rule 404(b).  (Gov't Other Acts Mem.

at 48.)  The court finds that evidence of Mr. Garrett's alleged

assaults and fines that occurred more ten years prior to the

start of the Indictment period are barely probative of intent,

knowledge, and lack of mistake.  For example, Mr. Garrett's

alleged stabbing of his landlord related to a robbery of his

home in the 1990s has no bearing on whether or not he intended

to engage in sex trafficking, drug trafficking, murder, or money

laundering during the Indictment period.  Rather, the

introduction of this evidence is likely to "lure the factfinder

into declaring guilt" on the ground that Mr. Garrett has a propensity for violent criminal activity. *Old Chief*, 519 U.S. at 180. Consequently, the court finds that evidence of the defendants' methods and means of control predating the Indictment period[4] is inadmissible pursuant to Rules 403 and 404(b) because it predates the Indictment period, appears to have little, if any probative value, and is unfairly prejudicial to the defendants. The court also declines to admit, at this time, evidence of defendants' methods and means of control where the government has failed to specify the time period of the evidence proffered.

### D. Garrett Supplying Firearms and Posting Bail for a Cooperating Witness

The government anticipates that a cooperating witness ("CW #3") will testify that Mr. Garrett supplied him with firearms and ammunition to protect himself after the homicide of Robert Barber in August 2011. (Gov't Other Acts Mem. at 25.) Thereafter, CW #3 was arrested after police executed a search warrant at his residence where firearms, ammunition, and a quantity of drugs allegedly provided by Mr. Garrett were recovered. (*Id.*) CW #3 is also expected to testify that, following his arrest, Mr. Garrett posted bail for him. (*Id.*)

---

[4] Based on the court's review of the government's memorandum, the government has proffered examples that Mr. Garrett assaulted CW #1 on at least three occasions in the 1990s (*see* Gov't Other Acts Mem. at 20) and that Mr. Garrett fined TF members in the 1990s (*see id.* at 21).

The government contends that CW #3's testimony is admissible as direct and highly probative evidence of the existence of the charged offenses (including murder and drug trafficking), the charged enterprise, the association-in-fact of CW #3 and Mr. Garrett, Mr. Garrett's protection and support of this TF member, and also provides corroboration for CW #3's expected testimony. (*Id.* at 43; Gov't Reply at 21.)  Mr. Garrett objects to the introduction of evidence relating to the circumstances of CW #3's arrest and his subsequent bail as "irrelevant, confusing, and creating a trial within the trial."  (Garrett Opp. at 13.) Mr. Garrett also claims that this evidence should be precluded under Rule 403.  (*Id.*)

The court finds that evidence that Mr. Garrett posted bail for CW #3 and provided him with firearms and ammunition after the alleged murder of Robert Barber is admissible as direct evidence of the charged offenses, the existence of the charged enterprise, Mr. Garrett's leadership in TF, his association with and relationship to Mr. Rivera and other TF members, and acts taken in furtherance of the enterprise and the conspiracies.  Given that Mr. Garrett allegedly provided the firearm and ammunition and paid the bail for CW #3 in connection with the death of Robert Barber, for which the defendants are charged with murder (Counts I (Racketeering Act VI), II (Racketeering Act VI), IX, X, and XI), the court finds this

evidence highly probative and that it far outweighs any risk of unfair prejudice or confusing the jury under Rule 403. Consequently, the court finds that evidence of Mr. Garrett providing a firearm and ammunition to CW #2 and posting his bail is admissible as direct evidence of the charged conduct.

