UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA                 **MEMORANDUM AND ORDER**


          - against -                    13-CR-149(KAM)


PAUL RIVERA,

MICHAEL GARRETT,

               Defendants.

------------------------------------X

**MATSUMOTO, United States District Judge:**

          On June 25, 2015, after a jury trial, defendants

Michael Garrett ("Mr. Garrett") and Paul Rivera ("Mr. Rivera")

(collectively, "defendants") were convicted of all counts with

which they were charged in a fourteen-count Third Superseding

Indictment (the "Superseding Indictment").  Presently before the

court are defendants' opposed motions for judgment of acquittal

on certain counts pursuant to Federal Rule of Criminal Procedure

29 ("Rule 29").  For the reasons set forth below, defendants'

motions are denied.

I.     BACKGROUND

          A. The Charges

          The Superseding Indictment charged both defendants

with racketeering (Count I), racketeering conspiracy (Count II),

interstate prostitution (Count III), conspiracy to engage in sex

trafficking and sex trafficking of children (Count IV), sex

trafficking and sex trafficking of children (Count V),

conspiracy to distribute and possess with intent to distribute heroin, cocaine base, cocaine and marijuana (Count VI), possession with intent to distribute heroin and cocaine (Count VII), conspiracy to commit murder in-aid-of racketeering (Count IX), murder in-aid-of racketeering (Count X), murder while engaged in a narcotics trafficking offense (Count XI), using, carrying and possessing a firearm (Count XIV), and causing death through use of a firearm (Count XV). (Third Superseding Indictment (S-3), dated April 28, 2014, ECF No. 94.)  Mr. Garrett was also charged individually with money laundering (Count VIII), and Mr. Rivera was charged individually with witness tampering (Count XII) and attempted obstruction of justice (Count XIII).  (*Id.*)

### B. The Trial

After selection of an anonymous and partially sequestered jury, trial commenced with opening statements on May 6, 2015.  The government presented numerous exhibits, including documents, photographs, video files, and physical evidence.  The government also presented testimony from the following witnesses:  Chimene Andrews (Trial Transcript ("Tr.") 1801-09); Jose Guzman (Tr. 1813-24); Dr. Fred Nicolas (Tr. 1825-57); Takieta Lacoste (Tr. 2560-92); Ayinde Hart (Tr. 2267-94); Bernard Foy (Tr. 2302-37); Maria Glover (Tr. 2534-43); Christopher Smigiel (Tr. 3081-3116); Caesar Campos (Tr. 2236-

66); Brigitte Landou (Tr. 3133-40); Todd Unangst (Tr. 3608-35); Michael Avella (Tr. 3959-88); Saphire Perez-Hernandez (Tr. 4098-4310); Luis Camacho (Tr. 4417-4524); victim witnesses Shelby Rivera (Tr. 4798-5155) and Jasaira Ortiz (Tr. 4334-74); cooperating witnesses Ferman Parker (Tr. 1899-2188), Vincent Fearon (Tr. 2546-2896), and Jonathan Fontanes (Tr. 3164-3532); expert witnesses NYPD Detective Jeffrey Bahm (Tr. 2211-36), Jennifer Libus (Tr. 2429-47), Fong-Yuh Lin (Tr. 2493-2509), Dr. Aglae Charlot (Tr. 2523-51), Stephen Wolthoff (Tr. 3704-21), Radha Kalra (Tr. 3830-42), FBI Document Analyst Forensic Examiner Melanie Maness (Tr. 4374-4400); law enforcement witnesses New York Police Department ("NYPD") Officer Katie Russell (Tr. at 1755-95), Pennsylvania State Police ("PSP") Trooper Thomas Horan (Tr. 2337-92), PSP Trooper Paul Lindsay (Tr. 2393-2427), NYPD Detective Anthony Proscia (Tr. 2448-83), NYPD Detective Steven Millwater (Tr. 2484-93), Federal Bureau of Investigation ("FBI") Special Agent Scott Byers (Tr. 2606-35), Captain Robert Maguire of Lackawanna County Prison (Tr. 2636-40), PSP Trooper Shane Lyon (Tr. 2524-34), New Jersey State Police ("NJSP") Trooper Armando Rivas (Tr. 3626-82), NJSP Detective Sergeant Jeffrey Shotwell (Tr. 3683-3704), Internal Revenue Service Special Agent Denise Cole (Tr. 3742-73), FBI Computer Forensic Examiner Stephen Flatley (Tr. 3793-3829), FBI Special Agent Carlos Koo (Tr. 3860-73), NYPD Detective Eric

3

Semler (Tr. 3873-3913), FBI Special Agent Eric Perry (Tr. 3989-4098), retired PSP Trooper and FBI Task Force Agent Dan Mimnaugh (Tr. 4525-4606), New York City Fire Department Paramedic Joel Brathwaite (Tr. 1867-78), and FBI Special Agent Thomas Duane (Tr. 4610-4785, 5156-89, 5227-5331); records custodians Cynthia Buchanan (Tr. 1810-13), Rory Miller (Tr. 2552-60), Juan Figueroa (Tr. 2593-2603), Issa Martin (Tr. 2646-53), Samantha Ramnarine (Tr. 3026-29), Victoria O'Brien (Tr. 3030-39), Gil Cygler (Tr. 3040-49), Philip Fanara (Tr. 3116-3120), Susan Eddleston (Tr. 3121-33), Norman Clark (Tr. 3532-56), David Lu (Tr. 3556-66), Ashley Weinberg (Tr. 3566-73), NJSP Police Sergeant Greg Allen (Tr. 3574-86), Jason McDevitt (Tr. 3722-33), Ty Joseph Lim (Tr. 3734-42), Joseph Sierra (Tr. 3843-45), Deserae Weitmann (Tr. 3851-60), Benjamin Butler (Tr. 4325-33), Samantha O'Brien-Lakeram (Tr. 5190-5208), and Latoya Nobles (Tr. 5215-36). The parties also entered three stipulations[1] during the course of the trial. The government rested on June 3, 2015. (Tr. 5337.)

Mr. Rivera presented a defense case by introducing exhibits, testifying on his own behalf (Tr. 5419-5567, 5675-6028), and presenting the testimony of witnesses Steven Rivera (Tr. 5247-74); Austin Serrano (Tr. 5375-86); and Roselle Ritorto

---

[1] The government and Mr. Garrett entered a stipulation relating to his incarceration from 2000 to 2007. (Tr. 5214-15; GX 800.) The parties entered a stipulation related to Shelby Rivera's use of marijuana and crack cocaine. (Tr. 5332; GX 801.) The government and Mr. Rivera entered a stipulation presenting the chronology of events relating to the government's decision not to seek the death penalty in his case. (Tr. 6002-03; GX 802.)

(Tr. 5404-19).  Mr. Rivera rested his case on June 9, 2015.
(Tr. 6029.)  Mr. Garrett also presented a defense case by
introducing exhibits, testifying on his own behalf (Tr. 6448-
6752), and presenting the testimony of witnesses Diamond Garrett
(Tr. 5568-5607), Adante Fowler (Tr. 6108-6297), Scott Schlachter
(Tr. 6298-6307), Kysharece Young (Tr. 6311-6426); and expert
witness Jon Mizrachi (Tr. 6032-6107).  Mr. Garrett rested on
June 15, 2015.  (Tr. 6816.)

        The government commenced its rebuttal case on June 15,
2015 and presented exhibits as well as testimony from Ingrid
Cronin (Tr. 6844-81), NYPD Detective David Guevara (Tr. 6882-
6918), and FBI Special Agent Daniel Mimnaugh (Tr. 6946-7003).
The government rested its rebuttal case on June 16, 2015.  (Tr.
7003.)

    **C. The Verdict**

        The jury was charged on June 22, 2015.  After
approximately four days of deliberations, the jury returned its
verdict on June 25, 2015.  The jury found both Mr. Rivera and
Mr. Garrett guilty on all counts, including: racketeering (Count
I), racketeering conspiracy (Count II), interstate prostitution
(Count III), conspiracy to engage in sex trafficking and sex
trafficking of children (Count IV), sex trafficking and sex
trafficking of children (Count V), conspiracy to distribute and
possess with intent to distribute heroin, cocaine base, cocaine

5

and marijuana (Count VI), possession with intent to distribute heroin and cocaine (Count VII), conspiracy to commit murder in-aid-of racketeering (Count IX), murder in-aid-of racketeering (Count X), murder while engaged in a narcotics trafficking offense (Count XI), carrying and possessing a firearm (Count XIV), and causing death through use of a firearm (Count XV). (Rivera Verdict Sheet, dated June 25, 2015, ECF No. 471; Garrett Verdict Sheet, dated June 25, 2015, ECF No. 472.) The jury found Mr. Rivera guilty of witness tampering (Count XII) and attempted obstruction of justice (Count XIII). (Rivera Verdict Sheet.) The jury found Mr. Garrett guilty of money laundering (Count VIII). (Garrett Verdict Sheet.)

The jury also found that the government proved beyond a reasonable doubt that Mr. Rivera and Mr. Garrett committed and conspired to commit each of the charged predicate acts of racketeering. (Rivera Verdict Sheet at 1-5; Garrett Verdict Sheet at 1-5.) With respect to the sex trafficking counts (Count I, Racketeering Act 1B; Count V), the jury also found that Mr. Rivera and Mr. Garrett each (1) knew means of force, fraud or coercion would be used to cause one or more persons to engage in one or more commercial sex acts and (2) knew that one or more persons had not attained the age of 18 years and would be caused to engage in one more commercial sex acts. (Rivera Verdict Sheet at 2,6; Garrett Verdict Sheet at 2,6.)

As part of the jury's verdict on conspiracy to distribute and possess with intent to distribute heroin, cocaine base, cocaine and/or marijuana (count VI), the jury found that Mr. Rivera and Mr. Garret were each responsible for (1) one kilogram or more of a substance containing heroin; (2) 280 grams or more of a substance containing cocaine base; (3) a substance containing cocaine; and (4) a substance containing marijuana. (Rivera Verdict Sheet at 6-7; Garrett Verdict Sheet at 6-7.) As part of the jury's verdict on possession with intent to distribute heroin and/or cocaine (count VII), the jury found that Mr. Rivera and Mr. Garrett both (1) possessed heroin with the intent to distribute it and (2) cocaine with the intent to distribute it. (Rivera Verdict Sheet at 7-8; Garrett Verdict Sheet at 8.) As part of the jury's verdict on murder while engaged in drug trafficking (count XI), the jury found that Mr. Rivera and Mr. Garrett were both responsible for (1) one kilogram or more of a substance containing heroin and (2) 280 grams or more of a substance containing cocaine base. (Rivera Verdict Sheet at 8-9; Garrett Verdict Sheet at 9.) As part of the jury's verdict on unlawful use of a firearm (count XIV), the jury found that (1) one or more of the firearms at issue was brandished and that (2) one or more of the firearms at issue was discharged by both Mr. Rivera and Mr. Garrett. (Rivera Verdict Sheet at 10; Garrett Verdict Sheet at 10.)

### D. Evidence at Trial[2]

#### 1. History of Together Forever

Together Forever, also known as "TF," was a Brooklyn-based group, founded by Mr. Rivera and others during the 1980s. (Tr. 4419 (testimony of Mr. Rivera's cousin, Luis Camacho); 5354-55 (testimony of Mr. Rivera's brother, Steven Rivera); 5444-46, 5828 (testimony of Mr. Rivera).) During his testimony, cooperating witness Vincent Fearon described Together Forever as follows:

> Together Forever is a movement. It is a group of individuals, young and old. It is also a gang. It is a -- a group of people seeking the same goals. And the -- some are artists and some are street individuals, hustlers, drug dealers. It's different -- it is different things.

(Tr. 2677.)

TF Mafia was the rap group associated with TF that Mr. Garrett founded following his release from prison in 2007. (GX[3] 200, Clip F; Tr. 5569-70 (testimony of Mr. Garrett's daughter Diamond Garrett), 6350 (testimony of Mr. Garrett's sister

---

[2] The evidence summarized herein is limited to the evidence adduced at trial that is relevant to the court's evaluation of the defendants' Rule 29 motions. Furthermore, in summarizing the evidence at trial, the court is mindful that "[i]n reviewing a challenge to the sufficiency of the evidence underlying a guilty verdict [pursuant to Rule 29, the court] 'must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.'" *United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).

[3] GX refers to government trial exhibits.

Kysharece Young)).  Mr. Fearon also described TF Mafia as "a branch from TF that is more pertaining to Rab[4]."  (Tr. 2677).

