UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

United States of America,

   - v. -                                    **MEMORANDUM & ORDER**

Paul Rivera,                                   No. 13-cr-149 (KAM)

            *Defendant*.
----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

       Defendant Paul Rivera, proceeding *pro se*, moves to vacate his convictions pursuant to 28 U.S.C. § 2255 and alleges ineffective assistance of counsel and prosecutorial misconduct. (ECF Nos. 578, 584.)  Mr. Rivera also moves to vacate his judgment pursuant to Federal Rule of Criminal Procedure 33(b)(1).  (ECF Nos. 539, 554.)  The government opposes both motions. (ECF Nos. 548, 589.)  For the reasons explained below, Mr. Rivera's motions under Section 2255 and Rule 33 are both respectfully denied.

<u>**BACKGROUND**</u>

       Given this case's lengthy and well-documented history, familiarity with the background of this case is assumed.  *See generally United States v. Garrett*, 42 F.4th 114, 116 (2d Cir. 2022) (affirming Mr. Rivera's conviction and "conclud[ing] that the district court did not err by permitting Rivera to represent himself without a psychiatric evaluation"); *United States v.*

*Garrett*, No. 17-59, 2022 WL 2979588 (2d Cir. July 28, 2022) (affirming Mr. Rivera's conviction and rejecting Mr. Rivera's arguments on appeal including "that the district court erred by ... denying his motion to suppress drugs recovered during a traffic stop"); *United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 7455504 (E.D.N.Y. Nov. 23, 2015) (this Court's 70-page denial of Rule 29 motions for judgments of acquittal filed by Mr. Rivera and his co-defendant Michael Garrett); *United States v. Rivera*, 89 F. Supp. 3d 376 (E.D.N.Y. 2015) (this Court's 106-page ruling on multiple pre-trial motions).

On June 25, 2015, a jury "found [Mr. Rivera] guilty on fourteen counts including racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963; murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); drug-related offenses, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A)(i), (b)(1)(A)(iii), (b)(1)(C), and (b)(1)(D); gun-related offenses, in violation of 18 U.S.C. §§ 924(c) and (j)(1); interstate prostitution, in violation of 18 U.S.C. § 2422(a); and sex trafficking of children, in violation of 18 U.S.C. § 1591(a)(1), (a)(2), (b)(1), and (b)(2)." *Garrett*, 42 F.4th at 115-16. Mr. Rivera is serving "a mandatory life sentence for murder in aid of racketeering, a consecutive twenty-year sentence for the section 924(c) gun charge, and concurrent sentences for the remaining counts." *Id.* at 118.

Mr. Rivera's trial presented overwhelming evidence

establishing his guilt. When discussing the weight of evidence of Mr. Rivera's sex crimes, the Second Circuit noted that "*the evidence against Rivera was so overwhelming* that a rational jury, even without watching the videos [of Mr. Rivera engaging in sexual conduct with a minor], would have convicted him." *Garrett*, 2022 WL 2979588, at *3 (emphasis added). The evidence supporting Mr. Rivera's murder conviction was similarly overwhelming. Mr. Rivera "admitted his involvement in the murder" of Robert Barber, *Garrett*, 42 F.4th at 117, and several other trial witnesses corroborated Mr. Rivera's admission to the murder.

Given his own admission to the murder of Mr. Barber, the corroborating trial evidence, and the Second Circuit's findings that bind this Court, Mr. Rivera's motions face an insurmountable factual record establishing his guilt. In its analysis, the Court is mindful of the Second Circuit's instruction that "the scope of review on a § 2255 motion should be narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotations omitted) (emphasis added). Accordingly, the Court proceeds with a "narrowly limited" analysis of Mr. Rivera's Section 2255 challenges to his conviction.

Below, the Court will *first* resolve Mr. Rivera's Section 2255 motion and *then* his Rule 33 motion. For efficiency, the

Court's findings pertaining to Mr. Rivera's Section 2255 motion are incorporated in the Court's analysis of Mr. Rivera's Rule 33 motion later in this Memorandum and Order.

## SECTION 2255 MOTION

## I.   Mr. Rivera's Pro Se Section 2255 Motion

Mr. Rivera's *pro se* Section 2255 motion, (ECF Nos. 578, 584), and reply, (ECF No. 591), are both "construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation modified).  Accordingly, the Court construes Mr. Rivera's Section 2255 motion as raising the following arguments:

- *First*, Mr. Rivera claims his attorneys were ineffective for inadequately challenging the constitutionality of a January 18, 2012 traffic stop that eventually led to his indictment in this case.  (ECF No. 584 at 14.[1])

- *Second*, Mr. Rivera claims that he was not competent to stand trial and that his attorneys were ineffective for failing to secure a psychological evaluation to prove his incompetence.  (ECF No. 591 at 4.)