### E. Defendants' Drug Use

The government seeks to introduce evidence that the defendants used illegal drugs before and during the charged period. (Gov't Mot. at 25-26.) Specifically, the government anticipates that one or more cooperating witnesses will testify (1) that Mr. Rivera frequently used crack cocaine and heroin and Mr. Garrett frequently used marijuana; (2) that Mr. Garrett took more leadership responsibility in TF because of Mr. Rivera's drug use; (3) that Mr. Rivera was using heroin the night he allegedly shot and killed Mr. Barber at the direction of Mr. Garrett; (4) that Mr. Garrett compensated Mr. Rivera for the murder partially with a quantity of heroin; and (5) that various government witnesses used drugs with Mr. Garrett, Mr. Rivera, and other TF members and associates at various locations in Brooklyn, NY, including at Mr. Garrett's apartment and Mr. Rivera's tattoo shop and in various locations in Scranton, PA. (*Id.*) The government argues that this evidence is inextricably intertwined with the charged offenses, helps to demonstrate the existence of the charged enterprise and a pattern of

racketeering activity, and is proof of the close relationships between the defendants and between the defendants and other witnesses and TF associates and members. (*Id.* at 43.)  The government also contends that the defendants' use of narcotics explains how cooperating witnesses and other witnesses knew the details of TF's narcotics and sex trafficking operations, including where narcotics or sex trafficking transactions took place, where the narcotics were packaged, and where narcotics and victims of sex trafficking were delivered.  (*Id.* at 44.)

Mr. Rivera objects to the government's attempt to introduce evidence of his drug use to explain the relationship between the defendants, arguing that the evidence is "cumulative and serves no purpose except to stigmatize" Mr. Rivera as a drug user who is prone to commit crimes, and that the evidence should be precluded pursuant to Rule 403.  (Rivera Opp. at 5.)  Mr. Garrett seeks preclusion of Mr. Garrett's drug use as "remote, not inextricably interwoven with the current crimes, and highly prejudicial."  (Garrett Opp. at 13.)

The court finds that the testimony and evidence that the government intends to elicit about defendants' drug use is admissible as direct evidence of, and is inextricably intertwined with, defendants' charged conduct.  Evidence that Mr. Rivera's drug use enhanced Mr. Garrett's leadership in TF is probative of how the illegal relationship developed between the

defendants and co-conspirators and the power and structure of

the enterprise. *See, e.g.*, *United States v. Guang*, 511 F.3d

110, 121 (2d Cir. 2007) (finding that evidence of other acts is

admissible to "enable the jury to understand how the illegal

relationship between the co-conspirators developed") (internal

quotation marks omitted). In addition, evidence relating to Mr.

Rivera's drug use in connection with the death of Robert Barber

is also direct proof of and inextricably intertwined with the

charged murder and is relevant to defendants' intent, motive,

and preparation. For instance, the defendants are charged in

Count X for conspiracy to commit murder in aid of racketeering

pursuant to 18 U.S.C. § 1959(a), an element of which is that the

illegal act is done "as consideration for the receipt of, or as

consideration for a promise or agreement to pay, anything of

pecuniary value from an enterprise engaged in racketeering

activity, or for the purpose of gaining entrance to or

maintaining or increasing position in an enterprise engaged in

racketeering activity." Here, evidence that Mr. Garrett paid

Mr. Riveras in cash and heroin for Robert Barber's murder is

directly relevant to prove this element of the charged

conspiracy to commit murder in aid of racketeering.

Additionally, evidence that witnesses used drugs with the

defendants at various locations in Brooklyn and Scranton is

relevant to establishing the locations where the enterprise's

activities took place and the relationships of trust that the witnesses had with the defendants.  The court finds that evidence of defendants' drug use is not unfairly prejudicial under Rule 403, does not involve conduct that is "any more sensational or disturbing than the crimes with which [defendants are] charged," and is highly probative as direct evidence of the charged offenses.  *Pitre*, 960 F.3d at 1120.

## III. Co-Conspirator Statement

Mr. Rivera, in his opposition, seeks to preclude a statement that the government intends to introduce from CW #1, that Mr. Garrett stated that it was his practice to keep his underlings poor so that they were dependent on him, as inadmissible against Mr. Rivera.  (Rivera Opp. at 5.)  Extra-judicial statements by co-conspirators may be admitted if the government establishes by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy.  *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)); *United States v. Orena,* 32 F.3d 704, 711 (2d Cir. 1994).  "In making these preliminary factual determinations under Federal Rule of Evidence 104(a), the court may consider the hearsay statements themselves.  However, these hearsay statements are

presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) (internal quotations and citations omitted). The government asserts that "there will be ample evidence at trial corroborating Rivera's participation in each charged conspiracy and predicate act." (Gov't Reply at 26.)