During their testimony, Mr. Rivera and Mr. Garrett each confirmed that he was a member of TF. (Tr. 5444-46, 5828 (Mr. Rivera's testimony stating that he and others founded TF in approximately 1983 or 1984, and he recruited others to join TF); 6450 (Mr. Garrett's testimony that he became aware of TF as a teenager and joined the group).)  Mr. Rivera also testified that TF Mafia was the business that arose from TF and that Mr. Garrett was his partner in TF Mafia. (Tr. 5792-93.)  In response to a question regarding his relationship to TF Mafia, Mr. Garrett testified: "I am the company." (Tr. 6603.)

### 2. The Defendants' Involvement in Interstate Prostitution and Sex Trafficking

#### i. Prior to the January 18, 2012 Car Stop

The government presented evidence at trial of Mr. Garrett and Mr. Rivera's prostitution of female TF members in the years leading up to the January 18, 2012 car stop. Jonathan Fontanes testified that Shelby Rivera, Kathy Rivera and Annmarie Luparelli were prostitutes while involved with TF and that Erina Henry ran TF's prostitution ring.  (*See* Tr. at 3267, 3273, 3279-89).  Numerous witnesses have testified that

---

[4] Numerous witnesses testified that Mr. Garrett was also known as Rab.  (*See, e.g.*, Tr. 1901 (testimony of Ferman Parker), 3226 (testimony of Jonathan Fontanes), 4334-35 (testimony of Jasaira Ortiz).)

Erina Henry was Mr. Garrett's girlfriend, worked as a prostitute for Mr. Garrett, and was deeply involved in TF's drug operations. (*See, e.g.*, Tr. 2742 (testimony of Mr. Fearon that Erina Henry prostituted for Mr. Garrett and was managing the drug business in New York in Mr. Garrett's absence), 3230-31 (testimony of Mr. Fontanes that Ms. Henry was involved in drug dealing and prostitution with TF).)

Mr. Fearon testified that over the course of a few months in 2008, he drove Ms. Henry to prostitution dates. (Tr. 2793.) Mr. Fearon also testified that Ms. Henry and "Amanda," one of Mr. Garrett's girlfriends, were "sent down" to Scranton, Pennsylvania in 2008 for the purpose of prostitution. (*Id*. at 2793-94.) Mr. Fearon testified that female members of TF delivered drugs to him in Pennsylvania after he moved there to sell drugs for Mr. Garrett in 2007. (*Id*. at 2764.) Mr. Parker testified that prior to a trip he took to Scranton in 2010, Ms. Henry told him that "Kathy's sister and a couple other girls was prostituting for [Mr. Garrett]." (*Id*. at 1971.)

TFO Daniel Mimnaugh testified that, during Mr. Rivera's August 30, 2012 proffer, Mr. Rivera stated that (1) he and another individual made money from girls having sex; (2) by prostituting the girls, he "helped girls do what they do best," which was to have sex; (3) Jasaira Ortiz, Annmarie Luparelli, Kathy Rivera, and Shelby Rivera were individuals working as

prostitutes for him and another individual; (4) the prostitution activities occurred in Mr. Rivera's tattoo shop[5] and, on several occasions, Mr. Rivera drove the girls to hotels and motels; (5) and the johns were usually charged $300 to have sex. (*See id.* at 6954-55.) Mr. Rivera's previous attorney, Ingrid Cronin, testified that during the August 30, 2012 proffer, Mr. Rivera stated that he helped find clients to pay money to the girls for sex and that he did not earn very much money from prostitution. (*See id.* at 6863-64.)

Shelby Rivera testified that she worked as a prostitute for Mr. Rivera and Mr. Garrett for a couple of years prior to the January 18, 2012 car stop. (*Id.* at 4800, 4817.) Shelby Rivera testified that on the first night that she met Mr. Rivera, he set up a prostitution date with an individual named "Gordo," and Shelby Rivera received $100 in payment, $50 of which was given to Mr. Rivera. (*Id.* at 4817-18.) Shelby Rivera also testified that Kathy Rivera, Annmarie Luparelli, "Jahira" and "a couple of other girls" worked as prostitutes for Mr. Rivera. (*Id.* at 4937.) She further testified that, when she worked for Mr. Rivera, she did dates in the back of the tattoo

---

[5] Mr. Rivera operated a tattoo shop in Brownsville, New York, which he testified was a gathering place for TF members. (Tr. 5676.) Mr. Rivera's tattoo shop was identified by multiple witnesses as the shop depicted in the photograph marked Government Exhibit 115. (*See, e.g.*, Tr. 1913 (testimony of Mr. Parker), 2256 (testimony of Mr. Campos), 3168 (testimony of Mr. Fontanes), 4101 (testimony of Ms. Perez-Hernandez), 4345 (testimony of Ms. Ortiz), 4821-22 (testimony of Shelby Rivera).)

shop, as well as outcalls where she would go to a client's home or a hotel. (*Id*. at 4935-36.) Shelby Rivera testified that she went on over twenty prostitution dates with Annmarie and that the dates were arranged by Mr. Rivera, and that Mr. Rivera kept half the money she earned from her work as a prostitute. (*See id*. at 4938-39.) In addition, Shelby Rivera testified that she and Ms. Henry worked as prostitutes for Mr. Garrett, that Mr. Garrett and Ms. Henry would both collect money from the prostitution dates, that Mr. Garrett provided her with condoms, and that she did outcalls for Mr. Garrett. (*See id*. at 4922-24, 3933-34.)

Shelby Rivera testified that Mr. Garrett posted advertisements for the girls who worked for him as prostitutes on a private website called the "Butterfly Club." (*See id*. at 4930.) The government also presented evidence that Mr. Garrett and Mr. Rivera were involved in advertising Shelby Rivera as a prostitute on Backpage.com. With regard to the advertising, Shelby Rivera testified as follows:

> Q: So who set up the dates for the girls in TF?
> A: Well, we be on Backpage so they'd just call the phone.
> Q: And who put the girls on Backpage?
> A: I thought Rab or Paul.

(*Id*. at 4923.) In addition, the government introduced a series of photographs recovered from Mr. Rivera's computer, some of which were taken on a day in September 2010 and some

of which were taken on two separate days in December 2010. In the photographs, Shelby Rivera is nude or partially-clothed. (*See, e.g.*, GX 410-DSCN2897_face0.jpg; 410-DSCN2906.JPG; 410-DSCN2889.JPG; 410A-DSCN2877.JPG.) Shelby Rivera testified that Mr. Rivera took the photographs of her in his tattoo shop for the purpose of posting them to Backpage.com. (*See* Tr. 4924-30). Certain of the photographs were modified to include text, such as "Call Zulaka 646-210-6476 No Txt." (*See* GX 410A-DSCN2866.JPG.)

Text messages recovered from Mr. Rivera's mobile phone showed that Mr. Rivera had been attempting to set up prostitution dates for Kathy Rivera with a client named Sam Tercish in the weeks leading up to the January 18, 2012 car stop. (*See* GX 300B, 347.) On December 23, 2011, Mr. Tercish sent Mr. Rivera a text message stating "Sup zance. Send me kathy"s [sic] pics. Got clients." (GX 347.) In response, Mr. Rivera agreed to send him photos, but did not send them immediately. (*Id.*) Mr. Tercish again asked for photos on December 25, 2011, messaging Mr. Rivera: "Zance send me kathys pics. Got client 4her." (*Id.*) Mr. Rivera did not respond. (*Id.*) On January 14, 2012, Mr. Tercish again messaged Rivera: "Wats up zance. Sup wth tht grl she never send pics?" (*Id.*) Approximately three hours later, Mr. Rivera sent a contact named

"tif" a message asking her to send him "a couple of pitures" for

his "man sammy" and that "hill [sic] be waiting for your call."

(*Id.*)  Mr. Rivera then sent tif's phone number to Mr. Tercish,

along with nude photos of her and a message that stated

"Tifany."  (*Id.*)  Mr. Tercish then asked Rivera: "P wat are her

rates?"  (*Id.*)  On January 15, 2012, Mr. Rivera responded to Mr.

Tercish: "two hundred . . . u n I slit 50."  (*Id.*)  Mr. Rivera

then messaged Mr. Tercish, stating that the rates are the "same

with kat."  (*Id.*)

    Shelby Rivera testified that (1) she began working as

a prostitute for Mr. Rivera and Mr. Garrett when she was a minor

(*see* Tr. 4906); (2) the first night she went to Mr. Rivera's

tattoo shop, he set up a date for her with "Gordo," and she had

sex with him in exchange for money (*see id.* at 4818); (3) Shelby

Rivera told Mr. Rivera she was 17 approximately two weeks after

she met him, when she received her first tattoo (*see id.* at

4910-11); (4) she attended a sex party at Mr. Rivera's tattoo

shop shortly after meeting him where he directed her to have sex

with SK, a TF member, during the party (*see id.* at 4918); (5)

shortly after meeting Mr. Rivera, she had sex with Mr. Garrett

for money (*see id.* at 4819); (6) shortly after meeting Mr.

Garrett he told her that she should work as a prostitute for

him, "because ain't no bitches like his bitches" (*id.* at 4904);

and (7) she worked for Mr. Garrett and Mr. Rivera as a

prostitute for "[b]asically the whole time [she] was with them." (*Id.* at 4906.)

Shelby Rivera also testified that she told Mr. Garrett that she was seventeen years-old the first time she met Mr. Garrett and had sex with him and that Mr. Garrett accused her of lying about her age, at which point she showed Mr. Garrett a form of identification. (*Id.* at 4819-4911.) Shelby Rivera testified that Mr. Garrett instructed her to lie about her age if she was ever arrested for prostitution by the police. (*Id.* at 4911.) Although Shelby Rivera testified that she met the defendants when she was seventeen, it became clear during her testimony that she actually met them when she was younger than seventeen.[6] Shelby Rivera was born on September 3, 1992. (GX 621 (Shelby Rivera's birth certificate).) Her sister Kathy Rivera was born on August 29, 1990. (GX 620 (Kathy Rivera's birth certificate).) Shelby Rivera testified that she has known Mr. Rivera since her sister Kathy was seventeen. (Tr. 4903.) Mr. Rivera's witness Roselle Ritorto testified that she saw Kathy Rivera in the tattoo shop from approximately 2007 to 2012. (*See id.* at 5410.) Mr. Rivera's witness Austin Serrano testified that Kathy Rivera was living in the tattoo shop from June to December of 2008. (*See id.* at 5379.) Mr. Garrett's witness

---

[6] Ms. Rivera struggled with the arithmetic required to determine her age at various points in time when she was involved with the defendants (*see, e.g.,* Tr. 5047), which the government asserts resulted from diagnosed learning disabilities (Tr. 4860.)

Kysharece Young testified that she saw Kathy and Shelby Rivera associating with TF from 2008 to 2012. (*See id*. at 6331.) The government introduced into evidence partially nude photographs of Shelby and Kathy Rivera which were recovered from Rivera's computer and taken on August 7, 2008. (*See* GX 450-P1030054.jpg; GX 450-P1030070.jpg (photograph depicting Shelby Rivera, topless, with SK); GX 450C at 43, 51.) Shelby Rivera testified that these photographs were taken in Mr. Rivera's tattoo shop the night that she went to a party shortly after meeting the defendants and Shelby Rivera was directed to have sex with SK. (*See* Tr. 4918-21.) As previously discussed, Shelby Rivera testified that Mr. Rivera set up her first date with Gordo prior to this party, and that she started working as a prostitute for Mr. Garrett about the same time that she started working as a prostitute for Mr. Rivera.