- *Third*, Mr. Rivera challenges his murder conviction by claiming – however implausibly – that (i) the murder weapon

---

[1] Pincites refer to the page numbers generated by CM/ECF unless otherwise noted. Citations to the trial transcript ("Trial Tr."), however, refer to the page and line numbers provided within the court reporter's transcript.

was a toy gun; (ii) there was an exonerating eyewitness at the murder scene; and (iii) his attorneys and prosecutors violated his constitutional rights by failing to discover such purported evidence (i.e. evidence that the murder weapon was a toy gun and that there was an exonerating eyewitness). (*See* ECF Nos. 539, 539-1, 554, 554-1, 584, 591.)

After discussing the applicable legal standards below, the Court will analyze each of Mr. Rivera's foregoing three arguments for vacatur of his convictions.

## II.  Legal Standard

Under 28 U.S.C. § 2255, a defendant convicted of a federal offense has the right to have his or her sentence vacated if "the sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  In other words, relief is available under Section 2255 "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotations omitted).

5

**A.    Procedural Default**

Generally, "a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) (citation omitted).  An exception is made, however, for claims of ineffective assistance of counsel raised for the first time in the Section 2255 motion. *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007).  "[A] defendant who raises on direct appeal ineffective assistance claims based on the strategies, actions, or inactions of counsel that can be, and are, adjudicated on the merits on the trial record, is precluded from raising new or repetitive claims based on the same strategies, actions, or inactions in a Section 2255 proceeding" but "is not precluded from raising new ineffective assistance claims based on different strategies, actions, or inactions of counsel." *Yick Man Mui v. United States*, 614 F.3d 50, 51 (2d Cir. 2010) (emphasis added).

For all claims other than ineffective assistance of counsel, if a movant has procedurally defaulted, "he is barred from raising the claim in a subsequent § 2255 proceeding unless he can establish [i] both cause for the procedural default and actual prejudice resulting therefrom or [ii] that he is actually innocent of the crime of which he was convicted." *De Jesus v. United States*, 161 F.3d 99, 102 (2d Cir. 1998) (internal quotations

6

omitted).

**B.  Mandate Rule**

The mandate rule "rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal." *United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024) (internal quotations omitted).  As applied to ineffective assistance of counsel claims made for the first time in a Section 2255 motion, "a claim presented in different terms and rejected on direct appeal may not thereafter be renamed or repackaged as an ineffective assistance claim and asserted in a habeas petition."[2] *Rodriguez v. United States*, No. 14-cv-4628 (CSH), 2017 WL 6404900, at *4 (S.D.N.Y. Dec. 13, 2017), *aff'd*, 767 F. App'x 160 (2d Cir. 2019) (summary order).

**C.  Ineffective Assistance of Counsel**

*Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny provide the applicable standard for ineffective assistance of counsel claims.  "Generally, to prevail on a Sixth Amendment claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test established by the Supreme Court in *Strickland*." *Baker v. Conway*, No. 23-46-pr, 2025 WL 995002, at *3 (2d Cir. Apr. 3, 2025) (summary order).  "First, a defendant must show that counsel's representation fell below an objective

---

[2] Courts "generally refer to a habeas request under § 2255 as a 'motion,' [and] a habeas request under § 2254 as a 'petition.'" *Johnson v. United States*, 623 F.3d 41, 43 n.2 (2d Cir. 2010).

standard of reasonableness, as evaluated under prevailing professional norms." *Id.* (internal quotations omitted). "Second, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (internal quotations omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted). "There is a most substantial burden on the claimant to show ineffective assistance." *Premo v. Moore*, 562 U.S. 115, 132 (2011). "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (internal quotations omitted).

### D.    Prosecutorial Misconduct

"To merit habeas relief on a claim of prosecutorial misconduct, petitioner must show that the alleged misconduct denied him a fair trial." *Mendez v. United States*, 379 F. Supp. 2d 589, 598 (S.D.N.Y. 2005) (citing *Greer v. Miller*, 483 U.S. 756, 765 (1987)). A movant must establish that the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

8

**III. Discussion**

As previously identified, Mr. Rivera raised three arguments in support of his Section 2255 motion. Each argument is analyzed in turn.