Based on the record before the court, the government has established by a preponderance of the evidence that there was a criminal conspiracy and that the defendants were members of the conspiracy. Although the court reserves decision as to whether CW #1 was a member of the conspiracy, the court anticipates that the government will be able to prove by a preponderance of the evidence that CW #1 was also a member of the conspiracy. Assuming that the government can prove by a preponderance of the evidence that CW #1 was a member of the conspiracy and that the statements were made during and in furtherance of the conspiracy, and provide independent corroborating evidence of Mr. Rivera's participation in the racketeering and drug trafficking conspiracies to which the relevant statement relates, Mr. Garrett's statement to CW #1 about keeping his underlings poor is likely to be admissible

against Mr. Rivera pursuant to Federal Rule of Evidence 801(d)(2)(E).

## IV. Mr. Garrett's Request For a Hearing

Mr. Garrett requests a hearing on the issues presented by the government's motion "demonstrating the relevance of the other crimes evidence pursuant to Fed. R. Evid. 403, their admissibility pursuant to Fed. R. Evid. 609(b), and other such relief as this court may deem just and proper," and to discuss the imposition of limiting instructions. (Garrett Opp. at 14.) Mr. Garrett does not identify the evidence that would be subject to consideration under Federal Rule of Evidence 609(b) or what issues would warrant a hearing. The government opposes Mr. Garrett's hearing request and argues that he is not entitled to such a hearing. (Gov't Reply at 25.) The court finds that the information in the parties' submissions has provided the court with sufficient bases to make determinations of admissibility regarding most of the uncharged acts with regard to Rule 404(b) and denies Mr. Garrett's hearing request regarding admissibility under Rule 609(b). To the extent defendants would like to request limiting instructions pursuant to Rule 404(b), the court will entertain such requests prior to or during trial.

### CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the government's motion. The following

evidence is admissible: (1) evidence of Mr. Garrett's drug trafficking and prostitution in Brooklyn and Scranton in the 1990s, including Mr. Garrett's shootout with a rival drug dealer over drug territory; (2) evidence of Mr. Garrett's incarceration following his conviction in 2001, but not the substantive charges of which he was convicted; (3) evidence of Mr. Rivera's incarceration resulting from his 2002 conviction for Hobbs Act conspiracy, but not the substantive charge of which he was convicted; (4) evidence of Mr. Rivera's supervised release violations for drug use during the Indictment period; (5) evidence of defendants' methods and means of control during the Indictment period, including assaults, meetings, threats, and fines; (6) evidence that Mr. Garrett supplied CW #3 with weapons and posted bail for him subsequent to the Robert Barber murder; and (7) evidence of defendants' drug use.

The following evidence is precluded: (1) evidence of Mr. Garrett's involvement in a shootout involving the theft of Mr. Garrett's gold chain and a shooting for hire prior to the Indictment period; (2) evidence of Mr. Rivera's obstruction of justice in 1997 and subsequent conviction for conspiracy to persuade a police officer; (3) evidence of Mr. Rivera's 1997 conviction for being a felon in possession of a firearm; (4) evidence of the specific narcotics charges of which Mr. Garrett was convicted in 2001; (5) evidence of Mr. Garrett's 2010 New

Jersey conviction for marijuana possession; (6) evidence of or references to the defendants' associations with and inspiration from the La Cosa Nostra Mafia or the Bloods gang; (7) evidence of the specific Hobbs Act conspiracy charge of which Mr. Rivera was convicted in 2002; (8) evidence of Mr. Rivera's violation of supervised release in 2006; (9) and evidence of Mr. Garrett's assaults and fines that occurred prior to the Indictment period and for which the dates are not provided, as described *supra* p. 48.

**SO ORDERED.**

Dated: April 22, 2015
      Brooklyn, New York


                                            _____/s/_____
                                            KIYO A. MATSUMOTO
                                            United States District Judge
                                            Eastern District of New York