Numerous witnesses testified that Kathy Rivera was subjected to violence at the hands of Mr. Rivera. Jonathan Fontanes testified that Mr. Rivera beat Kathy Rivera and that if she refused to go to work as a prostitute, Mr. Rivera would "get angry with her" and "straighten her." (Tr. 3268-70.) Mr. Fontanes also testified that he saw Mr. Garrett pay Mr. Rivera $200 to have sex with Kathy Rivera. (*See id*. at 3270-71.) Ferman Parker also testified that, at least on one occasion, he saw Mr. Rivera kick Kathy Rivera and that he observed bruises on

Kathy Rivera. (*See id.* at 1962.) Shelby Rivera testified that
Mr. Rivera started to beat Kathy Rivera just one month after
they met and on one occasion broke her jaw. (*See id.* at 4907-
10.) Saphire Perez-Hernandez, a former member of TF, testified
that she saw Kathy Rivera with bruises on her body after fights
with Mr. Rivera in the back of the tattoo shop. (*See id.* at
4151.) Ms. Perez-Hernandez also testified that Kathy Rivera
would be in the back room of the tattoo shop for several days at
a time. (*See id.* at 4144.) Mr. Rivera's witness Jermaine
Serrano also testified that Kathy Rivera stayed in the back of
the tattoo shop and that he would have to bring her food. (*See
id.* at 5379.) Kathy Rivera had several tattoos that related to
TF and Mr. Rivera, including a tattoo of Mr. Rivera's nickname
"Zance" on her wrist, a tattoo of the TF logo on her thigh, and
a tattoo of Mr. Rivera's nickname "Paulee Zance" on her back.
(*See* GX 10A-C (photographs of the tattoos).) Ms. Perez-
Hernandez testified that Kathy Rivera was crying with her head
down when Mr. Rivera tattooed his name on her back and that she
later covered up the tattoo. (*See id.* at 4152.) Shelby Rivera
testified that Mr. Rivera tattooed the girls that worked as
prostitutes for him and that the tattoos meant "that they [were]
his forever." (*Id.* at 4937.) Jonathan Fontanes testified that
Annmarie Luparelli was involved in prostitution for Mr. Rivera

and "belonged to Paulee" because he "stamped her." (*Id.* at 3273.)

Jasaira Ortiz, a victim witness, testified that (1) she met Mr. Rivera when she was fourteen years-old (*see id.* at 4346); (2) she told Mr. Rivera her age when she was 15 or 16 (*see id.*); (3) Mr. Rivera "brag[ged] about how young she was to others in the tattoo shop (*id.* at 4358); (4) she did not leave Mr. Rivera because she "was in love with him" (*id.* at 4348); (5) Mr. Rivera tattooed "Paulee Zance" on her breasts and a TF tattoo on her shoulder (*id.* at 4351); (6) Mr. Rivera told her she would be the only one to have his name tattooed on her, which made her feel "special" (*id.* at 4351-52); (7) Mr. Rivera asked her to have sex with other people in the tattoo shop, and Ms. Ortiz did so even though she did not want to and "sometimes" told Mr. Rivera she did not want to do so (*see id.* at 4355); and (8) Mr. Rivera was violent towards her — he hit and slapped her (*see id.* at 4348-49).

Ms. Ortiz also testified that, on one occasion, when she was sixteen years-old, Mr. Rivera and Mr. Garrett asked her to go to Mr. Garrett's house "to clean." (*Id.* at 4356). When she went to Mr. Garrett's residence, she discovered that "[i]t wasn't really to clean." (*Id.* at 4357.) Instead, she had sex with Mr. Garrett, he gave her money, and then she gave the money to Mr. Rivera. (*See id.* at 4357.) When asked why she went to

18

Mr. Garrett's residence, Ms. Ortiz testified: "I was stupid and I really thought it was to clean." (*Id*. at 4374.)

Ms. Perez-Hernandez testified that, when she viewed Ms. Ortiz topless, she noticed that her body was "[n]ot really developed." (*Id*. at 4153). She also testified that Ms. Ortiz lived in the back of the tattoo shop for a period of time and that on at least one occasion she heard Mr. Rivera ask Ms. Ortiz to give his "friends" a "little blow job for me." (*Id*. at 4153-54.) Ms. Perez-Hernandez testified that although Ms. Ortiz was upset that Mr. Rivera asked her to perform oral sex on his friend, "she still did it" and that afterwards Ms. Ortiz was "upset" and "crying." (*Id*. at 4281.) Ms. Perez-Hernandez also observed Mr. Garrett naked with Ms. Ortiz in the back of the tattoo shop and believed that Mr. Garrett was having sex with Ms. Ortiz. (*See id*. at 4162). Jonathan Fontanes testified that, if Ms. Ortiz didn't do what Mr. Rivera told her, Mr. Rivera would force her. (*Id.* at 3277.) For example, Mr. Fontanes testified that if Ms. Ortiz did not want to come to the tattoo shop, Mr. Rivera would drive to the Bronx and force her to get into the car by "grab[bing] her arm," "pull[ing] on her," and threatening her with violence. (*Id*.) He also testified that he observed Mr. Rivera "smack her . . . [a]cross the face." (*Id*. at 3278.) Shelby Rivera testified that, on one occasion, Mr. Rivera arranged a prostitution date for Gordo, and Gordo was given a

choice to have sex with either Shelby Rivera or Jasaira Ortiz.
(*See id.* at 4947-49.)  Gordo chose Ms. Ortiz, and they had sex
in the back room of the tattoo shop after which Ms. Ortiz gave
Mr. Rivera half of Gordo's payment.  (*Id.* at 4948-49.)  Shelby
Rivera also testified that Mr. Rivera "stamped" Ms. Ortiz. (*Id.*
at 4937.)

Ms. Ortiz was born on March 30, 1992. (*See* GX 623
(Jasaira Ortiz's birth certificate).)  The government introduced
a series of videos and photographs recovered from Mr. Rivera's
computer in which Ms. Ortiz is nude and/or engaged in sexual
conduct with Mr. Rivera. (*See, e.g.*, GX 450C, 450-1, 450-jay
024.jpg, 450-jay 046.mov, 450-P1020077.MOV, 450-P1020604.jpg,
450-P1030483.MOV, 450-P1070669.MOV.)  Mr. Rivera produced these
images and videos, between 2008 and 2010, and Ms. Ortiz was
fifteen to seventeen years-old at the time.  (*See* GX 450C, 450-
1.)

Mr. Rivera testified that he met Ms. Ortiz in his
tattoo shop in 2007 or 2008 and that she became his girlfriend.
(Tr. 5528-29.)  In response to the question, "did you love [Ms.
Ortiz]?" Mr. Rivera testified that he "had feelings" for Ms.
Ortiz but that he did tell her that he "loved her."  (*Id.* at
5728, 5753.)  He testified that he "perhaps" told Ortiz that, if
she loved him, she would have his name tattooed across her
breasts.  (*Id.*)  Mr. Rivera further testified that he took

pornographic videos of them together "[a]ll the time" and that they would "swing together." (*Id*. at 5529.)  Mr. Rivera's witness Jermaine Serrano, also testified that he saw Ms. Ortiz in the tattoo shop in April or May of 2008. (*Id*. at 5380.)

ii. The January 18, 2012 Car Stop

Shelby Rivera testified at trial that Mr. Rivera called her sister, Kathy Rivera, the night of January 17, 2012. (Tr. 4824.)  Shelby Rivera testified that Mr. Rivera asked on the speaker phone if Shelby and Kathy Rivera wanted to "make money." (*Id*).  Shelby Rivera testified that she understood Mr. Rivera to be asking if they wanted to make money by "sell[ing] [their] bod[ies]," and Mr. Rivera advised that the customers were "some guys in PA." (*Id*. at 4824-25.)  After the call, Shelby and Kathy Rivera took the train from their mother's home in Manhattan to a stop near Mr. Garrett's residence, where Mr. Rivera "and another guy, John" picked them up and took them to Mr. Garrett's residence. (*Id*. at 4825.)  At his residence, Mr. Garrett told Shelby Rivera that "everything was going to be all right" with respect to the trip and that "we would receive it right away". (*Id*. at 4825-26.)  From Mr. Garrett's residence, two cars left for the trip in the early morning hours on January 18, 2012. (Tr. 4826-30.)  Kathy and Shelby Rivera drove with Mr. Rivera, John Portalatin and "another girl", while Mr. Garrett drove the other car, in which "camera people" and the

sister of the other girl were passengers. (*Id*.) Shelby observed Mr. Portalatin smoke marijuana and call Mr. Garrett after they left Mr. Garrett's residence in the car driven by Mr. Rivera. (*Id*.) The car that Mr. Rivera drove was registered to Mr. Garrett. (*See id*. at 2347-48 (Officer Horan's testimony identifying license plate number FWH 5874), 4627-28, 4833 (Shelby Rivera's testimony that Mr. Rivera stated that Mr. Garrett was the owner of the car); GX 644 (New York State Department of Motor Vehicles Registration for license plate number FWH 5874).)

On the morning of January 18, 2012, PSP Trooper Horan observed a silver Honda Accord with New York license plate FWH 5874 travelling north on Interstate 81 in Susquehanna County, Pennsylvania and initiated a traffic stop for a left lane violation. (Tr. 2345-48; *see also* GX 163.) Immediately after the vehicle was stopped, Mr. Portalatin received a phone call from Mr. Garrett who told Mr. Portalatin to "shut the fuck up," which she understood to mean to not say anything to the state trooper. (Tr. 4830.) Based on several indicia of criminal activity[7], including the smell of marijuana, Mr. Rivera's inconsistent answers and apparent nervousness, and a canine alert, Trooper Horan subsequently arrested the vehicle occupants

---

[7] The circumstances surrounding Mr. Rivera's car stop are discussed in detail in the court's Memorandum and Order dated February 5, 2015 denying defendants' motion to suppress the narcotics recovered from Mr. Rivera's car. (ECF No. 177.)

and obtained a search warrant for the vehicle.  (Tr. 2356-57.)
The search of the vehicle yielded 7.5 grams of heroin and 170
grams of cocaine.  (GX 145.)

### iii. The Weeks Following January 18, 2012 Car Stop

Following the car stop, Mr. Garrett hired an attorney
to represent Shelby and Kathy Rivera.  (*Id*. at 4835-46.)  Mr.
Garrett's girlfriend, Erina Henry, came to visit the Rivera
sisters in jail.  (*Id*.)  Kathy and Shelby Rivera were in jail
for about a week until Mr. Garrett and Ms. Henry bailed them
out. (*See* GX 740-41; Tr. at 4836, 6513.)  Shelby Rivera
understood that they were bailed out by Ms. Henry because there
were drugs in the car and "they didn't want us to say nothing."
(Tr. at 4836-37.)  After Kathy and Shelby Rivera were released,
they proceeded to Mr. Garrett's residence on that same day,
after Ms. Henry dropped off drugs that she had secreted in
condoms in her body. (*See* Tr.  4839-40.)  At Mr. Garrett's
residence, Shelby Rivera showed Mr. Garrett papers reflecting
what was found in the car and stated that Mr. Garrett appeared
mad.  (*Id*.)  Ms. Henry "told Kathy that if Kathy would have
snitched, that she would have to shoot Kathy."  (*Id*. at 4841.)
Shelby Rivera testified that Mr. Garrett "said that if [he]
found out that we snitched, that he'd kill little kids, family,
mothers. He said that if he find out his mother was the snitch,

that he would kill his own mother." (*Id*.)  Mr. Garrett filmed a
video that same day that he later posted online under the title
"The RATS Who Lied on Paulee Zance." (GX 202A.)  Before filming
started, Mr. Garrett said "You should all be happy.  We're going
to make a video." (Tr. 4841-42.)  Shelby Rivera testified that
she laughed throughout the filming of the video to try to cover
up the fact that Kathy Rivera and she had spoken to the police.
(*See* Tr. 4844).  During the video, Kathy Rivera is crying as Mr.
Garrett accuses her of snitching. (*See* Tr. 4850; GX 202A.)
Shelby Rivera further testified that, when the video was posted,
she felt it placed her life and the life of her sister in
danger, and that Kathy Rivera was crying when she showed Shelby
Rivera the video that was posted on WorldStar and YouTube. (*See*
Tr. 5098, 4849-51.)

    The day that Kathy and Shelby Rivera were released on
bail, Mr. Garrett also informed Kathy and Shelby Rivera that
they had to pay him back for the cost of bail through
prostitution.  Shelby Rivera testified as follows:

> Q: The day you were bailed out, what, if
> anything, did Rab say to you about the bail
> money?
> A: That we had to pay him back.
> Q: What, if anything, did he say about how you
> could pay him back?
> A: By prostituting.
> Q: Did he give you any other option?
> A: No.
> . . .

> Q: Did you hear him say anything to Kathy about
> the bail money?
> A: It was to both of us.
> Q: When you say it was "both of us," what do you
> mean?
> A: Yes. What he said was to both of us, was we
> had to payback for the bail.
> Q: By doing what?
> A: Selling our body.

(*Id.* at 4851). Shelby Rivera further testified that she believed that Mr. Garrett "was going to kill [her] if [she] didn't pay back the money" and that, in light of the threats Mr. Garrett made to her that day, she was afraid of Mr. Garrett. (*Id.* at 4886.)