**A.  Mr. Rivera's Attorneys Adequately Challenged the Constitutionality of January 18, 2012 Traffic Stop**

Mr. Rivera's first argument is that he received ineffective assistance of counsel because his attorneys allegedly failed to challenge the constitutionality of the initiation of his January 18, 2012 traffic stop and the admissibility of the fruits of the subsequent search. (ECF No. 584 at 14.)  As explained below, Mr. Rivera challenged both the <u>initiation</u> and <u>duration</u> of his traffic stop in his motion to suppress before this Court but only challenged the <u>duration</u> of his traffic stop on appeal.[3]

**1.  Mr. Rivera's Trial Counsel Challenged the Constitutionality of the Initiation of the Traffic Stop Before the District Court**

One of Mr. Rivera's attorneys, Mr. David Stern, challenged the constitutionality of the traffic stop in Mr. Rivera's June 10, 2014 motion to suppress. (ECF No. 113 at 6-7.)

---

[3] The mandate rule bars this Court from considering collateral challenges to the Second Circuit's controlling finding in this case that the <u>duration</u> of the January 18, 2012 stop was constitutional. *See Aquart*, 92 F.4th at 87 (the mandate rule "rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal") (internal quotations omitted); *Garrett*, 2022 WL 2979588, at \*2 (finding that "[n]othing in the sequence of events suggests that the agents unreasonably dragged their feet during their investigation" over the course of the January 18, 2012 traffic stop and that "the district court did not err in denying Rivera's motion to suppress the narcotics recovered from the traffic stop").

Specifically, Mr. Stern argued for the suppression of all evidence traced back to Mr. Rivera's January 18, 2022 traffic stop in a section of the motion to suppress brief titled "There Was No Lawful Basis for the Initial Stop of Mr. Rivera's Vehicle." (ECF No. 113 at 6.)   The Court considered and ruled on this argument in its denial of Mr. Rivera's motion to suppress. *See United States v. Rivera*, 89 F. Supp. 3d at 402-15.

Mr. Rivera now claims that his attorneys should have also challenged the initiation of the traffic stop by alleging racial profiling. (*See* ECF No. 591 at 3-4.)   Although Mr. Stern challenged the initial stop of the vehicle, he did not specifically argue racial profiling as a motivating factor for the initiation of the allegedly unconstitutional traffic stop, but the lack of such argument is best explained by the absence of any evidence of racial animus.   Lodging broad, conclusory accusations, Mr. Rivera's reply brief now speculates that the traffic stop was racially motivated.   Mr. Rivera writes that "[he] was labeled 'Black' in the arrest report, and he was traveling with young, attractive women of a significantly lighter complexion." (ECF No. 591 at 3.)   He further writes that "[the officer's] conduct throughout the encounter show[s] that he presumed Rivera guilty solely based on his non-white appearance." (ECF No. 591 at 3.) Tooper Horan testified credibly as to the non-racial reason for the traffic stop – specifically the traffic violation he witnessed

when "he observed the Rivera Vehicle travelling in the left lane on I-81 when the right lane was available." *Rivera*, 89 F. Supp. 3d at 404.  Mr. Stern properly did not present bald and unsupported accusations of racial profiling in Mr. Rivera's motion to suppress.

### 2. Mr. Rivera's Appellate Counsel Was Not Ineffective for Foregoing a Challenge to the Constitutionality of the Initiation of the Traffic Stop on Appeal

Mr. Rivera's appellate counsel, Ms. Gwen Schoenfeld, did not challenge the <u>initiation</u> of the traffic stop on appeal and instead focused the appeal on, *inter alia*, challenging the constitutionality of the <u>duration</u> of the traffic stop.[4]  As discussed below, Ms. Shoenfeld's decision on appeal to forego one argument in favor of another does not constitute ineffective assistance of counsel.

### a. Legal Standard for Appellate Ineffective Assistance of Counsel Claims

"Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  "When a claim

---

[4] Mr. Rivera conceded the legality of the initiation of the traffic stop on appeal.  *See Garrett*, 2022 WL 2979588, at *1 ("While Rivera does not dispute the legality of the initial traffic stop, he argues that the officers violated the Fourth Amendment by failing to diligently pursue their investigation after developing reasonable suspicion.") (internal quotations omitted); *see also* Appellate Dkt. 17-59, ECF No. 154 at 76-78 (Mr. Rivera's concession on appeal that the initiation of the stop was constitutional and that "[Trooper] Horan's observations initially provided reasonable suspicion to extend the investigation").

of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal." *Id.* (internal quotations omitted). "Significant issues which could have been raised should then be compared to those which were raised." *Id.* (internal quotations omitted). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (internal quotations omitted). "[I]t is not sufficient ... to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Id.* (citation omitted).