Thereafter, Shelby and Kathy Rivera started working as prostitutes to repay Mr. Garrett. (*See* Tr. 4886.) Kathy Rivera went on three or four dates, but then left Mr. Garrett's house without telling anyone after approximately one week. (*See id.* at 4886-87.) Shelby Rivera stayed for approximately three weeks to one month, having sex with up to six men per day, every day. (*See id.* at 4887.) She gave all of the money that she made from the dates to Mr. Garrett. (*See id.* at 4888.) She also went to clients' houses and hotels for the purpose of prostitution. (*See id.*) Shelby Rivera testified that the dates "made [her] feel cheap." (*Id.*)

Mr. Garrett set up the dates for Shelby by placing advertisements on Backpage.com. (*See* Tr. 4888.) Customers were directed to call a cellular telephone that Mr. Garrett provided

to Shelby Rivera to arrange the dates. (*See* Tr. 2890.) The advertisement of Shelby Rivera that Garrett posted on Backpage.com on January 31, 2012 and then re-posted on February 7, 2012 was introduced into evidence. (*See* GX 630.) The advertisement contained a photograph of Shelby Rivera, who is depicted partially-clothed and sitting on a couch in Mr. Garrett's residence. (*See id*.) The advertisement was listed with the title: "Sexy/Spanish /girls 3476007663 Queens/BK/NYC – 19." During his testimony, Mr. Garrett admitted that the phone number posted in the advertisement was associated with the cellular telephone that he provided to Shelby Rivera. (Tr. 6631.) Backpage.com records showed that Mr. Garrett posted the advertisement using his real name, his telephone number, and the tfmafia@gmail.com email address. (*See* 6630-31; GX 630.) Records from Google show that the confirmation email for the advertisement was sent to tfmafia@gmail.com. (GX 479.) Records associated with Mr. Garrett's TF Mafia Muzik LLC JP Morgan Chase bank account showed payments made to Backpage.com on February 2 and 9, 2012. (See GX 613L.) The records also showed that Mr. Garrett had previously made a payment to Backpage.com in September 2009. (*Id*.)

Shelby Rivera testified that after approximately three weeks or a month, she went on a date and then never returned to Mr. Garrett's residence; she left without telling anyone. (*See*

Tr. 4895.)  Because Shelby left directly from a date, she took the phone with her that Mr. Garrett had given her for prostitution-related calls.  (*See id*. at 4895-96.)  Mr. Garrett was upset that Shelby Rivera left with the phone, because he also used the phone for drug dealing and the contact information for certain drug buyers was contained on the device.  (*See id*. at 4896-97.)  Mr. Garrett left Shelby Rivera at least one message where he stated "Fuck you, bitch.  When I catch you on the street, I'm going to strip you."  (*Id*. at 4896.)  Shelby Rivera testified that Mr. Garrett also "threaten[ed] Kathy and threaten[ed] to kill the kids and [their] family" after she left.  (*Id*. at 4898.)  After Kathy and Shelby Rivera stopped working as prostitutes for Mr. Garrett and left his residence, he and Ms. Henry revoked their bail in February 2012.  (*See id*.; GX 480A, 480B.)  Kathy and Shelby Rivera were then returned to jail for approximately one month thereafter, during which time they decided to cooperate with the government.  (Tr. 4900.)

### 3.    Mr. Rivera's Drug Trafficking Activity

Vincent Fearon testified he had worked for Mr. Garrett as a crack dealer in Brooklyn since meeting Mr. Garrett in 1997. (Tr. 2682-86.)  In approximately 1999, Mr. Garrett set Mr. Fearon up with an apartment in Scranton; there, Mr. Fearon sold crack that he received from Mr. Garrett alongside TF members and other dealers until Mr. Garrett was arrested in 2000.  (Tr.

27

2704-07.)  When Mr. Garrett was released from prison in 2007, he asked Mr. Fearon "if [Mr. Fearon] would help him do some of the things that [they] used to do" which Mr. Fearon understood to mean for the two men to start selling drugs together again. (*Id*. at 2718-19.)  Mr. Fearon delivered drugs to neighborhoods in Coney Island, Bedford Stuyvesant and Brownsville; in Brownsville, one of the locations to which he made deliveries of crack was Mr. Rivera's tattoo shop at 361 Sutter Avenue.  (Tr. 2727-28, 2741.)

### i.  Mr. Rivera's Tattoo Shop as Drug Distribution Hub

According to the government's evidence, Mr. Rivera's tattoo shop was a hub for the distribution of drugs and receipt of drug proceeds by the defendants.  Mr. Parker, a TF associate who worked as a drug dealer for TF in Brownsville, testified that he picked up drugs for sale from the tattoo shop — specifically, "crack, weed, coke, heroin" — a couple of times per month. (Tr. 1956.)  Mr. Fontanes, a TF member who lived part-time at Mr. Rivera's tattoo shop during the conspiracy period, testified that he saw packages of crack and heroin delivered to the tattoo shop.  (*Id*. at 3254-55.)  He testified that he initially observed packages delivered to the tattoo shop approximately once or twice a week, but "[a]s it buil[t] up," the deliveries came four or five times a week.  (*Id*. at 3255.)

Mr. Fontanes further testified that the crack and heroin was "taken to the back room [of the shop]" where Mr. Garrett and Mr. Rivera "dealt with it." (*Id.*) Mr. Fontanes also testified that he would often "get high" with Mr. Rivera and would buy drugs for their use. (*Id.* at 3223, 3260.) When questioned on cross examination about why Mr. Fontanes would be sent to buy drugs when Mr. Rivera had access to drugs at the tattoo shop, Mr. Fontanes distinguished the drugs that he consumed with Mr. Rivera from the drug dealing that occurred with Mr. Garrett in the back room, stating "Look, whatever business you had with Rab, it is what it is. Whatever we had was different." (*Id.* at 3359.)

Mr. Camacho, Mr. Rivera's cousin, testified that on one occasion when he was visiting the tattoo shop shortly after Mr. Garrett's release from prison, Mr. Garrett entered with a shopping bag. (*Id.* at 4425). Mr. Garrett told Mr. Camacho "if you want to know what's in the bag, there are two keys[8] of heroin in there. You ain't going to own it, don't touch it." (*Id.*) Ms. Perez-Hernandez, a TF member who also lived at the tattoo shop for a period of time within the conspiracy period, testified that she saw Mr. Garrett bring shopping bags into the tattoo shop. (*Id.* at 4115.)

---

[8] FBI Agent Thomas Duane testified that a "key" is code for a "kilogram" in drug parlance. (Tr. 5166.)

The evidence presented at trial demonstrated that Mr.
Garrett also distributed drugs into Pennsylvania between 2007
and 2012. Mr. Fearon testified that he received crack, cocaine,
heroin and marijuana from Mr. Garrett in New York; packaged
drugs for sale; distributed drugs to other TF 'soldiers'[9] in
Pennsylvania for sale; sold drugs himself to clients; and
collected money from drug sales to send back to New York. (Tr.
2760-61.) Mr. Fearon and his "soldiers" distributed TF's drugs
in Pennsylvania and nearby upstate New York, including Scranton,
PA; Hazelton, PA; Wilkes-Barre, PA; Mt. Pocono, PA; and
Binghamton, NY. (*Id*. at 2790-91.) Mr. Fearon testified that
crack, cocaine, marijuana and heroin from Mr. Garrett were
brought to Pennsylvania from New York several times a week
between 2007 and 2012. (*Id*. at 2771-76.) At Mr. Garrett's
direction, the drugs were transported by car, and often more
than one vehicle was used, where "the vehicle with the drugs in
it would ride in the front, and the one that didn't have the
drugs would ride in the back." (*Id*. at 2776-77.) Female
individuals were often used to transport drugs because they were
less likely to be searched by male law enforcement officers.
(*Id*. at 2781-83.) Mr. Garrett would fine or beat Mr. Fearon if

---

[9] Mr. Fearon explained that a "soldier is somebody that pretty much works for
Rab but probably just came in to the family," whereas "[a] general is
somebody with higher status." (Tr. 2761.)

he did something that Mr. Garrett thought was stupid or in violation of Mr. Garrett's rules. (*Id.* at 2781-83.)

Mr. Fontanes testified that he drove to Pennsylvania at Mr. Rivera's request on one occasion. (*Id.* at 3262-64.) Mr. Fontanes testified that three vehicles went on the trip; he, Mr. Rivera, and Kathy and Shelby Rivera were in one car, which Mr. Garrett stated was the "decoy" car, and Mr. Garrett drove in a different car. (*Id.*) When they arrived in Pennsylvania, they met Mr. Fearon. (*Id.*) Mr. Garrett and a number of female individuals that were driven from Brooklyn stayed in Pennsylvania, while Mr. Fontanes and Mr. Rivera returned to Brooklyn. (*Id.*) Takieta Lacoste, a former girlfriend of Hasan Woods, a member of TF and drug dealer for Mr. Garrett, testified that she traveled twice from Scranton with Mr. Woods to go to Mr. Garrett's home in Brooklyn (which Ms. Lacoste identified in GX 511). (*Id.* at 2573-77.) On the second trip, Ms. Lacoste testified that she saw Mr. Woods and Mr. Garrett talking in Mr. Garrett's kitchen and she observed Mr. Garrett hand drugs to Mr. Woods. (*Id.* at 2578.) Ms. Lacoste testified that the drugs were contained in a "clear condom" with "[l]ittle baggies of drugs inside." (*Id.*) After Mr. Garrett handed Mr. Woods the drugs, Ms. Lacoste observed Mr. Woods, Mr. Rivera and Mr. Garrett place shopping bags in the trunk of a car. (*Id.* at 2579.) Mr. Rivera then drove Ms. Lacoste, Mr. Woods and another

individual back to Pennsylvania. (*Id.*) Ms. Lacoste testified that during the trip back to Pennsylvania, Mr. Rivera made several stops, during which he would go into the trunk and then into a rest stop bathroom. (*Id.*) Ms. Lacoste testified that Mr. Rivera appeared high after those stops. (*Id.*)

Several of the witnesses, including Mr. Parker, Ms. Perez-Hernandez and Mr. Fearon testified that Mr. Garrett often used rental cars for drug trips. Both Ms. Perez-Hernandez and Mr. Parker testified that Mr. Garrett had a rented a Dodge Charger, and Mr. Parker testified that this car was used during his drug trip to Pennsylvania. (*Id.* at 1971, 2018, 4119.) Records from AllCar Rent-A-Car show that Mr. Garrett rented a black Dodge Charger between 2010 and 2012, and that Mr. Rivera was an authorized driver of that car. (GX 633.) Ms. Perez-Hernandez also testified that on one occasion she drove to Pennsylvania with her husband at Mr. Garrett's direction and picked up an envelope of cash from Mr. Fearon which she then delivered to Mr. Rivera at the tattoo shop. (Tr. 4130-31.)

As previously discussed, on the morning of January 18, 2012, PSP Trooper Horan initiated a traffic stop of the vehicle that Mr. Rivera was driving, which ultimately resulted in the discovery of significant quantities of heroin and cocaine and the arrests of the vehicle passengers. There were five individuals in the vehicle: Mr. Rivera was the driver of the

vehicle; Shelby Rivera was the front-seat passenger; and in the backseat was TF member John Portalatin, also known as "Yung John," Kathy Rivera, and a 14-year-old female.  (Tr. 2349.)  Mr. Rivera advised Trooper Horan that the vehicle belonged to Mr. Garrett, whom he described as his "boss."  (*Id*. at 2351.)

Numerous witnesses testified that on the morning of January 18, 2012, the defendants met at Mr. Garrett's residence with Shelby Rivera, Kathy Rivera, Mr. Portalatin, Bernard Foy (a videographer hired by Mr. Garrett to shoot footage for the TF movie[10]), Mr. Foy's girlfriend, a 14-year-old minor female, and a niece of Ms. Henry's.  (*Id*. at 4825-27 (testimony of Shelby Rivera), 5693-95 (testimony of Mr. Rivera), 6619-20 (testimony of Mr. Garrett)).  The group left for Binghamton, New York in two groups — Mr. Garrett drove Mr. Foy, Mr. Foy's girlfriend, and Ms. Henry's niece in his black Mercedes-Benz, and Mr. Rivera drove Mr. Portalatin, Shelby and Kathy Rivera, and the 14-year-old female in the silver Honda Accord.  (*Id*.)  After Mr. Rivera's vehicle was stopped, Trooper Horan testified that Mr. Rivera gave conflicting information about the purpose of his trip and refused to consent to a search of the car.  (*Id*. at

---

[10] The TF movie, excerpts of which were offered into evidence, is a movie about TF featuring members and associates of TF.  Mr. Garrett created the TF movie — he hired videographers and a video production firm to complete the project, and he served as the director for the movie, deciding which clips were to be used, in what order the clips would be used, the music, and the on-screen titles. (Tr. 2246-49 (testimony of video producer Caesar Campos), 2267, 2272-77 (testimony of videographer/editor Ayinde Hart), 2309, 2320-21 (testimony of videographer and video editor Bernard Foy).)