### b.   Ms. Shoenfeld Was Not Ineffective In Representing Mr. Rivera on Direct Appeal

A review of Mr. Rivera's opening brief shows that his appellate counsel, Ms. Shoenfeld, appropriately selected the issues that an effective attorney would view as most likely to succeed on appeal. (*See* Appellate Dkt. 17-59, ECF No. 154.) Given that the brief totaled nearly 100 pages, it was proper for Ms. Shoenfeld to pare down the arguments presented on appeal to those that reasonably appeared to be the most promising.

Applying the *Mayo* analysis, the Court does not find that the "ignored issues" in Mr. Rivera's appellate brief (i.e. the

constitutionality of the <u>initiation</u> of the traffic stop) "[were] clearly stronger than those presented" (i.e. the constitutionality of the <u>duration</u> of the traffic stop). *Mayo*, 13 F.3d at 533. Either argument would have faced difficult prospects, but a reasonable lawyer could conclude for several reasons that a challenge to the initiation of the traffic stop would be weaker: *First*, this Court found the testimony of the officer who initiated the stop, Pennsylvania State Police Trooper Thomas Horan, to be "credible, consistent, and reliable." *Rivera*, 89 F. Supp. 3d at 409. *Second*, "the court decline[d] to give significant weight to Mr. Rivera's affidavit" and "decline[d] to credit Mr. Rivera's statement that he was driving in the right lane" and adhering to Pennsylvania traffic laws. *Id.* *Third*, the Court found that "[t]he facts ... are *more than sufficient* to support a finding that Trooper Horan reasonably believed that the driver of the Rivera Vehicle had committed a violation of Pennsylvania's 'right lane' rule." *Id.* at 411 (emphasis added). In contrast, "[t]he duration of Mr. Rivera's car stop was approximately 81 minutes" – which "the court acknowledge[d] [to be] a relatively lengthy detention" – presented a closer constitutional question for appellate review. *Id.*

Under *Mayo*, this Court therefore finds that Ms. Shoenfeld's decision to forego a challenge to the <u>initiation</u> of the traffic stop (a weaker argument) in favor of focusing on the

duration of the traffic stop (a stronger argument) does not constitute ineffective assistance of counsel.

## B.  Mr. Rivera Was Competent to Stand Trial and His Attorneys Were Not Ineffective for Failing to Challenge His Competency

Mr. Rivera's second argument in support of his Section 2255 motion is that he was not competent to stand trial and that his attorneys were ineffective for failing to secure a psychological evaluation to prove his incompetence. (ECF No. 591 at 4.)

This argument is barred by the mandate rule[5] because the Second Circuit already found Mr. Rivera competent to represent himself at trial,[6] a higher cognitive standard than competence to stand trial. *See Indiana v. Edwards*, 554 U.S. 164 at 175–76 (2008) (finding that the competency standard required to conduct trial proceedings *pro se* is higher than the general competency standard because "[i]n certain instances an individual may well be able to satisfy [the general] mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be

---

[5] As previously discussed, the mandate rule "rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal." *Aquart*, 92 F.4th at 87 (internal quotations omitted).

[6] The Second Circuit held that Mr. Rivera was competent to represent himself at trial. *See Garrett*, 42 F.4th at 120 (2d Cir. 2022) ("Though Rivera now insists that his self-representation was irrational, self-destructive, and led to the unnecessary admission of devastating evidence, this argument in no way undermines the district court's finding that Rivera knowingly waived his right to counsel or otherwise suggests that Rivera suffered from severe mental illness to the point where he was not competent to conduct trial proceedings by himself.") (citation modified).

unable to carry out the basic tasks needed to present his own defense without the help of counsel").

Mr. Rivera cannot use an ineffective assistance of counsel claim to collaterally challenge the Second Circuit's finding of his competence. Such maneuvers are barred because "a claim presented in different terms and rejected on direct appeal may not thereafter be renamed or repackaged as an ineffective assistance claim and asserted in a habeas petition." *Rodriguez*, 2017 WL 6404900, at \*4, *aff'd*, 767 F. App'x 160 (2d Cir. 2019) (summary order).

## C. Mr. Rivera's Challenges to His Murder Conviction are Meritless

Despite overwhelming trial evidence establishing that Mr. Rivera murdered Mr. Barber (including, most notably, Mr. Rivera's own admission), Mr. Rivera still seeks vacatur of his murder conviction by (i) claiming ineffective assistance of counsel under Section 2255; (ii) claiming prosecutorial misconduct under Section 2255; and (iii) claiming that newly discovered evidence exonerates him.