2353-54.)  Meanwhile, Mr. Garrett continued on towards

Binghamton and sent Mr. Rivera a series of text messages,

including one that said: "Show them you know the law. Smoothe

tho. Be smart. U seen my work."  (GX 300B, texts 2002-2005.)

Mr. Foy testified that he filmed footage as the group

left Brooklyn that was later incorporated into the TF movie.

(Tr. 2312; GX 200, Clip H.)  Ayinde Hart, a videographer who

worked with Mr. Foy and whom Garrett hired to help put together

the movie, testified that Mr. Garrett added all the subtitles to

the movie, including the following subtitles on the footage shot

by Mr. Foy on January 18, 2012: "The Team heads out to

Bingham[]ton, NY And Scranton, PA 01/18/12 2:30 am," "During the

trip Zance and Yung John get KNOCKED! On 81 North by State

Troopers," and "Rab calls in the Lawyers and meets the Team in

Scranton." (Tr. 2280-81; GX 200, Clip H).  In the following

scenes of the movie, Mr. Garrett is filmed smoking and counting

a pile of cash. (GX 200, Clip H.)  He says the following in the

movie excerpt:

> Scranton, Pennsylvania. Took a long way. Take
> care of business.  Keep things going. Just so
> y'all know, it's the 18th. Not even 24 hours
> passed since y'all last had heard from big homie,
> so that mean the big homie been working overtime.
> It's the 18th. Homie Zance, Homie Yung, Kathy,
> Shelby, and uh, Shorty [UI]. They all locked up.
> [UI]  They got locked up this morning so it's a
> bad day for the team.  Too many mistakes make me
> look bad. It is, take that from me.  Uh, working
> man. It's a bad day for me man.  They got Zance

> locked up right now.  And it's only been 24
> hours, so it's the 18th.  We ain't, we ain't went
> to court for my sentencing yet, and we ain't do,
> um, Perfections yet.  But we all cool, [UI]
> that's still on tap. I don't think epic gonna let
> me miss that baby. I'm kind of twisted over what
> happened man, fucking state troopers. (*Id.*)

Mr. Rivera remained incarcerated in Pennsylvania after the car stop, and on June 9, 2012, when Mr. Garrett and Mr. Rivera spoke by phone, the call was recorded by the prison. (GX 700.) Mr. Rivera advised Mr. Garrett on the call that he had learned there was a federal investigation, and that he had been charged with possession of heroin and crack cocaine. (*Id.*) Mr. Garrett immediately responded: "You didn't have no crack." (*Id.* at 1.) Mr. Rivera then stated that if he was out on bail, he could talk to "them two idiots to tell 'em, you know, do the right thing, stop playing, man." (*Id.* at 5.) In response, Mr. Garrett asks if Mr. Rivera wanted him to make "some moves that way." (*Id.*) Mr. Garrett confirmed during cross-examination that the "two idiots" he and Mr. Rivera were discussing during this call were Kathy and Shelby Rivera. (Tr. 6739-40.)

### iii. Steps Taken by Mr. Rivera to Protect the Drug Business

Several witnesses testified that a robbery took place at Mr. Garrett's home where Mr. Garrett's daughter was held at gunpoint and approximately $11,000 was stolen. (*See, e.g.*, Tr. 4121 (testimony of Ms. Perez-Hernandez), 4975 (testimony of

Shelby Rivera), 1952-53 (testimony of Mr. Parker).) Mr. Parker testified that Mr. Garrett stated that if the robbers had come a little earlier, they would have gotten more money "because he had just re'd up." (*Id.* at 1952-53.) Mr. Parker explained that this statement meant that because Mr. Garrett had just purchased drugs, there was less money in the house to steal. (*Id.*) Mr. Garrett's daughter, Diamond Garrett, corroborated that the robbery occurred and testified that the robbers put a gun to her chest. (*Id.* at 5603-04.)

Ms. Perez-Hernandez testified that following the robbery, Mr. Garrett was paranoid that he might be robbed a second time. (*Id.* at 4167.) Ms. Perez-Hernandez testified that one evening, Mr. Rivera called Ms. Perez-Hernandez's husband and "called [them] over" to Mr. Garrett's home, where Mr. Garrett accused her husband of plotting another robbery. (*Id.* at 4164-69.) When Ms. Perez-Hernandez's husband told the defendants that they were mistaken, Mr. Garrett pulled out two guns and proceeded to viciously beat her husband with the guns. (*Id.*) Mr. Garrett also instructed Mr. Rivera to beat Ms. Perez-Hernandez's husband, and Ms. Perez-Hernandez testified that Mr. Rivera had "a hammer that he picked up from the counter" and that Mr. Rivera "hit him where Mr. Garrett instructed him to, which was his knees, his ankles and his hands." (*Id.*) Ms. Perez-Hernandez testified that the beating only stopped because

she shouted that her daughter was downstairs and Mr. Garrett stated, "You're lucky because, if not, we would kill you right here and just move." (*Id.*) She described how her husband's "whole face was swollen. He was bleeding from the mouth, bleeding from the back of the head profusely. It was dripping all over the floor." (*Id.; see also* GX 649 (hospital records for Perez-Hernandez's husband).) Mr. Parker testified that Mr. Rivera later told him that he and Mr. Garrett had "beat [Ms. Perez-Hernandez's husband] up because he tried to set Rab up" and that Mr. Parker then saw Ms. Perez-Hernandez's husband with a black eye and a busted lip. (Tr. 1960-61.)

The evidence also demonstrated that Mr. Rivera killed Robert Barber at the direction of Mr. Garrett and for compensation by Mr. Garrett to protect Mr. Garrett's drug territory.[11] Sometime in the summer of 2011, Mr. Parker was playing dice with Mr. Garrett and some others in the Van Dyke Houses and saw Mr. Barber, who asked to be introduced to Mr. Garrett. (Tr. 1979-81.) Mr. Parker introduced the two men and then watched as they talked and exchanged something. (*Id.*) Mr. Garrett subsequently told Mr. Parker that he had given Mr. Barber an eight-ball of crack to sell, and that Mr. Garrett

---

[11] Because defendants do not challenge the sufficiency of the evidence on the murder charges, the court declines to summarize the entirety of evidence introduced at trial relating to the murder of Robert Barber. The court summarizes the evidence to the extent it is relevant to the court's analysis of Mr. Rivera's challenge to the sufficiency of the evidence with respect to the drug conspiracy charges.

wanted to "see how he was gonna do with the drugs, see is he
gonna bring the money back." (*Id.* at 1980.)

Shortly thereafter, Mr. Parker was again playing dice
in front of his building when he saw Mr. Barber and Mr. Garrett
arguing loudly in front of the tattoo shop. (Tr. 1982-83.) Mr.
Garrett told Mr. Barber that he "need[ed] his money" for the
eight-ball of crack he had given Mr. Barber earlier. (*Id.*) In
response, Mr. Barber told Mr. Garrett he "ain't getting nothing"
and that Mr. Garrett "can't sell drugs over there no more."
(*Id.*) Afterwards, Mr. Garrett called Mr. Parker and recounted
his conversation with Mr. Barber: Mr. Barber had told Mr.
Garrett that Mr. Parker and an individual named "Kill Will" who
sold drugs for Mr. Garrett could no longer sell drugs for Mr.
Garrett. (*Id.*) Mr. Garrett asked Mr. Parker what he thought he
should do about the "Crowbar situation" and Mr. Parker said to
ignore it, because "it was gonna mess up us selling drugs out
there and it was gonna bring a lot of problems to me." (*Id.* at
1985.)

Mr. Camacho testified about an occasion when Mr.
Rivera called him over to the tattoo shop. (*Id.* at 4440.) Mr.
Camacho observed a gun on the table and asked Mr. Rivera about
the gun. (*Id.* at 4444.) Mr. Camacho testified that Mr. Rivera
made the following statements:

> [Y]o, man, I don't know what's going on. Some
> dude who was recently incarcerated, or whatever
> the case, just came home, stepped to Mike and he
> trying to extort him or whatnot. Mike told me he
> had a problem, take care of it. And offered him
> five thousand if I took care of it and I told
> him, you know, it wasn't his problem. It wasn't
> an issue. And to leave best alone.

(*Id.* at 4443.) Mr. Camacho testified that the conversation bothered him so much that he checked in with Mr. Rivera over the next few days. (*Id.* at 4444-45.) Text messages from Mr. Rivera's phone indicate that Camacho texted Rivera to say "Yeo paul, Whas good?" on August 19 and August 20, 2011. (GX 340.)

Mr. Barber was shot on the evening of August 22, 2011 and was found lying on the ground in front of 362 Sutter Avenue, across the street from Mr. Rivera's tattoo shop. (Tr. 1763-65.) Mr. Fontanes testified that on the night of the shooting, he saw Mr. Rivera leave the shop and go downstairs, where Mr. Fontanes could see him standing on the sidewalk on the shop's surveillance camera feed. (*Id.* at 3169-79.) Mr. Fontanes went downstairs and stuck his head out of the shop door to see what Mr. Rivera was looking at; at that point, Mr. Fontanes saw a silver .380 caliber pistol sitting on the ledge inside the tattoo shop door. (*Id.*) Mr. Rivera then came back to the door; and Mr. Fontanes and Mr. Rivera grabbed for the gun at the same time, but Mr. Rivera took it. (*Id.*) Mr. Fontanes then headed back upstairs, when he heard a "pop." (*Id.*)

Mr. Fontanes testified that Mr. Rivera came inside the door, put the gun on the stairs, and then went back out on to the stoop. (*Id.*) Back upstairs in the shop, Mr. Fontanes saw the door to the tattoo shop open and close again on the surveillance camera feed. (*Id.*) Mr. Rivera then came back upstairs to the shop himself and put the gun in a hole in the door to the boiler room. (*Id.*) A few hours later, Mr. Rivera left the shop; Mr. Fontanes stayed behind. (*Id.*) The government also introduced the video footage from two security cameras that surveilled the area outside of the deli directly downstairs from the tattoo shop taken at the time when Mr. Barber was shot (GX 108) and cell site records showing where Mr. Rivera was prior, during, and after the shooting and that he was in contact with Mr. Garrett during that time (GX 320). On August 30, 2012, Mr. Rivera, who was incarcerated in Pennsylvania at the time following the January 18, 2012 car stop, proffered details about the murder of Mr. Barber. (Tr. 4547-48, 4591-92, 6850-62.) Mr. Rivera proffered that "he shot Mr. Barber over disrespect and territory, drug dealing territory, basically." (*Id.* at 4550.)

### 4. Mr. Rivera's Witness Tampering and Obstruction of Justice

Records from the Bureau of Prisons ("BOP") demonstrated that Mr. Rivera was housed at the Metropolitan

Detention Center ("MDC") in House D, Range 17, Bed 002U from
March 1 through May 15, 2013. (GX 721.) BOP records also
showed that Mr. Fontanes was housed directly across from Mr.
Rivera at the MDC, in House D, Range 18, Beds 001U and 002U from
April 3 through April 10, 2013. (GX 723.) Shortly after they
were housed together, Mr. Fontanes testified that he discussed
with Mr. Rivera whether they were cooperating with the
government. (Tr. 3289-90.) When Mr. Fontanes admitted to Mr.
Rivera that he was cooperating with the government, Mr. Rivera
told Mr. Fontanes that he knew. (*Id*. at 3290.) Mr. Rivera
admitted to Mr. Fontanes that he too had proffered information
to the government, but Mr. Rivera told Mr. Fontanes that he
planned to recant his statements and go to trial. (*Id*.) Mr.
Rivera also told Mr. Fontanes that he wanted him to pull back
his statements and "come to trial with him." (*Id*.) Mr. Rivera
then told Mr. Fontanes that they should write a letter to Mr.
Rivera's attorney. (*Id*.) In regard to the proposed letter,
Fontanes testified as follows:

> Q: Can you please explain what happened in
> the conversation with Mr. Rivera about
> writing a letter?
> A: The conversation was, you know, basically
> simple. He was – he had wrote a letter for
> me, and when I read it, you know, when I
> agreed to it because at the same time he was
> telling me to write the letter he kept
> asking me about my family.