Below, the Court *first* reviews the strength of evidence supporting Mr. Rivera's murder conviction (Section III.C.1.), *then* analyzes Mr. Rivera's alternate theories of the murder (Section III.C.2.), and *finally* finds that Mr. Rivera is not entitled to vacatur of his murder conviction (Section III.C.3.).

>    1.    **The Trial Evidence that Mr. Rivera Murdered Mr. Barber Was Overwhelming**
>
>         a.    **Mr. Rivera's Admissions**

Pennsylvania State Trooper Daniel Mimnaugh testified at trial that, during an interview pursuant to a proffer agreement, "Mr. Rivera stated that ... he's the one that shot Mr. Barber, the victim." (Trial Tr. 4548:18-19.)  Trooper Mimnaugh then testified regarding Mr. Rivera's detailed description of how he murdered Mr. Barber:

> So, Mr. Rivera explained to me that he saw Mr. Barber on a monitor inside [Mr. Rivera's] tattoo shop, grabbed a .380 caliber weapon, he ran downstairs, and at first, the weapon was inside the door.
>
> Mr. Rivera was outside on his cell phone. Mr. Rivera did not remember who he was speaking to on his cell phone. Then he peeked back into the tattoo shop door, where Mr. Fontanes was, who also came down the stairs. The two were giving a tattoo, Mr. Rivera stated to an individual in the tattoo shop prior to all this.
>
> Mr. Rivera asked Mr. Fontanes to give him the gun, which Mr. Rivera stated that Mr. Fontanes did in fact hand him the gun. He pointed the gun out the door, and shot Mr. Barber.

(Trial Tr. 4548:25-4549:12.)  After Trooper Mimnaugh "showed Mr. Rivera a picture of a .380 caliber slide that was retrieved from a search [pursuant to a] warrant that was conducted inside the tattoo shop that [officers] retrieved," Mr. Rivera "confirmed that that was part of the gun ... that he used to shoot Mr. Barber." (Trial Tr. 4549:17-25.)  When asked for "the reason for the homicide," (Trial Tr. 4550:1), "Mr. Rivera stated that ... he shot

Mr. Barber over disrespect and ... drug dealing territory, basically," (Trial Tr. 4550:12-14).  In sum, Mr. Rivera provided the prosecutors with a detailed account of how he murdered Mr. Barber.

### b.  Corroborating Evidence

Though the Court will not present an exhaustive recitation of the trial transcript (spanning over 6,000 pages), the Court will describe below some of the abundant corroborating evidence supporting Mr. Rivera's murder conviction.

*First*, Luis Camacho, Mr. Rivera's cousin, testified that he eventually spoke with Mr. Rivera about the murder, and Mr. Rivera was "very panicky. He wasn't himself. Paranoid."  (Trial Tr. 4446:22-23.)  Mr. Camacho further testified that Mr. Rivera "was just a mess."  (Trial Tr. 4448:12-13.)  Mr. Camacho testified that he "got the sense that [Mr. Rivera] was remorseful or that he was, it just happened so fast that he reacted -- he didn't know how to react and he just fled from there."  (Trial Tr. 4447:1-4.)  According to Mr. Camacho, Mr. Rivera "was staying ... in different locations at first," which was indicative of Mr. Rivera hiding from the police after the murder.  (Trial Tr. 4447:25-4448:1.)  Mr. Rivera's tattoo shop "was basically abandoned and left open." (Trial Tr. 4447:22.)

*Second*, Jonathan Fontanes, Mr. Rivera's associate in the "Together Forever" racketeering enterprise, also corroborated Mr.

Rivera's admission to the murder of Mr. Barber.  Mr. Fontanes testified that Mr. Fontanes "was hanging out with Mr. Rivera in the tattoo shop" and that they "were getting high."  (Trial Tr. 3169:15-17.)  Mr. Fontanes described the events leading up to the murder and testified that Mr. Rivera grabbed "a silver .380" gun, that Mr. Rivera "went back out to the stoop area," and that Mr. Fontanes then "heard a pop sound."  (Trial Tr. 3173:18-3174:6.)  According to Mr. Fontanes, Mr. Rivera then "put the gun on the stairs, spun back around, and went back outside with a cell phone." (Trial Tr. 3174:8-10.)  Mr. Fontanes testified that Mr. Rivera later "came upstairs and he put the gun away" – specifically in "a wooden door with a hole in it" in the "boiler room."  (Trial Tr. 3178:9-11.)