> Q: When you say he kept asking you about
> your family, to be clear, who was asking
> about your family?
> A: Mr. Rivera.
> Q: What, if anything, did he say about your
> family as he was asking you about this
> letter?
> A: He just kept asking me if my family still
> lived in Coney Island and if my daughter
> went to school out there, you know, just
> family questions.
> Q: How did it make you feel that he was
> asking you about your family?
> A: Not good. I felt threatened. I was like,
> Where you going with this? I felt
> threatened.
> Q: When you say you felt threatened, what do
> you mean?
> A: I felt scared. I mean, I was pinned
> against the corner. There was nothing I
> could really do except to agree to rewrite
> the letter.

(*Id.* at 3293-94.) Mr. Rivera provided a letter (GX 150) that he wrote for Mr. Fontanes to copy onto a separate piece of paper. (Tr. at 3295-98.) Mr. Fontanes complied because he felt threatened. (*Id.*) The letter that Mr. Rivera asked Mr. Fontanes to copy stated that Mr. Fontanes fabricated statements to the government, but Mr. Fontanes testified that he did not fabricate any statements. (*Id.*)

On cross-examination, Mr. Fontanes's testimony that he felt intimidated was repeatedly and vigorously challenged by both Mr. Rivera, who was initially proceeding *pro se*, and

defense counsel[12], questioning whether Mr. Fontanes, a former high ranking member of the Latin Kings with an extensive criminal record, had in fact felt intimidated during his interaction with Mr. Rivera. (*See id*. at 3357, 3385, 3528-29.) Mr. Fontanes repeatedly explained that his prior criminal experience was a "different situation" than his interaction with Mr. Rivera, which Mr. Fontanes understood to include a threat of harm to his minor daughter and his daughter's mother. (*See id*.) In the context of questioning Mr. Fontanes about his cooperation, Mr. Rivera (acting *pro se*) asked Mr. Fontanes what the "term a buck fifty" means in jail. (*Id*. at 3354.) Mr. Fontanes explained that the phrase "means 150 stitches across your face." (*Id*.) Mr. Rivera then asked Mr. Fontanes: "And in jail, especially penitentiaries, would you be so kind as to explain to the jury what happens to corroborating witnesses with respect to gangs when they get caught up in the wrong place?," in response to which Mr. Fontanes testified: "They get hurt bad, sometimes killed." (*Id*.)

On re-direct examination, Mr. Fontanes further testified as follows:

> Q: While you were housed with Mr. Rivera, you talked on cross-examination about whether you felt threatened; do you remember those questions?

---
[12] The court notes that Mr. Rivera requested, and the court granted, the re-appointment of his counsel Mr. Duboulay during the cross examination of Mr. Fontanes. (Tr. 3374.)

A: Yes, I did.
Q: What were your concerns about what Mr.
Rivera was saying to you?
A: He was -- he just kept asking me about my
family, you know.
Q: Which family members in particular?
A: He was talking about Jackie and Erica, my
daughter.
Q: How old was your daughter at the time?
A: At that time – she's sixteen now, so
we're going back a couple of years. She had
to be about fourteen, thirteen, fourteen.
Q: So, in bringing up Jackie -- who is
Jackie to you?
A: That was my ex-girlfriend.
Q: Is that Erica's mom?
A: Yes, it is.
Q: In bringing up Jackie and your daughter,
what concerns did that raise for you?
A: I mean, I just -- I had concerns for my
family. My family comes first.
Q: What type of concerns, sir?
A: Any type of harm coming to my family.
Q: While you were incarcerated, would you
have been able to protect your family?
A: No.

(Tr. 3521-22.)

The letter that Mr. Rivera wrote for Mr. Fontanes to

copy was admitted into evidence. (GX 150.) It reads as

follows:

Johnathan Fontinez aka Bless
Am writing this letter to inform the courts
that I fabricated statements to both D.As
Bill Houser and _____ after they
informed me that Rivera told them that I
handed Rivera a 25 millimeter "handgun" —
that was used to shoot the person in
question, that Rivera told them I dismantled
and disposed of the 25 "handgun," that if I
didn't tell them Rivera handed me the 25
handgun to get rid of — I would face servere
[sic] time — 15 to 20 years . . . Hence I

44

> felt pressured to cooperate with them by
> fabricating the story they gave me.
> Note: When I was told by Rivera that he was
> threaten [sic] to make similar statements
> and that Riveras companion Brigitte was also
> threatened to surrender his harddrive I
> decided on my own free will to let the truth
> be known.
> Sincerely yours

(*Id.*)  Mr. Fontanes testified that nothing in the letter was true, and that he re-wrote the letter in his own handwriting and provided that version to Mr. Rivera because he "felt threatened." (Tr. at 3303.)  FBI Document Examiner Melanie Maness testified that the handwriting on the letter provided by Mr. Rivera to Mr. Fontanes was consistent with Mr. Rivera's handwriting, and that the paper on which the letter was written had impressions of other writing as well.  (*Id.* at 4387, 4396.) A forensic analysis of the document showed that the impressions included a TF logo and other handwriting consistent with Mr. Rivera's handwriting. (GX 150A, 150B, 151 (Document Examiner's Analysis); Tr. 4386.)

## II.  <u>DISCUSSION</u>

### A. Legal Standard

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970); *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).  Consequently,

a "mere modicum" of evidence is insufficient to meet the Due

Process requirement of proof of guilt beyond a reasonable doubt.

*See Jackson v. Virginia*, 443 U.S. 307, 320 (1979).  Pursuant to

Rule 29, defendants may move to "enter a judgment of acquittal

of any defense for which the evidence is insufficient to sustain

a conviction."  Fed. R. Crim. Pr. 29(a), 29(c).

In resolving Rule 29 motions, a court should "avoid

usurping the role of the jury."  *United States v. Guadagna*, 183

F.3d 122, 129 (2d Cir. 1999).  A court must "defer to the jury's

assessment of witness credibility and the jury's resolution of

conflicting testimony."  *United States v. Bala*, 236 F.3d 87, 93-

94 (2d Cir. 2000).  Moreover, a court cannot "substitute its own

determination of the weight of the evidence and the reasonable

inferences to be drawn for that of the jury."  *Guadagna*, 183

F.3d at 129 (citation and quotation omitted).  Therefore, the

jury's verdict will be upheld even when it is based entirely on

inferences from circumstantial evidence.  *Glenn*, 312 F.3d at 64;

*United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984).

Furthermore, "the task of choosing among permissible competing

inferences is for the jury, not a reviewing court," *United*

*States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (citation

omitted), and in determining whether the government has met its

burden, the court must "view pieces of evidence 'not in

isolation but in conjunction.'"  *United States v. Torres*, 604

F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).  In addition, the court "must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution." *United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995) (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

In order to grant a motion for a judgment of acquittal pursuant to Rule 29, however, the court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna,* 183 F.3d at 130 (citation and quotation omitted); *see also United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant Rule 29 motion for judgment of acquittal on grounds of insufficient evidence only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt").  Accordingly, a conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  Consequently, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Aleskerova*,

300 F.3d 286, 292 (2d Cir. 2002)(citation and quotation omitted).

**B. Application**

      1.    **Mr. Garrett and Mr. Rivera – Interstate Prostitution**

The defendants each challenge the sufficiency of the evidence with respect to the crime of interstate prostitution (Count I – Racketeering Act 1A and Count III). The defendants assert that the evidence at trial was insufficient for a jury to conclude that they "knowingly persuade[d], induce[d], entice[d] or coerce[d] any individual to travel in interstate commerce . . . to engage in prostitution." 18 U.S.C. § 2422(a).

Mr. Rivera contends that the evidence at trial was insufficient to prove beyond a reasonable doubt that prostitution was the dominant purpose of interstate travel and notes that prostitution neither occurred on the January 18, 2012 trip from New York to Pennsylvania, nor was attempted. (Def.'s Mem. for a J. of Acquittal Pursuant to Rule 29 ("Rivera Mem."), ECF No. 481, at 5.) Mr. Rivera further argues that the "sole evidence" of Shelby Rivera's testimony that she overheard and understood a conversation between Mr. Rivera and Kathy Rivera relating to "making money" by selling their bodies is insufficient to prove the interstate prostitution charge. (*Id.*)

Mr. Garrett maintains that he "had nothing to do with" transporting Shelby and Kathy Rivera to Pennsylvania for the purposes of prostitution on January 18, 2012. (Mem. of Law in Support of Def. Michael Garrett's Mot. Pursuant to Rule 29(c) ("Garrett Mem."), ECF No. 480, at 4.) Mr. Garrett further contends that the government failed to prove beyond a reasonable doubt that Shelby and Kathy Rivera were persuaded or pressured by Mr. Rivera to go on the trip and thus proof of Mr. Garrett's accomplice liability is also insufficient. (*Id*. at 5.) Mr. Garrett also argues that Mr. Fearon's testimony that Mr. Garrett "sent down" Ms. Henry and "Amanda" to Pennsylvania for the purpose of prostitution is "too vague and opaque" to prove the enticement element of interstate prostitution. (*Id*. at 6.)

The court finds that there was ample direct and circumstantial evidence at trial from which a reasonable jury could conclude that Mr. Rivera knowingly persuaded and enticed Shelby and Kathy Rivera to travel across state lines to engage in prostitution and that Mr. Garrett aided and abetted Mr. Rivera's commission of interstate prostitution. Shelby Rivera testified that she worked as a prostitute for Mr. Rivera and Mr. Garrett for several years before the January 18, 2012 trip to Pennsylvania. Shelby Rivera testified that Mr. Rivera called Kathy Rivera the night of January 17, 2012 asking Shelby and Kathy Rivera wanted to "make money," with "some guys in PA,"

which Shelby Rivera understood to mean prostituting herself in
Pennsylvania. Kathy and Shelby Rivera went to Mr. Garrett's
residence in the early morning hours of January 18, 2012 in
preparation for their trip to Pennsylvania, whereupon Mr.
Garrett told Shelby Rivera that "everything was going to be all
right" with respect to the trip and that they "would receive it
right away". Mr. Rivera drove the vehicle with Shelby and Kathy
Rivera and others while Mr. Garrett drove the other vehicle.
The vehicle that Mr. Rivera drove was registered to Mr. Garrett.
In the weeks leading up to the January 18, 2012 trip to
Pennsylvania, evidence from Mr. Rivera's mobile phone showed
that Mr. Rivera was in discussions over text message with an
individual named Sam Tercish about prostituting Kathy Rivera and
another woman named "Tifany." Additionally, Mr. Fearon
testified that Ms. Henry and "Amanda" were "sent down" to
Scranton, Pennsylvania in 2008 for the purpose of prostitution.
Viewing Shelby Rivera's testimony "not in isolation but in
conjunction," *Torres*, 604 F.3d at 67, with the substantial
evidence in the record of the defendants' facilitation, coercion
and persuasion of numerous women and girls to prostitute
themselves and Mr. Garrett's drug distribution operations in
Pennsylvania, a rational trier of fact could have found the
essential elements of interstate prostitution beyond a
reasonable doubt.

Mr. Rivera's contention that prostitution was not a dominant purpose of the interstate travel is unavailing. "[T]he contemplated unlawful sexual activity need not be the defendant's sole purpose for transporting a minor in interstate or foreign commerce. Rather, it must only be a 'dominant purpose' of the transportation. This can include being one of multiple dominant purposes." *United States v. Vargas-Cordon*, 733 F.3d 366, 375-76 (2d Cir. 2013)(quoting *United States v. Miller*, 148 F.3d 207, 212-13 (2d Cir. 1998)). Here, the evidence summarized above is sufficient for a jury to conclude that prostitution was one of the dominant purposes of the trip to Pennsylvania on January 18, 2012 among others, including transporting drugs for distribution and capturing footage of the drive on film for the TF movie. Additionally, Mr. Rivera's assertion that no prostitution occurred, is entirely irrelevant. A plain reading of the statute demonstrates that the prohibited conduct is persuasion, inducement, enticement or coercion of any individual **to travel** in interstate commerce for the purposes of prostitution, which does not require the prostitution to have actually occurred. *See* 28 U.S.C. § 2422(a). The evidence established that Kathy and Shelby Rivera were persuaded, induced, and enticed by Mr. Rivera to travel from New York to Pennsylvania for the purpose of prostitution. Furthermore, the jury evidently found the testimony of Shelby Rivera to be

credible in light of the substantial circumstantial evidence of defendants having arranged prior interstate travel of female individuals to Pennsylvania for the purpose of prostitution, and the court must defer to the jury's assessment of witness credibility. *See Bala*, 236 F.3d at 93-94.