   *Third*, the government presented other trial evidence, including physical evidence, connecting Mr. Rivera to the murder of Mr. Barber.  As the government explains, such evidence included "video surveillance evidence corroborating the cooperating witness's testimony," "evidence proving the victim's manner of death," "the bullet that was extracted from his body," and "pieces of a handgun consistent with the bullet."  (ECF No. 548-1 (May 31, 2018 Declaration of then-Assistant United States Attorney Taryn Merkl) at 7.)

   The abundant evidence the government presented, ranging from Mr. Rivera's admission to corroborating witnesses and

18

physical evidence, conclusively establish beyond a reasonable doubt that Mr. Rivera shot and killed Mr. Barber.

### 2. Mr. Rivera's Alternate Theories of the Murder Are Not Credible or Plausible

In his Section 2255 and Rule 33 motions, Mr. Rivera presents two alternate theories to challenge his murder conviction. *First*, he alleges that the murder weapon was a toy gun. *Second*, he alleges that an inmate Mr. Rivera later met was a purported eyewitness to the murder and saw that Mr. Rivera was not the shooter. As discussed below, Mr. Rivera's version of events and the declarations in support of his version of events are farfetched, not credible, implausible, and do not cast doubt on his murder conviction.

### a. Mr. Rivera's Toy Gun Theory

Mr. Rivera presents three declarations in support of his theory that the murder weapon was a toy gun.[7] (*See* ECF No. 539-1 at 3-7 (Declaration of Jermaine Serrano); ECF No. 584 at 34 (Declaration of Devonte Singletary); ECF No. 584 at 35 (Declaration of Catanna Rivera).)

Mr. Serrano states that "if FONTANEZ [sic] declared in a federal trial that it was real firearm that appeared in [a group

---

[7] For efficiency, the Court reviews all declarations submitted in support of Mr. Rivera's toy gun theory in this section, including Mr. Serrano's declaration submitted as an exhibit to Mr. Rivera's Rule 33 motion. The Court incorporates these findings, *see infra*, in its denial of Mr. Rivera's Rule 33 motion later in this Memorandum and Order.

picture with a gun labeled Government Exhibit 410-P1020458.JPG, (ECF No. 539-1 at 7)] and he declared that said weapon was used in the same murder this is completely false because this Gun was a 'Toy Gun.'" (ECF No. 539-1 at 3-4).    Mr. Rivera also attached to Mr. Serrano's declaration a picture of a gun that was introduced as Government Exhibit 110-A and a group picture with a gun labeled Government Exhibit 410-P1020458.JPG.  (*See* ECF No. 539-1 at 5-7.) Mr. Serrano's conclusory declaration regarding the functionality of a gun in a group photo is entitled to minimal weight, if any, because the government relied on abundant other evidence establishing Mr. Rivera's guilt – including, but not limited to, Mr. Rivera's own admission.

The one-page declarations of Devonte Singletary and Catanna Rivera are similarly of little to no value because both individuals speculate that a photo of a gun – not the murder weapon – introduced by the government may be a toy gun.  (ECF No. 584 at 34-35.)    As the government points out in its opposition to Mr. Rivera's Section 2255 motion, "the government ... introduced GX 110-A through Detective Semler, which was a photograph of a gun that was not the murder weapon — which the parties made clear on the record — but was a fully assembled slide plus frame of a similar weapon that Detective Semler used to show the jury what the Slide would look like if it were attached to a frame to make a complete weapon."  (ECF No. 589 at 21) (emphasis added).  The

Court will not credit the declarations submitted by Mr. Rivera that, through a mere review of one photograph, speculate on the functionality of the photographed weapon that all parties agree is not the murder weapon.  The declarations submitted by Mr. Rivera concern a non-issue and do not undercut any of the overwhelming evidence supporting Mr. Rivera's murder conviction.

### b.  Mr. Rivera's Assertion of an Exonerating Witness

In support of his alternate theories of the murder of Mr. Barber, Mr. Rivera submits a declaration submitted by Shaquan Jones, (ECF No. 539-1), and notes from an investigator's telephonic interview of Mr. Jones.[8]  (ECF No. 554-1.)  Mr. Jones – whom Mr. Rivera met in prison and refers to as "a trustworthy eye witness" to the murder of Mr. Barber (ECF No. 539 at 7) – is himself a convicted four-time murderer, (ECF No. 554 at 1 n.2).  As explained below, Mr. Jones's account of Mr. Barber's murder (that someone other than Mr. Rivera shot and killed Mr. Barber) is not credible.