Mr. Garrett's arguments are similarly unavailing. The evidence introduced at trial was sufficient for a jury to conclude that Mr. Garrett aided and abetted the interstate prostitution of Kathy and Shelby Rivera on January 18, 2012. As the court instructed the jury, in order to find a defendant guilty based on an accomplice theory of liability, the jury must find "that the defendant knowingly and willingly associated himself in some with way with the crime, and that he participated in the crime by doing some act to help make the crime succeed." (Tr. at 7491.) "The intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would tend to advance some nefarious purpose of the principal. Rather, the defendant must act with the specific intent of facilitating or advancing the principal's commission of the underlying crime." *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004). As summarized above, there is abundant circumstantial evidence that Mr. Garrett knowingly and willingly facilitated the transport of Kathy and Shelby Rivera across state lines for the purpose of

prostitution including, *inter alia*, that Mr. Garrett provided the car that Shelby and Kathy Rivera traveled in, Kathy and Shelby Rivera met at his house prior to the trip where Mr. Garrett reassured Kathy and Shelby Rivera that everything was going to be all right, Shelby Rivera testified that she prostituted herself for Mr. Garrett and Mr. Rivera, and Mr. Garrett paid for Shelby and Kathy Rivera's lawyers in connection with the car stop and paid for their bail. *See e.g.*, *United States v. Cain*, 671 F.3d 271, 303 (2d Cir. 2012)(upholding conviction of accomplice for extortion where he transported the principals and "was generally aware of [the principal's] criminal activities and had participated in other incidents of vandalism.")

Mr. Garrett's contention that the evidence at trial was insufficient to establish that Mr. Rivera persuaded or pressured Kathy and Shelby Rivera to go on the trip, because Mr. Rivera merely "provided an opportunity" to make money reflects a misunderstanding of the Mann Act. (Garrett Mem. at 5.) Mr. Garrett improperly attempts to shift the focus of the inquiry onto the mindset of the victim when the relevant question is whether the evidence is sufficient to show that Mr. Rivera intended to persuade or entice Shelby and Kathy Rivera. *See United States v. Joseph*, 542 F.3d 13, 18-19 (2d Cir. 2008)(citing *United States v. Rashkovski*, 301 F.3d 1133, 1137

(9th Cir. 2002) and noting that under section 2422, "it is the defendant's intent that forms the basis for his criminal liability, not the victims'"); *United States v. Dhingra*, 371 F.3d 557, 567-68 (9th Cir. 2004)(cited approvingly in *Joseph*, 542 F.3d at 19)("The victim's willingness to engage in sexual activity is irrelevant, in much the same way that a minor's consent to sexual activity does not mitigate the offense of statutory rape or child molestation.") Here, there is sufficient evidence that a rational trier of fact could have found that Mr. Rivera persuaded, induced, and enticed Shelby and Kathy Rivera travel to Pennsylvania to engage in prostitution.

### 2. Mr. Garrett and Mr. Rivera – Sex Trafficking/Sex Trafficking of Minors

The defendants both challenge the sufficiency of the evidence for the crimes of sex trafficking and sex trafficking of minors, and conspiracy to engage in sex trafficking and sex trafficking of minors (Counts I and II (Racketeering Act 1B), Count IV, Count V). The defendants assert that the evidence at trial was insufficient for a jury to conclude that they knowingly transported, recruited, enticed, harbored provided or obtained a person knowing that force, fraud or coercion would be used with respect to such a person or that such person was under the age of eighteen years, that defendants knew that such person would be engaged in a commercial sex act, and the defendants'

conduct was in or affecting interstate or foreign commerce. 18
U.S.C. § 1591; Tr. at 7509.

Mr. Rivera contends that there is insufficient
evidence to meet the interstate commerce element of the
charges.[13]  (Rivera Mem. at 6.)  "Although the Second Circuit has
not expressly interpreted the 'in or affecting interstate
commerce' element of the sex trafficking statute under which
[Mr. Rivera] w[a]s convicted, it has consistently interpreted
statutes dealing with commerce within the power of Congress to
regulate and requiring a similar element, i.e., an 'affect on
interstate commerce,' as requiring only a *de minimis* effect on
interstate commerce." *United States v. Rivera*, No. 09-CR-619,
2012 WL 2339318, at *13-14 (E.D.N.Y. June 19, 2012) aff'd, 799
F.3d 180 (2d Cir. 2015); *see also Celaj,* 649 F.3d 162, 167 (2d
Cir. 2011), *cert. denied*, 132 S.Ct. 1636 (2012) (holding that in
a prosecution under the Hobbs Act, 18 U.S.C. § 1951(a), "the
burden of proving a nexus to interstate commerce is minimal.");

---

[13] Mr. Rivera does not expressly challenge 18 U.S.C. § 1591 on
constitutionality grounds, but does argue that "the federalizing of state-law
sex offenses ought to be patrolled particularly closely," because "a person
is a minor for federal purposes when she is under the age of 18 [and] the age
of consent in New York is 17." (Rivera Mem. at 6.)  Although the Second
Circuit has yet to address this issue, other Courts of Appeals that have
addressed this question have held that sex trafficking has a substantial
effect on interstate commerce that is within the power of Congress to
regulate.  *See United States v. Todd,* 627 F.3d 329, 333 (9th Cir. 2010)
(finding that in enacting the TVPRA, "Congress concluded that prostitution in
American cities encouraged and enlarged the market for this traffic from
abroad" and that "[s]ex traffic is a global matter," and holding that the
TVPRA "deals with commerce within the power of Congress to regulate.");
*United States v. Evans,* 476 F.3d 1176, 117-9 (11th Cir. 2007) (finding that
in enacting the TVPRA, "Congress found that trafficking of persons has an
aggregate economic impact on interstate and foreign commerce.")

*United States v. Gomez,* 580 F.3d 94, 101 (2d Cir. 2009) (holding that in a prosecution under the Hobbs Act, "only a very slight effect on interstate commerce need be shown."). "[E]ven a potential or subtle effect on commerce will suffice." *Gomez,* 580 F.3d at 101; *see also Celaj,* 649 F.3d at 168 ("[A]ny interference with or effect upon interstate commerce, whether slight, subtle, or even potential, [ ] is sufficient.").

At trial, there was abundant evidence that Mr. Rivera's sex trafficking activities affected interstate commerce including, *inter alia*, that Mr. Rivera used his mobile phone to send text messages to Sam Tercish to facilitate the prostitution of Kathy Rivera and an individual named Tifany, Mr. Rivera took photographs of Shelby Rivera in his tattoo shop which were used in advertisements for prostitution on Backpage.com, and Mr. Rivera proffered that he drove the girls he prostituted to hotels and motels for dates. Such evidence is sufficient for a reasonable jury to find beyond a reasonable doubt that Mr. Rivera's sex trafficking activities had an effect on interstate commerce. *See*, *e.g.*, *United States v. Rivera*, 2012 WL 2339318, at *13-14 (finding that evidence that "cellular telephones and/or e-mail was used in connection with defendants' business at the bars, that beer manufactured out of state that had traveled in interstate commerce was sold at the bars, that the services provided in the bars was advertised over the internet

and that, on at least two (2) occasions, intoxicated waitresses who had been working at the bars had been transported to a hotel that served interstate travelers where they had been sexually assaulted" was sufficient to establish an effect on interstate commerce); *United States v. Paris,* No. 03:06-C-64, 2007 WL 3124724, at * 8 (D. Conn. Oct. 24, 2007) (finding that the defendant's use of cellular telephones in connection with his business, acceptance of credit cards as payment, operation of his business out of hotels frequented by out-of-state guests and provision of condoms that were manufactured out of state was sufficient to establish a substantial effect on interstate commerce because, *inter alia,* procuring women to engage in commercial sex acts contributes to an interstate market in commercial sex, even when the procuring occurred intrastate).

Mr. Garrett asserts that there is insufficient evidence of the use of force, fraud or coercion, arguing that Mr. Garrett's words and actions to Kathy and Shelby Rivera after they were released from their January 18, 2012 arrest constituted "coercion, if any . . . to re-pay the loan, not to engage in prostitution." (Garrett Mem. at 8.) Mr. Garrett also denies that the threats "were taken seriously," that his revocation of Shelby and Kathy Rivera's bail did not constitute abuse of process, and that Ms. Ortiz was not tricked to have sex with Mr. Garrett. (Garrett Mem. at 8-10.)

Mr. Garrett's arguments are unavailing.  Shelby Rivera testified that Mr. Garrett threatened to kill her, her sister, and their families after Mr. Garrett directed Ms. Henry to bail Shelby and Kathy Rivera out of prison following the January 18, 2012 car stop.  Shelby Rivera expressly testified that Mr. Garrett made clear that she and Kathy Rivera had to pay him back by prostituting themselves.  (Tr. 4851.)  Both Kathy and Shelby Rivera stayed at Mr. Garrett's residence after he bailed them out of jail and engaged in prostitution to pay him back.  Kathy Rivera went on three or four prostitution dates, but then left Mr. Garrett's house without telling anyone after approximately one week.  Shelby Rivera stayed at Mr. Garrett's home for approximately three weeks to one month, having sex with up to six men per day, every day.  She gave all of the money that she made from the prostitution dates to Mr. Garrett.  Shelby Rivera testified that she was afraid of Mr. Garrett.  During this period of time, Mr. Garrett paid for and posted advertisements of Shelby Rivera on Backpage.com for the purposes of prostituting Ms. Rivera, and provided her with a cell phone to use for the prostitution dates.  (*See* GX 479, 613L, 630.) Shelby Rivera testified that after approximately three weeks, she went on a date for prostitution and never returned to Mr. Garrett's residence.  Mr. Garrett then left messages on Shelby Rivera's phone threatening to kill her family.  Mr. Garrett's

argument that the jury should not have credited Shelby Rivera's testimony that she was threatened and coerced to engage in prostitution, notwithstanding that Mr. Garrett had the opportunity to develop his theory through his own testimony and the cross examination of Shelby Rivera, (*see* Tr. 5117, 6632), is to no avail. *See Bala*, 236 F.3d at 93-94; *Guadagna,* 183 F.3d at 130.

The standard for what constitutes a threat of force pursuant to 18 U.S.C. § 1591 permits the jury to consider the particular vulnerabilities of the victim and also requires the government to prove "that a reasonable person of the same background and circumstances would have also felt coerced." *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015). There is abundant evidence in the record that a reasonable jury could conclude that Mr. Garrett's threats made Shelby and Kathy Rivera, and any reasonable person of the same background and circumstances, believe that they would suffer serious harm if they refused to engage in commercial sex.

Mr. Garrett's contention that his threats that he would revoke Kathy and Shelby Rivera's bail if they did not pay him back do not constitute threatened abuse of legal process is meritless. As the court stated in the jury charge, "abuse or threatened abuse of legal process means to use threats of legal action, whether administrative, civil or criminal, in any manner

or for any purpose for which the law was not designed in order
to coerce someone into engaging in a commercial sex act against
that person's will."  (Tr. at 7512.)  The evidence at trial
showed that Mr. Garrett hired a lawyer to represent Kathy and
Shelby Rivera with the express purpose of making sure that the
Rivera sisters did not provide information to law enforcement,
that Mr. Garrett and Ms. Henry threatened to revoke Kathy and
Shelby Rivera's bail if they did not repay the cost of their
bail by prostituting themselves, and Mr. Garrett did indeed
revoke the bail for Kathy and Shelby Rivera after they left and
did not continue to go on prostitution dates at Mr. Garrett's
direction.

      Mr. Garrett's argument that there is insufficient
evidence that the cleaning incident involving Ms. Ortiz
constituted fraud under 18 U.S.C. § 1591 also fails.  Ms. Ortiz
testified that when she was sixteen years-old, the defendants
asked her to go to Mr. Garrett's house to clean, but she
discovered that the purpose was not really to clean upon her
arrival; instead, she had sex with Mr. Garrett, who gave her
money which she then turned over to Mr. Rivera.  In light of the
testimonies by numerous witnesses, including Ms. Ortiz, that Mr.
Rivera asked Ms. Ortiz to have sex with others even though she
did not want to, a reasonable jury could conclude that Mr.
Garrett and Mr. Rivera knowingly misstated the purpose of Ms.

Ortiz's visit to Mr. Garrett's home in order to entice her to engage in a commercial sex act. That Mr. Garrett disagrees with the inferences that the jury drew from the evidence is not a proper basis for the court to grant a Rule 29 motion. *See Bala*, 236 F.3d at 93-94; *Guadagna,* 183 F.3d at 130.