Mr. Jones first provided a bare-bones declaration signed on April 30, 2018 and submitted as part of Mr. Rivera's *pro se* Rule 33 motion.  (ECF No. 539-1.)  In this declaration, Mr. Jones stated, *inter alia*, that "[a] man wearing a dark hood at a distance

---

[8] Although these submissions were presented originally as part of Mr. Rivera's Rule 33 motion, Mr. Rivera also incorporated these submissions into his arguments in his Section 2255 motion.  *See* ECF No. 591, (Mr. Rivera's Section 2255 Reply Brief), at 8 ("Given its relevance, it would be appropriate for the Court to consider this [Rule 33] motion in conjunction with the present § 2255 motion.").

shot at [Mr. Barber]" and that the shooter was not Paul Rivera. (ECF No. 539-1 at 1-2.)

After Ms. Shoenfeld began representing Mr. Rivera in his post-trial proceedings, Ms. Shoenfeld conducted a telephonic interview with Mr. Jones on July 13, 2018 (approximately two and a half months after Mr. Jones's declaration). (ECF No. 554-1.) During this interview, Mr. Jones inexplicably disclosed – apparently for the first time – many details about Mr. Barber's murder that were left out of his initial declaration. (*See* ECF No. 554-1.) Such details include: (i) the presence of "two or three" teenagers who were "squatting and hiding behind cars" and apparently were "also surveilling [Mr. Barber]"; (ii) that these teenagers spoke with the shooter; (iii) that the purported shooter was "Dominican or light skinned black," in his 30s, and approximately 5 feet 6 inches to 5 feet 8 inches; (iv) that a "girl in the yellow blouse" who was "holding a baby" spoke with both the purported shooter and Mr. Barber before the murder; and (v) that, despite it being dark outside and Mr. Jones lacking personal knowledge of what Mr. Barber saw, Mr. Jones claims that Mr. Barber purportedly saw "the guy with the hoodie pulling out a gun and pointing it at [him]" at a distance of "approximately 30-40 feet;" and (vi) that Mr. Barber was able to "push[] the girl with the yellow blouse out of the way" before being shot. (ECF No. 554-1 at 1-3.) Even if Mr. Jones's more detailed account offered during

22

Ms. Shoenfeld's investigative interview somewhat conforms to the version of events that Mr. Rivera presented in his *pro se* Rule 33 motion, Mr. Jones concedes that he "spoke with Rivera about the shooting" before writing his declaration.  (ECF No. 554-1 at 3.)

A careful cross-check of Mr. Jones's April 30, 2018 declaration and his July 13, 2018 interview with Ms. Shoenfeld reveals at least two inconsistencies.  *First*, in his declaration, Mr. Jones stated that he "was standing in the facility <u>in a [p]ark</u> on Christopher and Sutter," (ECF No. 539-1 at 1) (emphasis added), but in his interview with Ms. Shoenfeld, Mr. Jones stated that he "was physically standing on Sutter Street <u>in front of a park</u>, near Christopher Street," (ECF No. 554-1 at 1) (emphasis added).  There is a subtle but meaningful difference in location between "standing in the facility in a park" and "standing on Sutter Street in front of a park."  *Second*, in his declaration Mr. Jones stated that "[s]hortly before [Mr. Jones] left" he saw that "Two Police officers ran to [Mr. Barber's] aide [sic]," (ECF No. 539-1 at 2), but in his interview with Ms. Shoenfeld, Mr. Jones stated that "he didn't stay around after [Mr. Barber] was shot, since he knew the police would be showing up."  (ECF No. 554-1 at 3.)  This obvious inconsistency – *first* declaring that Mr. Jones was present after the murder long enough to see two police officers arriving to aid Mr. Barber, *then* two and a half months later stating that he fled the scene because "he knew that the police would be showing up" –

23

further undermines Mr. Jones's credibility.  These inconsistencies in the account offered by Mr. Jones suggest that Mr. Jones's version of events should be given minimal, if any, weight. Further, Mr. Jones's account does not genuinely cast doubt on the overwhelming trial evidence supporting Mr. Rivera's murder conviction.

### 3. Mr. Rivera is Not Entitled to Vacatur of His Murder Conviction

For the reasons explained above, Mr. Rivera's alternate theories of the murder are not credible.  Therefore, as discussed below, his attorneys and prosecutors committed no constitutional violations by failing to investigate and validate his alternate theories.

### a. Mr. Rivera's Ineffective Assistance of Counsel Claim Under Section 2255

Mr. Rivera alleges his attorneys were ineffective for failing to investigate and validate his alternate theories of the murder of Mr. Barber.  (*See* ECF Nos. 539, 539-1, 554, 554-1, 584, 591.)