Mr. Garrett also moves pursuant to Rule 29 on the basis that the government presented insufficient evidence at trial to establish that he "knew, or acted in reckless disregard of the fact that a person under age 18 would be caused to engage in a commercial sex act, or that he had a reasonable opportunity to view the person." (Garrett Mem. at 10-12 (citing 18 U.S.C. § 1591(a),(c).) The following evidence was introduced at trial regarding Mr. Garrett's knowledge of the ages of Shelby Rivera and Jasaira Ortiz. Shelby Rivera was born on September 3, 1992. Numerous witnesses testified that they saw Shelby Rivera associating with TF starting around 2007 or 2008, when Shelby Rivera would have been approximately fifteen or sixteen years-old. The government introduced into evidence partially nude photographs of Shelby and Kathy Rivera which were recovered from Mr. Rivera's computer and taken on August 7, 2008 when Shelby Rivera was 16 years-old. (*See* GX 450-P1030054.jpg; GX 450-P1030070.jpg (photograph depicting Shelby Rivera, topless, with SK); GX 450C at 43, 51.) Shelby Rivera also testified that she told Mr. Garrett that she was seventeen years-old the first time

she met Mr. Garrett, had sex with him and when he accused her of lying about her age, she showed Mr. Garrett a form of identification. Shelby Rivera further testified that Mr. Garrett instructed her to lie about her age if she was ever arrested for prostitution by the police. Ms. Ortiz was born on March 30, 1992 and met Mr. Rivera in approximately 2007 or 2008 when she was approximately fifteen or sixteen years-old. Ms. Ortiz testified that the cleaning incident with Mr. Garrett occurred when she was sixteen years-old. Ms. Perez-Hernandez also observed Mr. Garrett naked with Ms. Ortiz in the back of the tattoo shop and believed that Mr. Garrett was having sex with Ms. Ortiz. The government introduced a series of videos and photographs produced between 2008 and 2010 that were recovered from Mr. Rivera's computer in which Ms. Ortiz is nude and/or engaged in sexual conduct with Mr. Rivera or another man. (*See, e.g.*, GX 450C, 450-1, 450-jay 024.jpg, 450-jay 046.mov, 450-P1020077.MOV, 450-P1020604.jpg, 450-P1030483.MOV, 450-P1070669.MOV.) Ms. Ortiz testified that Mr. Rivera bragged about how young she was to others in the tattoo shop.

Pursuant to 18 U.S.C. §§ 1591(a) and (c), the government may satisfy its burden for the *mens rea* element in one of three ways, by proving that the defendant (1) had knowledge of the victim's age; (2) acted in reckless disregard of the victim's age; or (3) had a reasonable opportunity to view

the victim.  *United States v. Robinson*, 702 F.3d 22, 31-32 (2d
Cir. 2012)("Accordingly, just as the District Court instructed,
§ 1591(a) and § 1591(c) provide the government with three
distinct options -- prove beyond a reasonable doubt that: (1)
the defendant had knowledge of the victim's underage status; (2)
that the defendant recklessly disregarded that fact; or (3) that
the defendant had a reasonable opportunity to observe the
victim.")  Here, based on the evidence summarized above, a
reasonable jury could find that Mr. Garrett knew that Shelby
Rivera was underage based on her statements to him, and, at the
very least, that he recklessly disregarded the fact that she was
underage in light of those statements.  Additionally, there was
evidence that Mr. Garrett had sex with Shelby Rivera soon after
they met, giving him a reasonable opportunity to observe her.
The jury credited Shelby Rivera's testimony despite rigorous
cross examination about her age at the time she was involved
with the defendants, and the court may not undermine the jury's
credibility determinations.  With respect to Ms. Ortiz, there
was sufficient trial evidence for a jury to conclude that Mr.
Garrett had a reasonable opportunity to observe Ms. Ortiz.  The
testimonies of Ms. Ortiz and Ms. Perez-Hernandez prove that Mr.
Garrett had sex with Ms. Ortiz on at least two occasions,
providing sufficient evidence that Mr. Garrett had a reasonable
opportunity to observe Ms. Ortiz.  Mr. Garrett's contention that

the evidence does not specify Ms. Ortiz's state of undress is entirely irrelevant; the statutory language merely requires the reasonable *opportunity* to observe the underage victim, and evidence of Mr. Garrett's sexual encounters with Ms. Ortiz are sufficient to prove that he had such opportunities.  When the evidence demonstrates that a defendant has the reasonable opportunity to observe an underage victim, strict liability applies.  *Robinson*, 702 F.3d at 26.

### 3.    Mr. Rivera – Drug Trafficking

Mr. Rivera challenges the sufficiency of the evidence to find him guilty on the counts relating to drug trafficking (Counts I (Racketeering Acts 2 and 4), II (Racketeering Acts 2 and 4), VI, and VII).  Mr. Rivera contends that the government presented extensive evidence of Mr. Garrett's involvement in drug trafficking, but failed to demonstrate that "Mr. Rivera *himself* conspired to traffic narcotics."  (Rivera Mem. at 9)(emphasis in original.)  Mr. Rivera claims that there was no evidence that Mr. Rivera "ever received any money or other pecuniary profit from Mr. Garrett's narcotics activities" and that there was no evidence that Mr. Rivera "procured narcotics in distribution quantities or that he in fact distributed narcotics."  (Rivera Mem. at 10.)

As summarized above, there is overwhelming evidence that Mr. Rivera's tattoo shop was a hub for TF's drug

distribution and receipt of drug proceeds.  For example, Mr.
Parker, Mr. Fearon, Mr. Fontanes, Mr. Camacho, and Ms. Perez-
Hernandez testified that they each saw drugs being dropped off
at the tattoo shop by Mr. Garrett and others, which were
received by Mr. Rivera.  Mr. Fontanes, who lived for a time at
the tattoo shop, testified that he saw packages of crack and
heroin come to the tattoo shop several times per week and when
the packages would arrive, they were taken to the back room and
"dealt with" by "Mr. Garrett and Mr. Rivera."  (T 3255.)  Mr.
Fontanes clarified on cross-examination that these drug
transactions that occurred in the back room were entirely
separate from any purchases of drugs that Mr. Fontanes and Mr.
Rivera made for personal use.

There was also ample evidence that Mr. Rivera
participated in drug trips for TF prior to the January 18, 2012
car stop.  Ms. Lacoste testified that she observed Mr. Rivera at
Mr. Garrett's apartment in late 2011 on the same day that she
saw Mr. Garrett hand Mr. Woods a condom full of drugs in the
kitchen.  Ms. Lacoste also testified that she then observed Mr.
Rivera help Mr. Garrett and Mr. Woods load the car with shopping
bags before Mr. Rivera drove Ms. Lacoste, Mr. Woods and another
individual back to Pennsylvania.  Mr. Fontanes also testified
that he took a trip to Pennsylvania at Mr. Rivera's request.
Mr. Garrett told Mr. Fontanes, who was driving in a car with Mr.

Rivera, that they were the "decoy" car for the trip, which included a caravan of three cars that all traveled to the residence of Mr. Fearon, a drug trafficker associated with TF, in Pennsylvania. Ms. Perez-Hernandez testified that on one of the trips she made to Pennsylvania at Mr. Garrett's direction, she and her husband picked up an envelope of cash from Mr. Fearon, which she gave to Mr. Rivera at the tattoo shop when they returned.

Moreover, there was evidence at trial that Mr. Rivera participated in acts of violence to protect TF's drug distribution business. Mr. Rivera killed Robert Barber at the direction of Mr. Garrett and for compensation by Mr. Garrett to protect Mr. Garrett's drug territory. Evidence was also introduced that Mr. Rivera assaulted Ms. Perez-Hernandez's husband with a hammer to protect Mr. Garrett's drug proceeds, because Mr. Garrett and Mr. Rivera suspected Ms. Perez-Hernandez's husband of planning a drug-related robbery.

There was also substantial evidence introduced that supports the jury's finding that Mr. Rivera possessed heroin and cocaine with intent to distribute when his vehicle was stopped on January 18, 2012. The cocaine and heroin found in the trunk of Mr. Rivera's vehicle was packaged for distribution. Mr. Rivera gave conflicting information about the purpose of his trip and refused to consent to a search of the car. Directly

after Mr. Rivera's car was pulled over, he received a text message from Mr. Garrett that advised him to be "smooth," and Mr. Garrett later stated in the TF movie that Mr. Rivera and the others were part of his "team," that they had made a "mistake" and made him "look bad." (GX 200, Clip H.)  In a phone call from prison, Mr. Rivera and Mr. Garrett discussed the types and quantities of drugs in the trunk, and Mr. Rivera discussed doing something to "take care" of Shelby and Kathy Rivera, because he and Mr. Garrett were worried that Kathy and Shelby Rivera could speak to law enforcement and serve as witnesses against them.

Viewing this evidence in conjunction with the remainder of the evidence presented at trial, the court finds that a reasonable jury could have readily found beyond a reasonable doubt that Mr. Rivera was a member of TF's drug trafficking conspiracy (as charged in Count Six and Racketeering Act 2) and that Mr. Rivera possessed heroin and cocaine with intent to distribute on January 18, 2012 (as charged in Count Seven and Racketeering Act 4).

### 4.    Mr. Rivera – Witness Tampering and Obstruction of Justice

Mr. Rivera challenges the sufficiency of the evidence to find him guilty of witness tampering and obstruction of justice (Counts XII and XIII).  Mr. Rivera contends that the evidence of Mr. Rivera asking Mr. Fontanes about his family was

insufficient to prove that Mr. Rivera intimidated Mr. Fontanes

or was acting corruptly.  (Rivera Mem. at 8-9.)

The evidence presented at trial demonstrated that Mr.

Rivera asked Mr. Fontanes to stop cooperating with the

government, recant his prior statements to law enforcement, and

to go to trial with him, that Mr. Rivera then gave Mr. Fontanes

a letter with false statements for Mr. Fontanes to copy and give

to the government, and that Mr. Rivera was asking Mr. Fontanes

about his family, particularly his daughter and daughter's

mother who reside in Coney Island while asking him to recant.

Mr. Fontanes testified that he understood Mr. Rivera's questions

to be a threat on his family.

The first element of witness tampering requires

proving that Mr. Rivera knowingly used intimidation, threatened,

or corruptly persuaded Jonathan Fontanes, or attempted to do so.

18 U.S.C. § 1512(b).  In its instructions to the jury, the court

stated that "to corruptly persuade means to act knowingly with a

wrongful purpose to convince or induce another to engage in some

action." (Tr. 7556.)  Similarly, an element of obstruction of

justice requires that Mr. Rivera have acted corruptly.  18

U.S.C. § 1512(c).  The court defined to act corruptly pursuant

to 18 U.S.C. § 1512(c) as "to act with an improper purpose and

to engage in conduct knowingly and dishonestly with the intent

to obstruct, impede or influence justice." (*Id*. at 7559.)  When

viewed in the light most favorable to the government, the court finds that the evidence presented at trial was sufficient for a reasonable jury to conclude that Mr. Rivera acted with a wrongful or improper purpose by asking Mr. Fontanes to copy a letter with false statements and then represent it as his own true statements to the government, in order to obstruct, impede or influence the prosecution of Mr. Rivera.

## III.   Mr. Rivera's *Pro Se* Motion

On October 9, 2015, Mr. Rivera, who is still represented by counsel, filed a motion *pro se* for an order to show cause as to why Assistant United States Attorneys Taryn A. Merkl, Michael Robotti, and Alixandra Smith should not be disqualified.  (ECF No. 487.)  Mr. Rivera alleges that Ms. Merkl, Mr. Robotti, and Ms. Smith have not taken the required oath of office and are thus perpetuating a fraud on the court. Mr. Rivera also contends that the above-mentioned Assistant United States Attorneys violated 5 U.S.C. §§ 3331 through 333 and 5 U.S.C. § 5507, alleging theft of United States Treasury Funds.  As an initial matter, the court need not consider Mr. Rivera's *pro se* motion, because a defendant has no right to hybrid representation absent any compelling reasons.  *See United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989).  Mr. Rivera does not allege any facts in support of his allegations, and the court finds them to be meritless on their face and for

the reasons set forth in the government's response dated October 27, 2015. (ECF No. 488.) Consequently, Mr. Rivera's motion for an order to show cause is denied.

## CONCLUSION

For the reasons set forth above, the court denies defendants' motions for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court also denies Mr. Rivera's *pro se* motion for an order to show cause.

SO ORDERED.

Dated: November 23, 2015
Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York