As a threshold matter, this Court has previously rejected Mr. Rivera's post-trial arguments that his trial counsel, Mr. Donald duBoulay, was ineffective.  *See* July 6, 2016 Docket Order ("Mr. duBoulay's representation was more than adequate to meet constitutional standards."); December 2, 2016 Docket Order ("The court reiterates that Mr. duBoulay['s] representation at

24

trial was more than sufficient to meet constitutional standards and Mr. Rivera has not met the *Strickland* standard required to establish ineffective assistance of counsel.").

The Court need not, however, re-analyze Mr. duBoulay's effectiveness because, as the Supreme Court instructs, the Court can resolve Mr. Rivera's ineffective assistance of counsel claim on the "prejudice" prong of the *Strickland* analysis.  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* Accordingly, "[t]he Second Circuit has long held that 'overwhelming' evidence of guilt may negate any 'reasonable probability that the outcome of the trial would have been different'" under the *Strickland* analysis. *United States v. Brennerman*, No. 17-CR-337 (RJS), 2023 WL 2242051, at *4 (S.D.N.Y. Feb. 27, 2023) (quoting *Wise v. Smith*, 735 F.2d 735, 738-39 (2d Cir. 1984)).  In light of the evidence discussed at length above, the "overwhelming evidence" of Mr. Rivera's guilt as to the murder of Mr. Barber "negate[s] any reasonable probability that the outcome of the trial would have been different" under the *Strickland* analysis.  *Brennerman*, 2023 WL 2242051, at *4 (citation modified).

25

### b.    Mr. Rivera's Prosecutorial Misconduct Claim Under Section 2255

Mr. Rivera also alleges that prosecutors violated his constitutional rights by failing to investigate and validate his alternate theories of the murder of Mr. Barber. (*See* ECF Nos. 584, 591.)

Mr. Rivera did not raise his prosecutorial misconduct allegations on appeal and, therefore, he has procedurally defaulted on this claim. (*See* Appellate Dkt. No. 17-59, ECF No. 154 (Mr. Rivera's appellate brief)). Unless Mr. Rivera can "establish [i] cause and prejudice or [ii] actual innocence, [Mr. Rivera] is precluded from raising his ... prosecutorial misconduct claims in his § 2255 motion." *Garafola v. United States*, 909 F. Supp. 2d 313, 328 (S.D.N.Y. 2012) (citation modified). For the reasons already explained at length, *see supra*, there is overwhelming evidence supporting Mr. Rivera's murder conviction. Mr. Rivera has failed to establish cause and prejudice, or actual innocence. Thus, his prosecutorial misconduct claim is procedurally defaulted and barred.

### **RULE 33 MOTION**

Mr. Rivera's Rule 33 challenge to his murder conviction fails for reasons similar to his ineffective assistance of counsel claim under Section 2255. Mr. Rivera argues that Mr. Jones's purportedly exonerating eyewitness account of the murder of Mr.

Barber is newly discovered evidence warranting vacatur of his murder conviction under Federal Rule of Criminal Procedure 33(b)(1). (ECF Nos. 539, 554.)

"Rule 33 relief should be granted only if there is 'a real concern that an innocent person may have been convicted.'" *DiMattina v. United States*, 949 F. Supp. 2d 387, 397 (E.D.N.Y. 2013) (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992)); *see also United States v. Snyder*, 740 F. App'x 727, 728 (2d Cir. 2018) (summary order) ("A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (internal quotations omitted). As discussed at length above,[9] Mr. Rivera has presented no evidence that casts doubt on his murder conviction. For relief under Rule 33, it is not enough for a defendant to merely present new evidence supporting his or her version of events; rather, the defendant must show "the new evidence would probably lead to an acquittal." *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993) (citation modified). Mr. Rivera's Rule 33 motion seeking vacatur of his murder conviction has not remotely met this demanding standard.

---

[9] The Court incorporates its earlier findings, *see supra*, regarding the overwhelming evidence supporting Mr. Rivera's murder conviction.

<u>**CONCLUSION**</u>

For the reasons explained above, the Court respectfully denies Mr. Rivera's Section 2255 and Rule 33 motions. Because the parties' submissions and records of this case "conclusively show that [Mr. Rivera] is entitled to no relief," a hearing is not necessary under 28 U.S.C. § 2255(b). The Court also certifies in accordance with 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and thus denies *in forma pauperis* status should Mr. Rivera appeal. *See Coppedge v. United States*, 369 U.S. 438 (1962).

The government is respectfully directed to serve a copy of this Memorandum and Order on Mr. Rivera and to note service on the docket by October 27, 2025.

**So ordered.**

Dated:    October 25, 2025
          Brooklyn, New York
          _____
          **Kiyo A. Matsumoto**
          United States District Judge
          Eastern District of New York

28